**No. 22-35612**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Doug Smith, Robert Griffin, Allen Vezey, Albert Haynes,
Trevor Shaw, Families of the Last Frontier,
and Alaska Free Market Coalition,

*Plaintiffs-Appellants*,

v.

Anne Helzer, in her official capacity as chair of the Alaska
Public Offices Commission, and Lanette Blodgett, Richard
Stillie Jr., Suzanne Hancock, and Dan LaSota, in their official
capacities as members of the Alaska Public Offices
Commission,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Alaska
No. 3:22-cv-00077-SLG
Hon. Sharon L. Gleason

---

## PRINCIPAL APPELLANTS' BRIEF

---

Daniel R. Suhr (WI No. 1056658)
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjustice
center.org
*Counsel of record*

Craig W. Richards
(AK No. 0205017)
Law Offices of
Craig Richards
810 N Street, Suite 100
Anchorage, Alaska 99501
Email: crichards@alaska
professionalservices.com

*Attorneys for Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................... 2

STATEMENT OF THE CASE ............................................................... 4

SUMMARY OF ARGUMENT ............................................................... 7

STANDARD OF REVIEW.................................................................... 10

ARGUMENT ................................................................................... 11

    I.    Compelling individual donors to duplicatively report their donations within 24 hours is not narrowly tailored because it is largely redundant of existing reporting by recipients................................................................... 11

    II.   The requirement to disclose donations to nonprofits not engaged in current political activity is not narrowly tailored because it is not tightly tied to the electioneering justification for the State's informational interest. ................. 18

    III.  The compelled speech in Ballot Measure 2 should be subject to strict scrutiny. .......................................................... 22

    IV.  The compelled donor disclaimer fails even exacting scrutiny because it adds marginal additional value while imposing substantial cost on the speaker. ................................ 32

    V.   Requiring disclaimer of out-of-state support is not narrowly tailored and unconstitutionally discriminates against out-of-state speakers. ................................................... 38

CONCLUSION ................................................................................. 43

# ADDENDUM
## TABLE OF CONTENTS

Alaska Stat. § 15.13.040........................................................ Addendum 1

Alaska Stat. § 15.13.090........................................................ Addendum 7

Alaska Stat. § 15.13.110...................................................... Addendum 10

Alaska Stat. § 15.13.135...................................................... Addendum 14

2 Alaska Admin Code 50.258 .............................................. Addendum 16

## EXCERPTS OF RECORD
## TABLE OF CONTENTS

*Smith et al. v. Helzer et al.,* No. 3:22-cv-00077-SLG (D. Ak.)

Order re Motions for Preliminary Injunction,
    Dkt. 48 (July 14, 2022) ............................................................ 3

Alaskans for Better Elections' Motion to Dismiss,
    Dkt. 33 (May 16, 2022) ......................................................... 43

Alaska's Better Elections Initiative,
    Dkt. 33-1 at 7-31 (May 16, 2022)........................................ 81

Declaration of Steve Strait,
    Dkt. 21 (May 2, 2022) ..................................................... 106

Declaration of Trevor Shaw,
    Dkt. 18-6 (April 25, 2022) .............................................. 108

Notice of Appeal,
    Dkt. 49 (July 21, 2022) .................................................. 110

Docket Report ....................................................................... 112

# TABLE OF AUTHORITIES

## Cases

*ACLU of Nevada v. Heller*,
  378 F.3d 979 (9th Cir. 2004) ..................................................28, 29, 34

*Am. Bev. Ass'n v. City & Cnty. of S.F.*,
  916 F.3d 749 (9th Cir. 2019) ...........................................................9, 36

*Americans for Prosperity Foundation v. Bonta,*
  141 S. Ct. 2373 (2021) ................................................................ passim

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) .............................................................................25

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..........................................................................20, 42

*Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*,
  556 F.3d 1021 (9th Cir. 2009) ..................................................16, 18, 29

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*,
  782 F.3d 520 (9th Cir. 2015) ....................................................29, 30, 32

*Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*,
  454 U.S. 290 (1981) .............................................................................44

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ....................................................................8, 16, 42

*Doe v. Reed*,
  561 U.S. 186 (2010) .............................................................................35

*FEC v. Massachusetts Citizens for Life*,
  479 U.S. 238 (1986) .............................................................................15

*FEC v. Ted Cruz for Senate*,
  142 S. Ct. 1638 (2022) ...........................................................................7

*Frudden v. Pilling*,
  742 F.3d 1199 (9th Cir. 2014) ............................................................28

*Gralike v. Cook*,
  191 F.3d 911 (8th Cir. 1999) ...............................................................30

*Human Life of Wash., Inc. v. Brumsickle,*
    624 F.3d 990 (9th Cir. 2010) .............................................................. 12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.,*
    515 U.S. 557 (1995) .............................................................. 22, 27, 28

*Landell v. Sorrell,*
    382 F.3d 91 (2d Cir. 2004) .................................................................. 40

*McCullen v. Coakley,*
    573 U. S. 464 (2014) ......................................................................... 42

*McCutcheon v. FEC,*
    572 U.S. 185 (2014) .......................................................................... 33

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) .............................................................. 28, 33, 34

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .............................................................. 44

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974) .......................................................................... 26

*N.A. for Gun Rights, Inc. v. Mangan,*
    933 F.3d 1102 (9th Cir. 2019) ............................................................ 11

*Nat'l Ass'n for Gun Rights, Inc. v. Mangan,*
    933 F.3d 1102 (9th Cir. 2019) ........................................................ 8, 20

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) .................................................................... 9, 23

*Nordstrom v. Lyon,*
    35 A.3d 710 (N.J. Super. Ct. App. Div. 2012) ..................................... 17

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California,*
    475 U.S. 1 (1986) ............................................................................. 25

*R.J. Reynolds Tobacco Co. v. FDA,*
    696 F.3d 1205 (D.C. Cir. 2012)........................................................... 37

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .................................................................. 9, 22, 23

*Riley v. Nat'l Fed'n of Blind,*
    487 U.S. 781 (1988) .................................................................... 25, 38

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006) .................................................................... 22

*Sampson v. Buescher*,
   625 F.3d 1247 (10th Cir. 2010) ........................................... 16

*Sanders Cnty. Republican Cent. Comm. v. Bullock*,
   698 F.3d 741 (9th Cir. 2012) ....................................... 10, 43

*Stanley v. Georgia*,
   394 U.S. 557 (1969) .................................................................... 27

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ........................................... 10

*Thompson v. Hebdon*,
   7 F.4th 811 (9th Cir. 2021) ..................................... 10, 39, 40

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) .................................................................... 22

*Vote Choice v. DiStefano*,
   4 F.3d 26 (1st Cir. 1993) .......................................................... 34

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) .................................................................... 22

*Wash. Post v. McManus*,
   944 F.3d 506 (4th Cir. 2019) ............................................... 27

*Wooley v. Maynard*,
   430 U.S. 705 (1977) .................................................................... 22

*Yamada v. Snipes*,
   786 F.3d 1182 (9th Cir. 2015) ........................................... 15

**Statutes**

28 U.S.C. § 1292 .............................................................................. 2

28 U.S.C. § 1331 .............................................................................. 2

28 U.S.C. § 1343 .............................................................................. 2

42 U.S.C. § 1983 .............................................................................. 2

AS 15.13.040 ...................................................................... 11, 19, 21

AS 15.13.090......................................................................... 31, 37

AS 15.13.110......................................................................... 12, 21

AS 15.13.135......................................................................... 31

## Regulations

2 AAC 50.258......................................................................... 13

## INTRODUCTION

Speech about elections, candidates, and issues are at the core of the First Amendment's protection for the marketplace of ideas. For that reason, any attempt by the government to stifle or control such speech deserves vigilant judicial scrutiny. This is a burden Alaska's recently enacted Ballot Measure 2 cannot meet.

Ballot Measure 2, passed in November 2020 and operating to govern the upcoming 2022 election in Alaska, places new and unprecedented burdens on the rights of citizens to speak about matters of public concern. The law requires that donors redundantly report donations to avoid incurring thousands of dollars in fines. It demands that speakers fill their ads with extensive disclaimers for huge portions of their run times, converting ads from communications about candidates into advertisements of the speaker's contributors.

Appellants seek timely relief from this Court to participate fully in the November 2022 election by communicating their messages in the final weeks leading up to Election Day without these unconstitutional impositions. The district court wrongly denied them a preliminary injunction. Rather, Appellants are entitled to a preliminary injunction

because they are likely to succeed on the merits of their claims, and all other factors favor their request.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because this claim arises under the First Amendment to the Constitution and therefore presents a federal question, and under 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983.

On July 21, 2022, all Appellants filed a timely Notice of Appeal (ER-110), from the District Court's order of July 14, 2022, denying their motion for a preliminary injunction (ER-3). This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The First Amendment protects the freedoms of speech and association, which include the treatment of political speech and donations by organizations and their donors. These freedoms are generally protected by strict or exacting scrutiny. This case presents the following issues for review:

1. The State of Alaska requires individual donors to duplicatively report their donations to independent

expenditure entities within 24 hours, when the recipient

entities must make the same report. The State also requires

donors to report donations to entities that are not currently

engaged in independent expenditures this campaign season.

Do these requirements pass exacting scrutiny under the

First Amendment?

2. An on-ad disclaimer is a script that the state requires be

spoken or displayed as part of a campaign advertisement.

Alaska requires that independent expenditure

advertisements disclaim their top-three donors and the fact

that a majority of their donations came from outside the

State of Alaska. Does this requirement compel speech such

that it is subject to strict scrutiny?

3. If the on-ad disclaimer requirements are not subject to strict

scrutiny, do they nevertheless fail exacting scrutiny under

the First Amendment?

All relevant statutes and regulations are contained in the addendum

to this brief.

**STATEMENT OF THE CASE**

In November 2020, Alaska voters approved Ballot Measure 2, the most sweeping overhaul of election procedures in the State's history, and the most speech-restrictive state campaign finance law in the country. On appeal from the denial of a preliminary injunction, Appellants challenge several aspects of the scheme to protect their rights in advance of this November's crucial elections.[1]

First, Ballot Measure 2 requires donor disclosure, not only by political committees and other groups, but simultaneously by the donors themselves. Section 7 provides that anyone who contributes as little as $2,000 in aggregate in a calendar year to any group that makes independent expenditures must himself file a report with the commission within 24 hours of the donation. ER-84 Under Section 15, anyone who forgets or neglects to file this immediate disclosure is subject to civil fines of up to $1,000 per day, whether the oversight is intentional or out of ignorance. ER-86. This is on top of the required

---

[1] Appellants also brought other challenges below, but the District Court's ruling makes clear these issues need factual record development to be appropriately presented. Appellants do not concede these arguments, but focus on the most pressing concerns that are most suitable for resolution in a preliminary posture.

disclosures from independent expenditure groups themselves. Donors

are also required to report donations to organizations that engaged in

independent expenditures within the last two years or that the donor

has reason to believe will engage in independent expenditures.

Second, Ballot Measure 2 requires political advertising to include

extensive disclaimers. Under Section 11, television and internet

advertisements must include, for the entirety of the ad, a disclaimer

detailing (1) the individual or entity who paid for the ad along with the

funder's city and state of principal place of business and (2) the name

and city and state of residence of the three largest contributors to the

speaker (disclaimer of the top three donors predates Ballot Measure 2).

ER-85. Section 12 requires that any ad funded with out-of-state

donations include on screen—for its entirety—the statement that "A

MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED

ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF

ALASKA." *Id.*

A third pillar of Ballot Measure 2, which Appellants challenge below

but do not seek relief from in this preliminary appeal, is the "true

source" requirement. This provision requires that each individual

independent expenditure donor report the "true source" of the funds, which the law defines as the individual person or corporation that earned the funds. An illustration is helpful. Imagine the Alaska Chamber of Commerce donated $5,000 to an independent expenditure entity supporting Governor Dunleavy's reelection. Under prior law, the recipient entity would have to report that donation. Under the new law, the Alaska Chamber would have to report within 24 hours, and its report would have to include not only the fact of its donation, but also a list of its donors. If one of those donors was also an association rather than a corporation, say the Alaska Realtors Association, then the state chamber would have to work with the Realtors Association to get a list of its donors. And if its donors included a local realtors association, then a list of its members, all the way back to the "true source," *i.e.*, the original person or corporation who earned the funds eventually donated. Alaska is the only state in the nation that demands this level of disclosure, wherein the genealogy of every dollar is reported.

Plaintiffs are individuals and organizations subject to Ballot Measure 2. Two plaintiffs are independent expenditure groups: Families of the Last Frontier and the Alaska Free Market Coalition. As

such, they will be responsible for complying with the disclaimer requirements of Ballot Measure 2. The other plaintiffs are individual donors with proven track records of supporting independent expenditure groups and other political and charitable organizations at levels greater than $2,000 in a calendar year. As such, they will be subject to the disclosure requirements and their names may be included among the top three donors required in the disclaimer requirement.

Plaintiffs filed this lawsuit at the state of April, 2022, against Ballot Measure 2 to vindicate their First Amendment right to engage in political speech without overly intrusive government regulation. They sought a preliminary injunction against Ballot Measure 2 in advance of the fall 2022 election, which the District Court declined to issue.

## SUMMARY OF ARGUMENT

1A. Just months ago, the Supreme Court again criticized the "prophylaxis-upon-prophylaxis approach" to campaign finance law. *FEC v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1652 (2022). This is the approach Alaska has taken here, requiring individual and organizational donors to report their donations to independent expenditure entities within 24 hours, even as the entities themselves

7

must also report those same donations. This duplicative, audit-and-accounting mindset failed exacting scrutiny in *Americans for Prosperity Foundation v. Bonta,* 141 S. Ct. 2373, 2387 (2021) ("*AFPF*"). The State argues it is necessary to discover secondary donors (itself a constitutional problem), but this is not narrowly tailored to most donors. The District Court erred when it found otherwise.

1B. Not only must individual donors report their contributions to independent expenditure committees within 24 hours, but they must also report with similar promptitude their donations to any group that has made independent expenditures in the past two years and any group they *think* is likely to do so in the future. This is utterly unfair to donors: "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney . . . ." *Citizens United v. FEC*, 558 U.S. 310, 324 (2010). Moreover, disclosure requirements must be "tied with precision to specific election periods" and "carefully tailored to pertinent circumstances." *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1117-18 (9th Cir. 2019). Alaska's requirements are not tied with precision or carefully tailored; they invade the privacy of non-profit groups without justification, and they require complete past and

prophetic knowledge of independent expenditure groups from donors. The District Court erred when it found this survives exacting scrutiny.

2. The State of Alaska precisely prescribes in statute exactly what an independent expenditure entity must say in its television ads. This is literally a "a government-scripted, speaker-based disclosure requirement." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2377 (2018). Because it is compelled, content-altering speech, strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163, 165 (2015). The District Court erred when it found that exacting, rather than strict, scrutiny applies to the compelled speech requirements.

3A. Even if only exacting scrutiny applies to the on-ad donor-disclaimer requirements, they constitute a tremendous burden on speakers, consuming a substantial portion of their advertisements. The minor gain in the convenience of information for voters is not narrowly tailored in a manner that could justify the significant burden on speakers. *See Am. Bev. Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019).

3B. As for the out-of-state disclaimer, not only does it have all the failings of the top-donor disclaimer, but it also unconstitutionally

discriminates against out-of-state speakers. *Thompson v. Hebdon*, 7 F.4th 811, 824 (9th Cir. 2021).

## STANDARD OF REVIEW

"Where a district court's denial of a preliminary injunction motion 'rests solely on a premise of law and the facts are either established or undisputed, [this Court's] review is de novo.'" *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012). In this case, the few necessary facts related to Appellants' standing are established in undisputed declarations, and the "essential issues are matters of law," *id.*, which this Court reviews de novo.

"When seeking a preliminary injunction 'in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id.* (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

## ARGUMENT

### I. Compelling individual donors to duplicatively report their donations within 24 hours is not narrowly tailored because it is largely redundant of existing reporting by recipients.

Ballot Measure 2 requires independent expenditure donors to report donations to the Alaska Public Offices Commission within 24 hours—even though the law already requires the recipients of such donations to report exactly the same information. AS 15.13.040(r) (donors) & (d) (recipients). The District Court and the parties agree that this disclosure requirement is subject to exacting scrutiny. ER-11. *See N.A. for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1114 (9th Cir. 2019) ("we apply exacting scrutiny in determining the validity of election disclosure requirements covering electioneering communications"). Exacting scrutiny has two components. First, the government must show "an important interest," which is less than a compelling interest, but nevertheless a high hurdle. *See AFPF*, 141 S. Ct. at 2384. Second, "[w]hile exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Id.* at

2383. Here, the Appellants acknowledge that the public's interest in learning about the donors behind campaign advocacy (the so-called informational interest) is a sufficiently important interest under this Circuit's case law to sustain a disclosure regime. *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1017 (9th Cir. 2010). However, Ballot Measure 2's requirement of near-instantaneous duplicative reporting is not narrowly tailored to serve the informational interest and cannot justify the burden it places on donors.

Alaska law already requires independent expenditure entities to promptly report their donors. AS 15.13.110(a)-(b). Ballot Measure 2 extends that requirement to donors. The Defendants below offered, and the District Court accepted, one reason for this: that only the donor knows, or can discover, the true source of the donation. ER-18-19. In other words, to return to the example above, if the Alaska Chamber receives money from the Anchorage Chamber, only the Anchorage Chamber knows its members that the Alaska Chamber must now report as the true sources of its funds.

But the redundant disclosure rule is not narrowly tailored to serve the government's asserted informational interest, in three ways. (1)

Appellant donors are all individuals who are themselves always the true source of their donations. It is an illegal straw donation for an individual to accept funds from someone else and give it in their name, 2 AAC 50.258(a). If an individual reported that he were not the true source of a donation, he would be admitting he is breaking the law. (2) Moreover, when corporations make independent expenditure donations with funds they earned, they are the true source of their donations; again, it would be an illegal straw donation for a corporation to accept funds from someone else and turn around and give them in their own name. *Id.* (3) Finally, many organizations that do not themselves earn income nevertheless report publicly their donors to other public authorities, such as the Alaska Public Offices Commission, the Internal Revenue Service, or the Federal Election Commission.

In each of these three ways, the State could have crafted a more narrowly tailored statute that still served its asserted purpose of discovering "true sources" without burdening everyday Americans. Indeed, even the District Court acknowledged that "the donor disclosure requirement in Section 7 overlaps with, but is not completely duplicative of, the reporting requirements for independent expenditure

entities." ER-19. Discovering this marginal amount of additional information does not justify Alaska casting "a dragnet for sensitive donor information . . . even though that information will become relevant in only a small number of cases." *AFPF,* 141 S. Ct. at 2387.

That overlap, where individuals, corporations, and registered political committees are reporting information that adds nothing new beyond what the recipient is already reporting, is proof of that lack of narrow tailoring. Alaska "is not free to enforce any disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *AFPF*, 141 S. Ct. at 2386. It cannot make such a demonstration here: the less intrusive alternative is obvious, but was not the law they wrote.

In the course of reaching its incorrect conclusion, the District Court dismisses Appellants' reliance on *McCutcheon's* "'prophylaxis-upon-prophylaxis' analysis [as] inapplicable to the present litigation," saying *McCutcheon* addressed limits on contributions and expenditures, whereas this case addresses disclosure. ER-19. This is a legal error. *McCutcheon* did concern a different topic, but its discussion of prophylaxis-upon-prophylaxis bears on the nature of the exacting

scrutiny test. Appellants cite *McCutcheon's* line, readopted in *Cruz*, to explain that a law is not narrowly tailored when it layers safeguard-atop-safeguard, whatever the underlying problem being guarded against. Here, requiring duplicative reporting from everybody when the informational gain is quite narrow is a layering approach that fails exacting scrutiny.

Meanwhile, the burden on everyday Americans is great. Filing requirements that are "onerous" and "unduly" burdensome should be struck down. *Yamada v. Snipes*, 786 F.3d 1182, 1195-96 (9th Cir. 2015). *See FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 254 (1986) (plurality) (stating that when a law imposes "[d]etailed record-keeping and disclosure obligations" and other "administrative costs that many small entities may be unable to bear," it is unconstitutional). Under Ballot Measure 2, anyone donating as little as $2,000 must meet the sort of compliance burdens typically reserved for sophisticated parties who have the expertise—and the lawyers—to ensure they are following the rules. "The average citizen cannot be expected to master on his or her own the many campaign financial-disclosure requirements set forth" by Ballot Measure 2. *Sampson v. Buescher*, 625 F.3d 1247, 1259

(10th Cir. 2010). "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney . . ." *Citizens United v. FEC*, 558 U.S. 310, 324 (2010). These issues are exacerbated when the rules are in flux based on authoritative yet draft regulations from the Alaska Public Offices Commission. *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1035 (9th Cir. 2009) (Noonan, J., concurring) ("To comply with the statute, the pastor would first have to understand what the statute requires in the framework of Montana election law. This understanding is not materially assisted by the regulations issued by the Commissioner of Political Practices."). *See* Notice of Proposed Rulemaking, Alaska Public Office Commission (Apr. 26, 2022) (proposing rules for administering Ballot Measure 2).[2]

Here, everyday citizens who make modest donations face three burdens. First, they must know whether or not the group they are supporting is engaged in independent expenditures. Of course the recipient entity knows whether it is engaged in independent expenditures; it is subject to a bevy of rules if so. *See* AS Ch. 15. But there is no reason a businessman who decides to donate $2,000 to the

---

[2] https://doa.alaska.gov/apoc/pdf/NoticeOfProposedRegulations.pdf.

Alaska Chamber of Commerce would necessarily know whether the
Chamber is or is not actively sponsoring independent expenditure
advertisements at the moment. And if the Chamber sends him a thank-
you letter with a note to make sure to file his APOC report, it will arrive
after the 24-hour period and he will thus be in violation of the law.

Second, even if the donor knows the recipient is engaged in an
independent expenditure, he must also know of his obligation to report
his donation. Anyone familiar with the law in Alaska previously, the
laws of other states, and the rules for federal campaigns would assume
that the recipient entity is the only one obligated to report its donors.

Third, the donor who does know must suspend whatever else he is
doing and complete the required forms within 24 hours every time he
makes a donation. Filing requirements that are counted in hours rather
than weeks or months are usually reserved for the periods shortly
before an election, where regular quarterly reporting would not serve
the informational interest in a timely way. *See, e.g., Nordstrom v. Lyon*,
35 A.3d 710, 716 (N.J. Super. Ct. App. Div. 2012) ("a 48-hour reporting
requirement for donations greater than $1200 within the last thirteen
days prior to an election"). Imposing such a near-immediate turnaround

on everyday citizens *all the time,* regardless of the proximity of the election, is not narrowly tailored.

The District Court dismisses all of this because the State introduced "seven screen shots of the relevant Statement of Contributions Form 15-5, which appears to be a straightforward document." ER-17. But the problem is not the complexity of document itself, but rather the burden to know about the recipient entity's activities, know of the requirement, and to comply with it instantaneously—keeping in mind that most donors are everyday individual Americans, not professional political operatives. "It is easy to suppose these reporting and filing requirements are slight. They may be so for a large enterprise. They are care-demanding and time-consuming" for a single individual. *Canyon Ferry Rd. Baptist Church*, 556 F.3d at 1036 (Noonan, J., concurring).

## II. The requirement to disclose donations to nonprofits not engaged in current political activity is not narrowly tailored because it is not tightly tied to the electioneering justification for the State's informational interest.

Ballot Measure 2 requires both encyclopedic and prophetic knowledge of Alaska independent expenditure groups. Under Section 7 of Ballot Measure 2, a donor must report not only a contribution to an active independent expenditure group, but also a contribution to any

group that has made independent expenditures in the past two years or that she has reason to believe is likely to do so in the future. AS 15.13.040(r).

This is not narrowly tailored for two reasons. First, it is unfair to the donors. Again, a donor should not have to hire a campaign finance attorney to research whether the group she is supporting engaged in an independent expenditure eighteen or more months ago.

Second, it is an unconstitutional invasion of privacy as to the recipient groups. The U.S. Supreme Court reiterated loud and clear last year that nonprofit organizations are entitled to keep their donors private from the prying eyes of the state. *AFPF*, 141 S. Ct. at 2382. "The government may regulate in the First Amendment area only with narrow specificity and compelled disclosure regimes are no exception. When it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." *Id*. at 2384 (cleaned up). Because the baseline is privacy for nonprofit groups, narrow tailoring (or narrow specificity) to the state interest is necessary. Here, the state interest is knowing who funds election

advocacy. Hence, disclosure requirements must be "tied with precision" and "carefully tailored" to actual election advocacy. *Nat'l Ass'n for Gun Rights*, 933 F.3d at 1117-18. The government's only interest is in the disclosure of dollars "that [are] unambiguously campaign related." *Buckley v. Valeo*, 424 U.S. 1, 81 (1976).

Again, the Defendants and District Court have "acknowledge[d] that the disclosure law 'might sweep in some excess information at the margins' as it applies to contributions made during a current election cycle to an entity that has not made any expenditures in the current cycle, but did make them in the past cycle." ER-21. And again the District Court found that such excess does not violate narrow tailoring because "requiring the disclosure of donations made to independent expenditure entities in the previous election cycle and are likely to make independent expenditures in the current election cycle helps ensure that voters will promptly have access to complete information regarding the source of independent expenditures in advance of an election, and prevents donors from sidestepping disclosure requirements by strategically donating in the final stretch of an election cycle." ER-22.

This is a phantom fear; such sidestepping is impossible under current Alaska law. A full report is due to APOC seven days before an election for all activity up to three days before the due date, i.e., ten days before the election. AS 15.13.110(a)(2). And for the "final stretch" after that last full report, any contribution over $250 must be reported by the recipient entity within 24 hours. AS 15.13.110(b).

The requirement that donors disclose contributions to groups that are not actively engaged in independent expenditures is an unfair expectation on donors and an unconstitutional invasion of the recipient group's privacy. If the group chooses to become an independent expenditure group again in this current cycle, it will have to disclose all of its donors over $100 for the calendar year per existing disclosure law. AS 15.13.040(b)(2). But if it does not become an independent expenditure entity this cycle, either because it never intended to or because it changes its mind, then its privacy will have been invaded without cause. This requirement is not narrowly tailored to election activity.

### III.    The compelled speech in Ballot Measure 2 should be subject to strict scrutiny.

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The general rule is that the government may not compel a person "to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Compelled speech on the government's behalf is impermissible because it "affects the message conveyed." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 572 (1995). Put another way, the government violates a speaker's First Amendment rights by "interfer[ing] with the [speaker's] ability to communicate its own message." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64 (2006).

"Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as other content-based laws. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,*

22

*Ariz.*, 576 U.S. 155, 163 (2015). In other words, such laws are "subject to strict scrutiny." *Id.* at 165.

The Supreme Court recently applied these settled principles in *National Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361 (2018). At issue was a California statute that compelled licensed clinics that served pregnant women to post a notice about abortion rights. Unlicensed clinics were required to post a notice that they were not licensed to provide medical services.

The Court concluded that the required notices for licensed clinics were compelled speech. Those clinics had to "provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them." *Id.* at 2371 (cleaned up). "By compelling individuals to speak a particular message," this requirement "alter[ed] the content of their speech." *Id.* (cleaned up). And though the Court focused on the unlicensed clinic requirement's lack of tailoring, the Court characterized this requirement as "a government-scripted, speaker-based disclosure requirement." *Id.* at 2377.

23

Like California's licensed-clinic notice, Alaska's requirement that Appellants list their top three donors on their advertisements is a "government-drafted script" whose exact wording is set by statute. Appellants are compelled to alter their advertisements to incorporate the government's message just as the pregnancy centers were forced to alter their speech to incorporate the government's notice. By requiring crisis pregnancy centers to post a notice about California's state-sponsored abortion services, California's licensed clinic notice effectively altered the message of crisis pregnancy centers seeking to counsel pregnant women against having an abortion. Similarly, the Alaska donor disclaimer requirement forces Appellants to alter their advertisements that seek to inform or convince people on a particular political issue, to also encourage viewers or listeners to consider Appellants' own donors.

If anything, the speech alteration is even more severe here, for instead of merely posting a government-provided notice, petitioners must change *their own speech* to accommodate the government's. Nor was there any suggestion California's poster took up one-third of the clinic's wall space, as the mandated disclaimer can easily take up one-

third of a thirty-second radio ad (a fact discussed further below). And Alaska's intrusion on speech is especially offensive to the First Amendment because it pertains to speech about elections—an area "integral to the operation of our system of government," where the First Amendment should have "its fullest and most urgent application." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (cleaned up).

The on-ad donor disclaimer here is content-based and thus subject to strict scrutiny because compelled speech is content-altering. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988). "Since all speech inherently involves choices of what to say and what to leave unsaid," *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 11 (1986) (plurality), the compelled speech requirement here harms Appellants in multiple ways. It both restricts their ability to speak their preferred message and forces them to speak the message of someone else.

First, Appellants cannot use those portions of their advertisements that the government commandeers. Such a feature has been recognized

in other content-based compelled speech cases as a "penalty" on speech. For instance, in *Miami Herald Publishing Co. v. Tornillo*, considering a statute that granted political candidates equal space in a newspaper to reply to criticism, the Supreme Court noted that this "compelled printing" imposed a "penalty" on publishers, including "the cost in printing and composing time and materials and in taking up space that could be devoted to other material the newspaper may have preferred to print." 418 U.S. 241, 256 (1974). Here, similarly, the government's speech consumes ad time that displaces petitioners' preferred speech.

The requirement here also forces organizations like petitioners to speak the government's own message. Appellants believe strongly in the right to privacy for citizens and would not include their donors' information in their advertisements if not forced to by the law. ER-108-09 (Shaw Decl. ¶¶ 5, 6, & 9); ER-106 (Strait Decl. ¶¶ 4, 5 & 7). Forcing an organization committed to limited government and personal freedom to announce the names of its donors in advertisements is similar to forcing pro-life groups to share information about abortion access. "[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the

speaker's right to autonomy over the message is compromised." *Hurley*, 515 U.S. at 576. Donors may be less likely to support groups that appear to violate their own principles. And listeners' rights are harmed too, for Appellants' message is distorted by government interference. *Cf. Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas."). Rather than hearing the information the speaker wants to convey, listeners must hear the information the government says the speaker must convey.

The requirement also forces Appellants to change the subject of their advertisements, from informing or trying to convince listeners about a political issue to talking about Appellants' donors. The government's forced speech about the speaker's funding distracts the listener from the speaker's intended message. *Wash. Post v. McManus*, 944 F.3d 506, 515 (4th Cir. 2019) ("many political advocates today also opt for anonymity in hopes their arguments will be debated on their merits rather than their makers," or in this instance their makers' funders).

The compelled disclosure is no less offensive because it compels statements of fact rather than statement of opinion: the "general rule that the speaker has the right to tailor the speech[] applies not only to

expressions of value, opinion, or endorsement, but equally to statements

of fact." *Hurley*, 515 U.S. at 573. The problem is the government-

mandated change in the content of one's speech, not whether the new

content is neutral, factual, or otherwise non-ideological. *Frudden v.*

*Pilling*, 742 F.3d 1199, 1206 (9th Cir. 2014) ("the right against

compelled speech is not, and cannot be, restricted to ideological

messages." Rather, "compelled statements of fact, like compelled

statements of opinion, are subject to First Amendment scrutiny."

(cleaned up)).

Thus, Alaska's mandate is a regulation of "pure speech"—not merely

a regulation of "the mechanics of the electoral process." *McIntyre v.*

*Ohio Elections Comm'n,* 514 U.S. 334, 345 (1995). This Court recognized

this "constitutionally determinative distinction between on-publication

identity disclosure requirements and after-the-fact reporting

requirements" in *ACLU of Nevada v. Heller*, 378 F.3d 979, 991 (9th Cir.

2004). This Court found that "requiring a publisher to reveal her

identity on her election-related communication is considerably more

intrusive" because it "necessarily connects the speaker to a particular

message directly." *Id*. at 992. In contrast, "[c]ampaign regulation

28

requiring off-communication reporting of expenditures made to finance communications does not involve the direct alteration of the content of a communication." *Id*. Because the Nevada law at issue in that case forced the ACLU to alter the content of its message, and not merely file information after the fact with the state, it was subject to strict scrutiny. *Id*.

This case is even more extreme than the Nevada law struck down in *ACLU*. There, the speaker had to identify only himself. Here, the speaker must identify their top three supporters. That is more burdensome on the speaker and the supporters, and less useful to the public. *See Canyon Ferry Rd. Baptist Church*, 556 F.3d at 1036 (Noonan, J., concurring) ("Does any voter exclaim, 'Hank Jones gave $76 to this cause. I must be against it!'").

The District Court rejected this argument chiefly relying on *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 537 (9th Cir. 2015), ER-26, where this Court considered a mandate that "an official proponent's name appear on the face of the initiative petitions circulated to voters." 782 F.3d at 535. There, "[t]he public nature of an official proponent's position and the legislative character of an initiative

petition inform this analysis." *Id*. at 536. Here, we are dealing with independent expenditure committees rather than official candidates, so the government's interest is lessened (voters have a greater interest in knowing the top donors directly to a single candidate rather than an unaffiliated, unofficial, *independent* expenditure group, which may be active in multiple races). And this is a candidate contest rather than a petition process, where First Amendment protection "is at its zenith." *Gralike v. Cook*, 191 F.3d 911, 919 (8th Cir. 1999). Moreover, *Chula Vista Citizens* recognizes that strict scrutiny can apply when a law "severely burdens" constitutional exercise. Again, there the Court considered a very short disclaimer: "an official proponent's name appear on the face of the initiative petitions circulated to voters." 782 F.3d at 535. The Court found disclosure of the name of the organization was not a severe burden.

Here is the disclaimer Alaska law now requires of Appellant Families of the Last Frontier. On a radio ad: "Paid for by Families of the Last Frontier, 123 Main Street, Anchorage, Alaska 56789. This notice to voters is required by Alaska law. We certify that this advertisement is not authorized, paid for, or approved by any candidate. The top

contributors of Families of the Last Frontier are Tim Smith, Sally Jones, and Jane Doe." AS 15.13.090(a) & (d) and AS 15.13.135(b)(2). And one cannot rush reading this announcement; "the . . . statements must be read in a manner that is easily heard." AS 15.13.090(d).

In a television ad, the message must include a video statement: "I am Steve Strait, president of Families of the Last Frontier, and I approved this message." AS 15.13.090(a)(2)(B). On the screen there must be text reading: "Paid for by Families of the Last Frontier, 123 Main Street, Anchorage, Alaska 56789. This notice to voters is required by Alaska law. We certify that this advertisement is not authorized, paid for, or approved by any candidate. The top contributors of Families of the Last Frontier are Tim Smith of Anchorage, Alaska, Sally Jones of Fairbanks, Alaska, and Jane Doe of Wasilla, Alaska. A MAJORITY OF CONTRIBUTIONS TO FAMILIES OF THE LAST FRONTIER CAME FROM OUTSIDE THE STATE OF ALASKA." AS 15.13.090(a), (c), & (g) and AS 15.13.135(b)(2). The statement must be "easily discernible" and must "remain onscreen throughout the entirety of the communication." AS 15.13.090(c) & (g).

Displaying the name of the organization may not be a severe burden, but a message that takes up a third of a radio advertisement or more is a severe burden—it "operates to reduce the total quantum of speech," *Chula Vista Citizens*, 782 F.3d at 537, by repurposing a third of the total time spoken from groups' messages to government's message. As such, even under *Chula Vista Citizens*, strict scrutiny should apply.

## IV.  The compelled donor disclaimer fails even exacting scrutiny because it adds marginal additional value while imposing substantial cost on the speaker.

If the Court concludes it is bound by precedent to apply exacting scrutiny, and that *Chula Vista Citizens* cannot be distinguished, then the on-ad disclaimer of the top three donors should still fail.

On the one side, the State's interest is again only the informational interest. But here, the information is already available on Defendants' website, so all the state can claim is the "more efficient and effective" disclosure from providing the information directly on the ad. ER-31.

First, as a matter of precedent, "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would

32

otherwise omit," so the government's "informational interest is plainly insufficient." *McIntyre*, 514 U.S. at 348–49.

Second, all the information conveyed by the on-ad donor disclaimer is already available to the public under the law's other provisions, "at the click of a mouse." *McCutcheon v. FEC*, 572 U.S. 185, 224 (2014). Narrow tailoring requires more than a marginal gain in convenience or efficiency. California made the same type of argument trying to survive exacting scrutiny in *Americans for Prosperity Foundation*: "the up-front collection of Schedule B information improves the efficiency and efficacy of the Attorney General's important regulatory efforts." 141 S. Ct. at 2385. California said other measures, such as subpoenas or audit letters for specific investigations, "are inefficient and ineffective compared to up-front collection" of information. *Id*. at 2386. The Supreme Court rejected this rationale, saying "the prime objective of the First Amendment is not efficiency." *Id*. at 2387. Once again, Alaska's law looks a lot like prophylaxis-atop-prophylaxis. Not content to make this information available to voters on the Internet, we must now beam it into their homes and force them receive it.

Third, the on-ad sponsor disclaimer (the name of the independent expenditure committee) alone easily satisfies any informational interest that might exist. Who sponsored the ad "will signify more about the candidate's loyalties than the disclosed identity of an individual contributor will ordinarily convey." *Vote Choice v. DiStefano*, 4 F.3d 26, 35 (1st Cir. 1993). "That a certain, unknown individual supplied the [funds] involved in producing a given communication 'adds little, if anything, to the reader's ability to evaluate the document.'" *ACLU of Nev.*, 378 F.3d at 994 (quoting *McIntyre*, 514 U.S. at 348-49). Indeed, conveying the top-three donors on the ad may decrease viewers' information by giving them a distorted view of the organization's overall donors.

Fourth, the State's claim lacks any limiting principle. If the State can require the city and state of residence for the top three donors be included on an ad, why not whether they are registered as Republicans or Democrats? That could be more useful to voters than their names and cities—a voter in Anchorage viewing an ad may not know Sally Jones of Fairbanks, but he knows he likes Democrats and opposes Republicans. Certainly Sally Jones' party affiliation would help him

34

know if "Citizens for Alaska" is a front for Republican or Democrat interests. Because different voters find different information important as they consider an advertisement, the State could require donors to "disclose all kinds of demographic information, including the signer's race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships." *Doe v. Reed*, 561 U.S. 186, 207 (2010) (Alito, J., concurring). Or the State could require not only their name and city, but also their phone number or e-mail address to "more easily enable members of the voting public to contact them and engage them in discussion." *Id*. The "informational interest" is not a blank check for the State to require disclosure and now disclaimer of any and all information it wants.

On the other side of the balance sheet, the imposition on the speaker and donors is considerable. First, the speaker must express a message he does not wish to say. The District Court discounts this, saying "the burden here on independent expenditure entities is much lower than in *NIFLA*, where pro-life pregnancy crisis centers were required to 'inform women how they can obtain state-subsidized abortions,' which was 'the very practice that [they] are devoted to opposing.' Here, while Plaintiffs

may hold broad ideological concerns about privacy, the on-ad top-three-donor disclaimer does not require them to convey a message that is directly contrary to whatever political statement they seek to make in their electioneering communications." ER-31. In fact, the burden on Appellants is *greater* than the burden on the clinics in *NIFLA*: instead of merely posting a government-provided notice, Appellants must change their own speech to accommodate the government's and not only post a government-provided poster, but say the government's message from their own mouths. And it is not the District Court's role to say that the pregnancy resource centers' opposition to abortion is any less fervent or important than Appellants' opposition to government control of otherwise free speech.

Moreover, the restriction is especially onerous because the required disclaimers will take up a significant portion of the advertisement. In the commercial context, this Court has struck down mandatory warnings as compelled speech in situations where the requirement was only that the "warning occupy at least 20% of the advertisement." *Am. Bev. Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019); *accord R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1208 (D.C.

Cir. 2012) (striking down tobacco warning labels that took up 20% of the packaging). But the extensive disclaimers here cover far more—requiring not just the names but also identifying information for three different donors, and on top of that the State's all-caps warning about donations from out-of-state, for the entirety of the ad, commandeering even more speech than the health warning in *American Beverage Association*, and in a context far more vital than sugary drinks. AS 15.13.090(c). This burden is even more pronounced in a radio ad, where the names of contributors must be read aloud. *Id*. at (d). The significant amount of space taken up by the State's mandated scripts exacerbates the compelled speech problem.

The Supreme Court in *Riley* considered a similar situation: not a prohibition on anonymity, but a mandate of additional information. *Riley* posited "a law requiring a speaker favoring an incumbent candidate to state during every solicitation that candidate's recent travel budget. Although the foregoing factual information might be relevant to the listener, and, in the latter case, could encourage or discourage the listener from making a political donation, a law compelling its disclosure would clearly and substantially burden the

protected speech." *Riley*, 487 U.S. at 798. In the same way, Ballot Measure 2 requires every speaker to disclose factual information that might be relevant to the listener, and may even encourage or discourage the listener from supporting or opposing the candidate discussed in the ad, but the law nevertheless "clearly and substantially burden[s] the protected speech." As such, it cannot survive exacting scrutiny.

## V. Requiring disclaimer of out-of-state support is not narrowly tailored and unconstitutionally discriminates against out-of-state speakers.

As with the "top three" disclaimer requirement, this Court should also find that Ballot Measure 2's disclaimer requirement for out-of-state contributions fails heightened scrutiny. Section 12 of the law requires that any independent expenditure entity that receives more than 50% of its aggregate contributions from "true sources" with their principal place of business outside Alaska must include as a part of their speech the government authored statement: "A MAJORITY OF CONTRIBUTIONS TO [THIS GROUP] CAME FROM OUTSIDE THE STATE OF ALASKA." Appellant Families of the Last Frontier has received more than fifty percent of its contributions in the past from contributors outside Alaska and intends to solicit outside Alaska to

38

raise money in 2022. ER-106. This Court should likewise find that Appellants are likely to succeed on the merits of their claim that the out-of-state disclaimer requirement violates the First Amendment.

Out-of-state campaign contribution restrictions are routinely invalidated by courts. Last year this Court struck down Alaska's nonresident aggregate limit, which barred candidates from accepting more than $3,000 per year from non-Alaskans. As the Court recognized, "[a]t most, the law aim[ed] to curb perceived 'undue influence' of out-of-state contributors—an interest that is no longer sufficient after" the Supreme Court's decisions in *McCutcheon* and *Citizens United*." *Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021). This Court rejected Alaska's argument that the state had an interest in avoiding the appearance of undue out-of-state influence, pointing out that the only relevant inquiry was whether the state could show an interest in preventing actual corruption, and that Alaska's argument "sa[id] nothing about corruption." *Id*. The court concluded that "Alaska fail[ed] to demonstrate that the risk of quid pro quo corruption turns on a donor's particular geography." *Id*. at 825. The court found "no indication that the First Amendment interest in protecting political access waxes

or wanes depending on the representative relationship between contributor and candidate." *Id.* at 826 n.6.

Likewise, in *Landell v. Sorrell*, the Second Circuit held that Vermont's law prohibiting candidates, political parties, and political action committees from receiving more than twenty-five percent of their donations from out-of-state donors violated the First Amendment. 382 F.3d 91, 146 (2d Cir. 2004). The court recognized "that many non-residents have legitimate and strong interests in Vermont and have a right to participate, at least through speech, in those elections." *Id.* at 147. The court thus held that Vermont had "no sufficiently important governmental interest" to justify "disproportionately curtailing the voices of some, while giving others free rein, because it questions the value of what they have to say." *Id.* at 146, 148.

This Court should similarly invalidate the out-of-state disclosure disclaimers here. Section 12 impermissibly burdens the protected speech of both donors and groups by compelling them to speak the government's message implying that out-of-state funding is somehow suspect or disreputable. The disclaimer serves no anti-corruption interest—the donors to independent expenditure groups are already

40

disclosed to the state, and to the public on the state's website, so one can easily determine whether any particular group draws its support from outside Alaska—and rival groups can point out this supposed foreign influence in their own speech if they think it will matter to Alaska's voters. Compared to this traditional give-and-take of politics, Section 12's disclaimer requirement is more likely to mislead than enlighten: including the government's required message will only imply that there's something shady about a group's funding, devoid of any context by which voters could make a reasoned judgment.

Nor is Alaska's supposed interest narrowly tailored to its supposed interest. Section 19 defines "outside-funded entity" as a group that takes donations from a true source with a principal place of business outside Alaska. But one's principal place of business is a poor proxy for one's interest in Alaska's elections. Indeed, a donor could have significant operations in Alaska, even a majority of its operations, while happening to be headquartered elsewhere.

Intervenor-Defendant Alaskans for Better Elections admitted the game in its brief below: "It is one thing for one Alaska voter to influence another, it is quite another for entities or persons with no ties to Alaska

to influence the outcome of elections within the State." ER-70. In other words, the State through the mandated disclaimer is telling voters which ads to listen to and which ads to ignore based on who supported the sponsor of the ad. This goes against the Supreme Court's admonition that the "the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United*, 558 U.S. at 340. The Government should not "deprive[] the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Id.* To permit the government to "restrict the speech of" out-of-state supporters "to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley,* 424 U.S. at 48-49.

Again, the District Court upholds the law because it finds it efficient and effective at communicating information. ER-34-35. But again, "the prime objective of the First Amendment is not efficiency." *McCullen v. Coakley*, 573 U. S. 464, 495 (2014). The District Court distinguishes *Thompson* and the other out-of-state cases because they dealt with contributions, not disclaimers, ER-34, but the point remains the same:

discrimination against out-of-state speakers is unconstitutional, regardless of how the discrimination is manifest in the law.

## CONCLUSION

This law is an outlier among all the other states and the federal government. It is not narrowly tailored. It discourages everyday citizens from participating in the public square, commandeers more of an advertisement's space with compelled speech, and imposes substantial speech costs for marginal information gains.

The District Court did not address the other preliminary injunction factors, but in a First Amendment case Appellants establish them if they win on the likelihood of success on the merits.[3] The loss of speech rights before an election is irreparable harm, *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012), and "there is

---

[3] The District Court says the Appellants "waited over one year to seek preliminary injunctive relief," ER-41, but no rule requires litigants to file lawsuits moments after laws are enacted. Appellants waited to see if litigation in Alaska state courts would strike down some or all of Ballot Measure 2, an issue the Alaska Supreme Court did not decide until January. Appellants also waited to see how the Alaska Public Offices Commission used its interpretive authority to narrow or expand the rule. Finally, Appellants are citizen activists, whether donors or entities, and brought a lawsuit when they focused their attention on the November 2022 election and realized the impact of the new law on their rights.

no significant state or public interest in curtailing debate and discussion of a ballot measure," or any other topic relevant to the upcoming election. *Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290, 299 (1981). Finally, the enforcement of constitutional rights is, by definition, always in the public interest. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). For all those reasons, after concluding the Appellants have raised at least colorable claims on the merits, the Court should promptly order an injunction be issued protecting their speech this fall.

Dated: August 19, 2022             Respectfully submitted,

Daniel R. Suhr
Liberty Justice Center
Chicago, Illinois 60603
Ph.: 312-263-7668
Email: dsuhr@libertyjusticecenter.org
*Lead Counsel for Plaintiffs*

Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N Street, Suite 100
Anchorage, Alaska 99501
Email: crichards@alaskaprofessionalservices.com

*Attorneys for Appellants*

44

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 22-35612

I am the attorney or self-represented party.

**This brief contains** | 8,397 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Daniel Suhr | **Date** | 8/19/2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*