No. 22-35612

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

Doug Smith, Robert Griffin, Allen Vezey, Albert Haynes,
Trevor Shaw, Families of the Last Frontier,
and Alaska Free Market Coalition,

*Plaintiffs-Appellants*,

v.

Anne Helzer, in her official capacity as chair of the Alaska
Public Offices Commission, and Lanette Blodgett, Richard
Stillie Jr., Suzanne Hancock, and Dan LaSota, in their official
capacities as members of the Alaska Public Offices
Commission,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Alaska
No. 3:22-cv-00077-SLG
Hon. Sharon L. Gleason

---

## EXCERPTS OF RECORD

---

Daniel R. Suhr (WI No. 1056658)
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjustice
center.org
*Counsel of record*

Craig W. Richards
(AK No. 0205017)
Law Offices of
Craig Richards
810 N Street, Suite 100
Anchorage, Alaska 99501
Email: crichards@alaska
professionalservices.com

*Attorneys for Appellants*

# TABLE OF CONTENTS

*Smith et al. v. Helzer et al.,* No. 3:22-cv-00077-SLG (D. Ak.)

Order re Motions for Preliminary Injunction,
   Dkt. 48 (July 14, 2022) ........................................................................ 3

Alaskans for Better Elections' Motion to Dismiss,
   Dkt. 33 (May 16, 2022) ....................................................................... 43

Alaska's Better Elections Initiative,
   Dkt. 33-1 at 7-31 (May 16, 2022) ...................................................... 81

Declaration of Steve Strait,
   Dkt. 21 (May 2, 2022) ....................................................................... 106

Declaration of Trevor Shaw,
   Dkt. 18-6 (April 25, 2022) ................................................................ 108

Notice of Appeal,
   Dkt. 49 (July 21, 2022) ..................................................................... 110

Docket Report ...................................................................................... 112

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| DOUG SMITH, et al., | |
| Plaintiffs, | |
| v. | |
| ANNE HELZER, et al., | Case No. 3:22-cv-00077-SLG |
| Defendants, | |
| and | |
| ALASKANS FOR BETTER ELECTIONS, INC., | |
| Intervenor-Defendant. | |

## ORDER RE MOTIONS FOR PRELIMINARY INJUNCTION

Before the Court at Docket 18 is Plaintiffs' motion for a preliminary injunction.[1] Defendants responded in opposition at Docket 30,[2] and Intervenor-Defendant Alaskans for Better Elections, Inc. ("ABE"), also responded in

---

[1] Plaintiffs are Doug Smith, Robert Griffin, Allen Vezey, Albert Haynes, Trevor Shaw, Families of the Last Frontier, and Alaska Free Market Coalition. Plaintiffs additionally filed a motion for a preliminary injunction at Docket 7. This order addresses both motions, which involve the same three claims. Also pending before the Court are motions to dismiss filed by Defendants and Intervenor-Defendant Alaskans for Better Elections ("ABE") at Dockets 31 and 33, respectively. ABE incorporated by reference its motion to dismiss into its opposition to the motion for preliminary injunction. *See* Docket 34 at 3.

[2] Defendants are the five members of the Alaska Public Offices Commission who are sued in their official capacities: Commission Chair Anne Helzer and Commission members Van Lawrence, Richard Stillie, Jr., Suzanne Hancock, and Dan LaSota.

opposition at Docket 34. Plaintiffs filed their reply at Docket 39. Oral argument was held in Anchorage, Alaska on June 13, 2022.

## BACKGROUND

On November 3, 2020, Alaskan voters enacted by initiative Ballot Measure 2, entitled "An Act Replacing the Political Party Primary with an Open Primary System and Ranked-Choice General Election, and Requiring Additional Campaign Finance Disclosures" ("the Measure").[3] The Measure officially became law 90 days later on February 28, 2021.[4] On June 9, 2021, the Alaska Public Offices Commission ("APOC") adopted regulations implementing the Measure.[5] In April 2022, Plaintiffs initiated this action and filed a motion for a preliminary injunction seeking to enjoin the enforcement of several provisions of Alaska's campaign finance laws, including certain provisions added by Ballot Measure 2.[6]

The ranked-choice voting provisions of the Measure were challenged in state court and upheld by the Alaska Supreme Court.[7] The present litigation concerns three sets of campaign finance provisions. *First*, the Measure imposes disclosure requirements on donors to organizations that make independent

---

[3] Docket 33-1 at 2, 36–37 (Kendall Aff., Ex. C, "Ballot Language and Legislative Affairs Summary for Ballot Measure 2"). The Ballot Measure is also referred to on the Ballot Measure itself as "Alaska's Better Elections Initiative." *See* Docket 33-1 at 7 (Kendall Aff., Ex. A).

[4] Docket 40 at 4, ¶ 17 (Am. Compl.).

[5] *Id*. at ¶ 18.

[6] Docket 1 (Compl.); Docket 7.

[7] *Kohlhaas v. State*, Case No. S-18210 (Alaska Jan. 19, 2022).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 2 of 40

expenditures in elections. Pursuant to Section 7 of the Measure, Alaska Statute § 15.13.040 is amended to impose a reporting requirement on "[e]very individual, person, nongroup entity, or group that contributes more than $2,000 in the aggregate in a calendar year to an entity that made one or more independent expenditures in one or more candidate elections";[8] the reporting must be made within 24 hours of the time that the donation was made.[9] In conjunction with Section 7, Section 15 of the Measure amends Alaska Statute § 15.13.390(a) to establish new civil penalties for contributors who fail to comply with Section 7.[10]

---

[8] Although the text of Section 7 purports to add a new subsection (s) to Alaska Statute § 15.13.040, the text of Section 7 is codified under Alaska Statute § 15.13.040(r). Accordingly, the Court refers to subsection (r) throughout this order, except when quoting the text of Ballot Measure 2.

[9] Section 7 reads in full: "(s) Every individual, person, nongroup entity, or group that contributes more than $2,000 in the aggregate in a calendar year to an entity that made one or more independent expenditures in one or more candidate elections in the previous election cycle, that is making one or more independent expenditures in one or more candidate elections in the current election cycle, or that the contributor knows or has reason to know is likely to make independent expenditures in one or more candidate elections in the current election cycle shall report making the contribution or contributions on a form prescribed by the commission not later than 24 hours after the contribution that requires the contributor to report under this subsection is made. The report must include the name, address, principal occupation, and employer of the individual filing the report and the amount of the contribution, as well as the total amount of the contributions made to that entity by that individual, person, nongroup entity, or group during the calendar year. For purposes of this subsection, the reporting contributor is required to report and certify the true sources of the contribution, and intermediaries, if any, as defined by AS 15.13.400(18). This contributor is also required to provide the identity of the true source to the recipient of the contribution simultaneously with providing the contribution itself."

[10] Section 15 adds a new subsection (2) that reads: "A person who, whether as a contributor or intermediary, delays in reporting a contribution as required by AS 15.13.040(s) is subject to a civil penalty of not more than $1,000 a day for each day the delinquency continues as determined by the commission subject to right of appeal to the superior court"; and a new subsection (3) that reads: "A person who, whether as a contributor or intermediary, misreports or fails to disclose the true source of a contribution in violation of AS 15.13.040(s) [Ballot Measure 2, Section 7] or AS 15.13.074(b) is subject to a civil penalty of not more than the amount of the contribution that is the subject of the misreporting or failure to disclose. Upon a showing that the

---

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 3 of 40

*Second*, Ballot Measure 2 amends existing statutory financial disclaimer requirements for political communications. Section 11 of the Measure provides that the requisite disclaimers be easily discernable throughout the "entirety" of the "broadcast, cable, satellite, internet or other digital communication."[11] Section 12 of the Measure adds a new subsection to Alaska Statute § 15.13.090 applicable to political communications by print or video that are "paid for by an outside-funded entity," which requires a disclaimer throughout the entirety of the communication stating that "A MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF ALASKA."[12] Prior to the implementation of Ballot Measure 2, political communications were already

---

violation was intentional, a civil penalty of not more than three times the amount of the contribution in violation may be imposed. These penalties as determined by the commission are subject to right of appeal to the superior court."

[11] Section 11 reads in full: "AS 15.13.090(c) is amended to read: (c) To satisfy the requirements of (a)(1) of this section and, if applicable, (a)(2)(C) of this section, a communication that includes a print or video component must have the following statement or statements placed in the communication so as to be easily discernible, **and in a broadcast, cable, satellite, internet or other digital communication the statement must remain onscreen throughout the entirety of the communication**; the second statement is not required if the person paying for the communication has no contributors or is a political party: This communication was paid for by (person's name and city and state of principal place of business). The top contributors of (person's name) are (the name and city and state of residence or principal place of business, as applicable, of the largest contributors to the person under AS 15.13.090(a)(2)(C))." (Amended text in bold.)

[12] Section 12 adds a new subsection (g) to Alaska Statute § 15.13.090, which reads: "To satisfy the requirements of (a)(1) of this section and, if applicable, (a)(2)(C) of this section, a communication paid for by an outside-funded entity as that term is defined in AS 15.13.400(19) that includes a print or video component must have the following statement placed in the communication so as to be easily discernible, and in a broadcast, cable, satellite, internet or other digital communication the statement must remain onscreen throughout the entirety of the communication; the statement is not required if the outside entity paying for the communication has no contributors or is a political party: 'A MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF ALASKA.'"

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 4 of 40

required by statute to include: (1) a sponsor disclaimer stating who paid for the communication; and (2) a disclaimer listing the names and locations of the person or organization's top three contributors.[13]

*Third*, Ballot Measure 2 creates new statutory requirements applicable to independent expenditure entities regarding "dark money" and the "true source" of contributions to these entities. "Dark money" is defined by Section 17 as "a contribution whose source or sources, whether from wages, investment income, inheritance, or revenue generated from selling goods or services, is not disclosed to the public."[14] Section 6 of the Measure amends Alaska Statute § 15.13.040(j)(3) to require an independent expenditure entity to report on the "true source" of "contributions and all intermediaries" over $2,000.[15] And pursuant to Section 9, "[i]ndividuals, persons, nongroup entities, or groups subject to AS 15.13.040(s) may not contribute or accept $2,000 or more of dark money as that term is defined

---

[13] Alaska Stat. § 15.13.090(a)(1), (2).

[14] Section 17 reads in full: "AS. 15.13.400 is amended by adding a new paragraph to read: (17) 'dark money' means a contribution whose source or sources, whether from wages, investment income, inheritance, or revenue generated from selling goods or services, is not disclosed to the public. Notwithstanding the foregoing, to the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source."

[15] Section 6 reads in full: "AS 15.13.040(j)(3) is amended to read: (3) for all contributions described in (2) of this subsection, the name, address, date, and amount contributed by each contributor, [AND] for all contributions described in (2) of this subsection in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor**, and for all contributions described in (2) of this subsection in excess of $2,000 in the aggregate during a calendar year, the true source of such contributions and all intermediaries, if any, who transferred such funds, and a certification from the treasurer that the report discloses all of the information required by this paragraph.**" (Amended text in bold.)

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 5 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 5 of 40

7

in AS 15.13.400(17)," and disclosure of the true source of funds is required of contributions made by intermediaries.[16] Finally, Section 14 imposes a requirement on the recipient entity to report the "true source" and "all intermediaries" of certain contributions within 24 hours of receipt,[17] and Section 18 provides a statutory definition of "true source" as used in Section 14.[18]

## LEGAL STANDARD

In *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court held that plaintiffs seeking preliminary injunctive relief must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in

---

[16] Section 9 reads in full: "AS 15.13.074(b) is amended to read: (b) A person or group may not make a contribution anonymously, using a fictitious name, or using the name of another. **Individuals, persons, nongroup entities, or groups subject to AS 15.13.040(s) may not contribute or accept $2,000 or more of dark money as that term is defined in AS 15.13.400(17), and may not make a contribution while acting as an intermediary without disclosing the true source of the contribution as defined in AS 15.13.400(18).**" (Amended text in bold.)

[17] Section 14 reads in full: "AS 15.13.110 is amended by adding a new subsection to read: (k) Once contributions from an individual, person, nongroup entity, or group to an entity that made one or more independent expenditures in one or more candidate elections in the previous election cycle, that is making one or more independent expenditures in one or more candidate elections in the current election cycle, or that the contributor knows or has reason to know is likely to make independent expenditures in one or more candidate elections in the current election cycle exceed $2,000 in a single year, that entity shall report that contribution, and all subsequent contributions, not later than 24 hours after receipt. For purposes of this subsection, the entity is required to certify and report the true source, and all intermediaries if any, of the contribution as defined by AS 15.13.400(18)."

[18] Section 18 reads in full: "AS 15.13.400 is amended by adding a new paragraph to read: (18) 'true source' means the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services. A person or legal entity who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source. Notwithstanding the foregoing, to the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source."

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 6 of 40

the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest.[19]  *Winter* places the burden on a plaintiff to make a showing on all of the *Winter* factors before a court will issue a preliminary injunction.[20]

"Courts asked to issue preliminary injunctions based on First Amendment grounds face an inherent tension: the moving party bears the burden of showing likely success on the merits . . . and yet within that merits determination the government bears the burden of justifying its speech-restrictive law."[21] Accordingly, "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been

---

[19] 555 U.S. 7, 20 (2008).  When, as here, the government is a party to the action, "the balance of equities factor and the public interest factor merge."  *Jones v. Bonta*, 34 F.4th 704, 713 (9th Cir. 2022) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

[20] *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Following *Winter*, the Ninth Circuit addressed the first element—the likelihood of success on the merits—and held that the Circuit's "serious questions" approach to preliminary injunctions was still valid "when applied as a part of the four-element *Winter* test."  *Id.*at 1131–35. Accordingly, if a plaintiff shows "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor.'"  *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).  "Serious questions are 'substantial, difficult, and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'"  *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)).  They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance on the merits.'"  *Id.* (quoting *Marcos*, 862 F.2d at 1362).  All of the *Winter* elements must still be satisfied under this approach for a preliminary injunction to issue.

[21] *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (alteration in original) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011)).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 7 of 40

infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech."[22]

## DISCUSSION

For a preliminary injunction to issue, the Court must determine that each of the *Winter* factors are satisfied. The Court turns first to assessing Plaintiffs' likelihood of success on the merits. Because Plaintiffs advance a facial, as opposed to an as-applied, challenge to certain provisions of Alaska election law,[23] Plaintiffs must demonstrate that a "substantial number of applications [of the challenged provisions] are unconstitutional, judged in relation to [their] plainly legitimate sweep."[24] In that regard, courts will not engage in "speculat[ion] about 'hypothetical' or 'imaginary' cases."[25]

## I.     Likelihood of Success on the Merits

### A. Count I

In Count I, Plaintiffs assert that "[c]ompelling individual donors to report donations to independent expenditures violates the First Amendment."[26]

---

[22] *Thalheimer*, 645 F.3d at 1116, *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

[23] *See* Docket 39 at 18 (Plaintiffs acknowledging that "[t]his is a facial challenge," "not an as-applied challenge").

[24] *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

[25] *Yamada v. Snipes*, 786 F.3d 1182, 1201 (9th Cir. 2015) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).

[26] Docket 40 at 17.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 8 of 40

Specifically, Plaintiffs allege that the donor disclosure requirements in Sections 7 and 15 of Ballot Measure 2 are unconstitutional for two reasons: (1) "because they compel individual independent expenditure donors to report donations within 24 hours to Defendants when the recipient organizations must also report them"; and (2) because "they require donors to report donations to groups that are not actively engaged in independent expenditures."[27]

### 1. Standard of Review

The Court agrees with the parties that the appropriate standard of review applicable to resolution of Count I is exacting scrutiny.[28] To withstand exacting scrutiny, "there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest.'"[29] That is, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."[30] "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest."[31] Narrow tailoring "require[s] a fit that is not necessarily perfect, but reasonable; that represents not

---

[27] Docket 40 at 17–18, ¶¶ 88, 91.

[28] Docket 18-1 at 7 (citing *Ams. for Prosperity Found*, 141 S. Ct. at 2383); Docket 30 at 5.

[29] *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).

[30] *Id.* (quoting *Reed*, 561 U.S. at 196).

[31] *Id.* at 2383.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 9 of 40

necessarily the single best disposition but one whose scope is in proportion to the interest served."[32]

### 2. Sufficiently Important Governmental Interest

The parties dispute whether the State has a sufficiently important interest to justify the challenged provisions of Ballot Measure 2. Defendants contend that the State has two important interests with regard to the challenged provisions of the Measure: (1) "the State's interest in an informed electorate" and (2) the State's interest in "'deterr[ing] actual corruption and avoid[ing] the appearance of corruption by exposing large contributions and expenditures to the light of publicity.'"[33]

Plaintiffs, to the contrary, assert that Defendants lack a sufficiently important governmental interest in relation to the challenged provisions of Ballot Measure 2. They concede that "laws requiring disclosure of campaign contributions may serve a governmental interest."[34] But, specifically as to the donor disclosure requirement, Plaintiffs maintain that because the State already requires each independent expenditure entity to report the donations that it receives, "[t]here is

---

[32] *See id.* at 2384 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014)).

[33] Docket 30 at 5–7 (quoting *Buckley v. Valeo*, 424 U.S. 1, 67 (1976)).

[34] Docket 18-1 at 7 (citing *Buckley*, 424 U.S. at 81).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 10 of 40

no state interest in requiring individual donors to report information to the government that the government already has."[35]

The Court finds that the State has a sufficiently important governmental interest in providing voters with information related to the source of funds received by independent expenditure entities. The Supreme Court and the Ninth Circuit have repeatedly recognized that disclaimer and disclosure laws advance the important governmental interest of "providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas."[36] In *Citizens United v. FEC*, for example, the Supreme Court noted that the challenged disclaimer requirement, which applied to electioneering communications funded by independent groups, served an important state interest because a reasonable disclosure requirement "enables the electorate to make informed decisions and give proper weight to different speakers and messages."[37] And in *Buckley v. Valeo*, the Supreme Court recognized that disclosure and disclaimer requirements help citizens "make informed choices in

---

[35] Docket 18-1 at 10; *see* Alaska Stat. § 15.13.040(d).

[36] *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1008 (9th Cir. 2010); *see also Citizens United v. FEC*, 558 U.S. 310, 368 (2010); *McConnell v. FEC*, 540 U.S. 93, 196 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310; *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected."); *Buckley*, 424 U.S. at 76; *Family PAC v. McKenna*, 685 F.3d 800, 806 (9th Cir. 2012) (noting the "important (and even compelling) informational interest" in "informing the voting public" through disclosure of contributions to ballot measure committees).

[37] 558 U.S. at 371.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 11 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 11 of 40

13

the political marketplace," particularly when independent groups run ads "while hiding behind dubious and misleading names."[38]  Indeed, while disclaimers may burden First Amendment rights in some ways, they also "advanc[e] the democratic objectives underlying the First Amendment" because "[p]roviding information to the electorate is vital to the efficient functioning of the marketplace of ideas."[39]  The Ninth Circuit, too, has recognized that the government's informational interest in election communications is "vital," "important and well recognized."[40]  And the Ninth Circuit has stressed that "[a]ccess to reliable information becomes even more important as more speakers, more speech—and thus more spending—enter the marketplace, which is precisely what has occurred in recent years."[41]  Accordingly, the State has demonstrated a sufficiently important governmental interest as required by the exacting scrutiny standard.[42]

---

[38] *Id.* at 367 (describing holding of *Buckley*) (quoting *McConnell*, 540 U.S. at 197).

[39] *Brumsickle*, 624 F.3d at 1005.

[40] *Id.* at 1008, 1017.

[41] *Id.* at 1007.

[42] The Court further finds that the State has an important governmental interest in deterring the appearance of and actual corruption in elections, as well as foreign influence in elections.  *See* Alaska Stat. § 15.13.068.  Indeed, the Supreme Court has long recognized that disclosure laws "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity."  *Buckley*, 424 U.S. at 67.  However, as the Court finds that Plaintiffs are unlikely to prevail on their claim that the challenged provisions are un constitutional based on their substantial relationship to the State's informational interest, it does not separately address the anti-corruption interest in this order.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 12 of 40

### 3. Substantial Relationship

Plaintiffs contend that the donor disclosure requirement in Section 7 of Ballot Measure 2 is not justified by a substantial and narrowly tailored relationship with the State's informational interest because it is unduly burdensome and duplicative of other reporting requirements, and because it is not sufficiently related to a specific election.[43]  The Court discusses each claim in turn.

### a. The Donor Disclosure Requirement Is Not Unduly Burdensome

Plaintiffs assert that the "burdensome nature" of the donor disclosure requirement "suffices by itself to render the requirement unconstitutional" for three reasons.[44]  *First*, they contend that Section 7 imposes "compliance burdens typically reserved for sophisticated parties" on "anyone who writes a moderate-sized check" and maintain that "[r]equiring individuals to meet standards usually reserved for sophisticated parties violates the First Amendment."[45]  *Second*, Plaintiffs assert that the obligation to report donations within 24 hours is "a tremendous burden."[46]  *Third*, Plaintiffs contend that compliance with the donor disclosure requirement demands "both encyclopedic and prophetic knowledge of Alaska independent expenditure groups," because "a donor must report not only a

---

[43] Docket 18-1 at 7–12.

[44] Docket 18-1 at 8.

[45] Docket 18-1 at 8–9 (citing *Sampson v. Buescher*, 625 F.3d 1247, 1259 (10th Cir. 2010)).

[46] Docket 18-1 at 9.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 13 of 40

contribution to an active independent expenditure group, but also a contribution to any group that has made independent expenditures in the past two years or is likely to do so in the future."[47]

In response, Defendants contend that compliance with the disclosure requirements is neither "tremendous[ly] burden[some]" nor does it require "encyclopedic and prophetic knowledge."[48]  Defendants assert that "the plaintiffs offer no evidence that individual donors will find compliance difficult" and describe the burden as limited to "filling out a single online form."[49]  Defendants further argue that the donor disclosure requirement is narrowly tailored to further the State's claimed interests and as such survives exacting scrutiny.[50]

The Court finds that the donor disclosure requirement is not unduly burdensome so as to render Sections 7 and 15 unconstitutional.  Foremost, Plaintiffs provide no evidence to suggest that filling out the online form required by Section 7 within 24 hours of making a contribution is difficult.  Indeed, Plaintiffs fail to provide evidence from the previous 16 months since the donor disclosure requirement took effect to support their assertion that compliance has been burdensome or onerous.  Instead, they have opted to bring a facial challenge; but

---

[47] Docket 18-1 at 9.

[48] Docket 30 at 13 (quoting Docket 18-1 at 9).

[49] Docket 30 at 13.

[50] Docket 30 at 8.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 14 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 14 of 40

16

Plaintiffs cannot sustain a facial challenge based on "'hypothetical' or 'imaginary' cases."[51]  In contrast, the State has filed seven screen shots of the relevant Statement of Contributions Form 15-5, which appears to be a straightforward document that enables a donor to promptly comply with the reporting requirement.[52]

Plaintiffs rely on *Americans for Prosperity Foundation v. Bonta*, where the Supreme Court invalidated a donor disclosure requirement.[53]  But *Americans for Prosperity* is not a case concerning electioneering by independent expenditure entities.  Rather, it concerned the right of private charities to withhold donor names, and it contained an extensive record that demonstrated that government investigators had only rarely used the donor information to detect charitable fraud, the asserted state interest in that case.[54]  In contrast, here, the donor disclosure requirement in Section 7 is directly related to the State's important interest in promptly providing voters with information about the source of funding of political advertisements by independent expenditure entities.  Moreover, the donor disclosure requirement is tailored to that interest through both the $2,000 minimum and the temporal requirements, discussed below.[55]

---

[51] *Yamada*, 786 F.3d at 1201 (citing *Wash. State Grange*, 552 U.S. at 450).

[52] *See* Docket 30-2 (Hebdon Decl., Ex. B).

[53] *See* Docket 18-1 at 8.

[54] *See Ams. for Prosperity Found.*, 141 S. Ct. at 2381.

[55] Alaska Stat. § 15.13.040(r); *see also* Docket 30 at 10.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 15 of 40

### b. The Donor Disclosure Requirement Is Not Unduly Duplicative

Plaintiffs next contend that the donor disclosure requirement is unconstitutional because it imposes a "burden on citizens even though [the State] *already has* a source of the *same information*."[56]  Plaintiffs maintain that because the "[d]isclosure of donations by the donee political entitles" is already required by Alaska Statute § 15.13.040(d), "the burden on individual donors is great, and the marginal gain to the state is very small."[57]

"fulfills any legitimate interest Alaska may claim."[58]  Accordingly, Plaintiffs assert that "[t]here is no state interest in requiring individual donors to report information to the government that the government already has."[59]

Defendants respond that the donor disclosure requirement complements, as opposed to duplicates, other requirements of Alaska campaign finance law. Specifically, Defendants contend that the donor disclosure requirement traces the "true source" of the donor's funds, such that "the law reasonably obligates the donor to provide and certify the truth of this information."[60]  In the absence of the donor disclosure requirement, Defendants maintain that "[p]lacing this obligation

---

[56] Docket 18-1 at 10.

[57] Docket 18-1 at 11.

[58] Docket 18-1 at 10; *see* Alaska Stat. § 15.13.040(d) ("Every person making an independent expenditure shall make a full report of expenditures made and contributions received, upon a form prescribed by the commission, unless exempt from reporting.")).

[59] Docket 18-1 at 10.

[60] Docket 30 at 12.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 16 of 40

solely on the recipient would lead to incomplete or inaccurate reporting of true sources," whereas "[r]equiring both sides of the transaction to report . . . ensures that no transactions are missed."[61]

The Court finds that the donor disclosure requirement in Section 7 overlaps with, but is not completely duplicative of, the reporting requirements for independent expenditure entities. As ABE notes, "the contributor will *always* be in a better position than the [independent expenditure entity] to both identify the true source of its own contribution and quickly report it."[62] Requiring the donor, in addition to the recipient, to report contributions over $2,000 does not unreasonably burden the donor. Rather, requiring prompt disclosure by both parties maximizes the likelihood of prompt and accurate reporting of the information when it is most useful to the electorate.[63]

Plaintiffs' reliance on *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014), is unavailing. In *McCutcheon*, the Supreme Court considered the constitutionality of a regime that imposed limitations on both candidate contributions and expenditures. Here, by contrast, Plaintiffs are challenging the constitutionality of disclosure requirements. As such, the Supreme Court's "prophylaxis-upon-prophylaxis" analysis is inapplicable to the present litigation.

---

[61] Docket 30 at 12.

[62] Docket 33 at 21.

[63] Docket 33 at 22 & n.102; *see Yes on Prop B v. City & County of San Francisco*, 440 F. Supp. 3d 1049, 1059 (N.D. Cal. 2020).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 17 of 40

Because the donor disclosure requirement is closely tailored to providing valuable funding information to the State and its citizens, Plaintiffs are not likely to succeed on their claim that Sections 7 and 15 of Ballot Measure 2 are unconstitutional because they are duplicative of other reporting requirements.

### c. The Temporal Parameters of the Donor Disclosure Requirement Are Not Unconstitutional

Plaintiffs also take issue with the provisions of Section 7 that extend the reporting requirement beyond a current election cycle to contributions made to an entity that made independent expenditures in the previous election cycle, as well as to contributions made to an entity that the donor "knows or has reason to know is likely to make independent expenditures in one or more candidate elections in the current election cycle."[64] Plaintiffs assert that "the government has no business requiring disclosure of current donations to groups that engaged in independent expenditures in the past or may do so in the future."[65] Plaintiffs maintain that the temporal reach of the donor disclosure requirement is not "tied with precision to specific election periods" or "carefully tailored" to any sufficiently important governmental interest.[66]

---

[64] Alaska Stat. § 15.13.040(r).

[65] Docket 18-1 at 11.

[66] Docket 18-1 at 11–12 (citing *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1117–18 (9th Cir. 2019)).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 18 of 40

In response, Defendants acknowledge that the disclosure law "might sweep in some excess information at the margins" as it applies to contributions made during a current election cycle to an entity that has not made any expenditures in the current cycle, but did make them in the past cycle.[67]  However, Defendants argue that this does not make the disclosure requirement impermissibly overbroad, as it furthers the law's purpose.  Defendants explain: "If the law covered only contributions to entities that had *already* made expenditures [in the current election] cycle, many relevant contributions would be missed" because "an entity could amass a secret war chest and delay reporting by beginning its expenditures at the last minute, leaving voters to sort through reports after the election."[68]

Foremost, the Court reiterates that Plaintiffs cannot sustain a facial challenge to the donor disclosure provisions of Ballot Measure 2 based on "'hypothetical' or 'imaginary' cases."[69]  Plaintiffs have not submitted any evidence that they have been impacted by the temporal scope of the donor reporting requirement.  Nor have they demonstrated that a "substantial number" of contributions subject to the donor reporting requirement are unconstitutional in relation to the "plainly legitimate sweep" of the requirement.[70]  The Court finds that

---

[67] Docket 30 at 10.

[68] Docket 30 at 10.

[69] *Yamada*, 786 F.3d at 1201 (citing *Wash. State Grange*, 552 U.S. at 450).

[70] *Ams. for Prosperity Found.*, 141 S. Ct. at 2387.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 19 of 40

the temporal reach of Section 7 is substantially related and narrowly tailored to the State's important interest in providing voters with prompt information related to the funding of political advertisements in a current election cycle. Specifically, requiring the disclosure of donations made to independent expenditure entities in the previous election cycle and are likely to make independent expenditures in the current election cycle helps ensure that voters will promptly have access to complete information regarding the source of independent expenditures in advance of an election, and prevents donors from sidestepping disclosure requirements by strategically donating in the final stretch of an election cycle.

For the foregoing reasons, Plaintiffs have not established a likelihood of success on the merits of Count I.[71]

## B. Count II

In Count II, Plaintiffs assert that "[t]he entirety of AS 15.13.090, as modified by Sections 11 and 12 of Ballot Measure 2, is unconstitutional" because it "[c]ompel[s] speakers to recite government-imposed scripts on campaign materials" and discriminates against nonresidents in violation of the First Amendment.[72] Alaska Statute § 15.13.090, as modified by the Measure, requires

---

[71] The Court has applied the more stringent "likelihood of success on the merits" analysis; however, applying the more relaxed "substantial question" analysis would yield the same result. Even assuming, without deciding, that the "balance of hardships tips *sharply* in the plaintiff's favor," Plaintiffs have not carried their burden at this stage of the litigation to demonstrate that an adequately "serious question" exists with regard to the constitutional validity of the donor disclosure provisions in Sections 7 and 15.

[72] Docket 40 at 18–20.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 20 of 40

political advertisements by independent expenditure entities to include three on-ad disclaimers: (1) a sponsor disclaimer; (2) a top-three-donor disclaimer; and (3) when applicable, an out-of-state disclaimer.[73]

### 1. Standard of Review

As a threshold matter, the parties disagree as to which standard of review applies to the disclaimer requirements: strict scrutiny or exacting scrutiny. Plaintiffs maintain that the disclaimer requirements are subject to strict scrutiny because they are content-based requirements that "force[] Plaintiffs to alter their advertisements that seek to inform or convince people on a particularly political issue, to also encourage viewers or listeners to consider Plaintiffs' own donors."[74] They point to *National Institute of Family & Life Advocates (NIFLA) v. Becerra*, in which the Supreme Court applied strict scrutiny to strike down a California statute compelling crisis pregnancy centers to post notices about the availability of abortion services.[75] Plaintiffs also rely on *ACLU of Nevada v. Heller*, a case in which the Ninth Circuit applied strict scrutiny to a Nevada law that "require[d] certain groups or entities publishing 'any material or information relating to an

---

[73] Plaintiffs do not specifically challenge the sponsor disclaimer by itself but do assert that the three disclaimers are overly burdensome when considering their cumulative effect because "they take up such a significant portion of an advertisement." *See* Docket 40 at 19–20, ¶ 98.

[74] Docket 18-1 at 14-15. Specifically with regard to the out-of-state disclaimer, Plaintiffs also assert that strict scrutiny is the appropriate standard because it is a "law[] that discourage[s] a certain class of people from making political contributions and thus burden[s] political speech." Docket 18-1 at 24.

[75] 138 S. Ct. 2361 (2018); *see also* Docket 18-1 at 13–14.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 21 of 40

election, candidate or any question on a ballot' to reveal on the publication the names and addresses of the publication's financial sponsors."[76]  There, the court recognized a "constitutionally determinative distinction between on-publication identity disclosure requirements and after-the-fact reporting requirements," holding that the former should receive strict scrutiny because such requirements "involve the direct alteration of the content of a communication."[77]

Defendants, by contrast, contend that exacting scrutiny is the appropriate standard because the Supreme Court applied that standard to "both disclosures and disclaimers" in *Citizens United*, "even though the plaintiff had advocated for strict scrutiny—like the plaintiffs here—on the theory that disclaimers constitute 'compelled speech' or 'content-based restrictions on political speech.'"[78]  They assert that *Heller* is no longer good law because it was decided before *Citizens United* and maintain that the Ninth Circuit now "recognizes *Citizens United* as the controlling law on political disclaimers."[79]  Plaintiffs reply that *Citizens United* is inapposite because it "said not one word about compelled speech" and only addressed a "stand by your ad" disclaimer.[80]  They assert that the Measure "goes

---

[76] 378 F.3d 979, 981, 992 (9th Cir. 2004) (emphasis omitted); *see also* Docket 18-1 at 18.

[77] *Heller*, 378 F.3d at 994.

[78] Docket 30 at 14–15 (citing *Citizens United*, 558 U.S. at 366; Br. for Appellant at 43–44, *Citizens United*, 558 U.S. 310 (Case No. 08-205), 2009 WL 6147).

[79] Docket 30 at 15 (citing *Yamada*, 786 F.3d at 1202).

[80] Docket 39 at 10.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 22 of 40

far beyond" such a disclaimer and that "[t]he State's interest in forcing a candidate to acknowledge his own ad is different from exposing donors on the face of the ad."[81]

The Court finds that, to the extent that the Ninth Circuit's decision in *Heller* can be read as requiring strict scrutiny for all on-ad political disclaimer requirements, such a holding is "clearly irreconcilable" with the Supreme Court's subsequent decision in *Citizens United*.[82]  Contrary to Plaintiffs' assertions, the Supreme Court did consider compelled speech in *Citizens United* because one of the challenged statutory provisions that the Supreme Court upheld required that "televised electioneering communications funded by anyone other than a candidate must include a disclaimer" stating the "name and address (or Web site address) of the person or group that funded the advertisement."[83]  The Supreme Court made clear that its rationale in employing exacting scrutiny applied to both disclosures *and* disclaimers, explaining that "[d]isclaimer and disclosure

---

[81] Docket 39 at 10.

[82] *See United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)).  For a Supreme Court decision to "effectively overrule[]" Ninth Circuit precedent, the Supreme Court decision must "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."  *Id.* (quoting *Miller*, 335 F.3d at 900).  It appears that *Citizens United* and *Heller* are irreconcilable in this respect because *Citizens United*'s reasoning in applying exacting scrutiny, which distinguished on-ad disclaimer and disclosure requirements as less burdensome than outright caps or bans on electioneering activities, undercuts the reasoning underlying *Heller*'s application of strict scrutiny, which instead turned on the temporal distinction between on-publication and after-the-fact disclosure requirements.  *Compare Citizens United*, 558 U.S. at 366, *with Heller*, 378 F.3d at 994.

[83] *See Citizens United*, 558 U.S. at 366 (citing 2 U.S.C. § 441d(a)(3)).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 23 of 40

requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'"[84] Indeed, the Ninth Circuit has since recognized *Citizens United* as controlling on the appropriate level of scrutiny for political disclaimer requirements.[85]  In *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, for example, the Ninth Circuit, sitting en banc, cited *Citizens United* to conclude that exacting scrutiny applied to California's statutory requirement that the name of the official proponent of a ballot initiative must appear on each section of the initiative petition that is circulated to voters.[86]

Thus, even if a disclosure or disclaimer is viewed as compelling speech, exacting scrutiny is the appropriate standard to apply in considering Plaintiffs' likelihood of success on the merits of Count II.  To survive exacting scrutiny, the disclaimer requirements must be "substantially related to a sufficiently important

---

[84] *Id.* at 366 (citation omitted) (first quoting *Buckley*, 424 U.S. at 64; then quoting *McConnell*, 540 U.S. at 201); *see also Reed*, 561 U.S. at 196 (stating that disclosure requirements are subject to less demanding standard of review because they are "not a prohibition on speech").

[85] *See Montanans for Cmty. Dev. v. Mangan*, 735 Fed. App'x 280, 284 (9th Cir. 2018) (citing *Citizens United*, 558 U.S. at 369) (applying exacting scrutiny to "paid-for" attribution requirement for electioneering communications); *Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 535–36 (9th Cir. 2015) (en banc) (citing *Citizens United*, 558 U.S. at 366–67); *Yamada*, 786 F.3d at 1194 (applying exacting scrutiny to requirement that political advertisements include disclaimer stating whether they are broadcast or published with approval of a candidate); *see also San Franciscans Supporting Prop B v. Chiu,* Case No. 22-cv-02785-CRB, 2022 WL 1786573, at *4 (N.D. Cal. June 1, 2022) (concluding that *Heller's* analysis of disclaimer law as content-based restriction subject to strict scrutiny is no longer good law in light of *Citizens United* and other Supreme Court cases applying exacting scrutiny to disclaimers), *appeal filed*, Case No. 22-15824 (9th Cir. June 6, 2022).

[86] 782 F.3d at 535–36 (citing *Citizens United*, 558 U.S. at 366–67).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 24 of 40

governmental interest"[87] and "be narrowly tailored to the government's asserted interest."[88]

### 2. Sufficiently Important Governmental Interest

As discussed above, the Court finds that the State has a sufficiently important governmental interest in providing voters with information related to the funding of political advertisements by independent expenditure organizations. While Plaintiffs argue in their motion that the out-of-state disclaimer does not serve an important state interest in preventing corruption,[89] Defendants respond that they do not "seek[] to justify the out-of-state disclaimer as a means of preventing quid pro quo corruption."[90] Thus, the Court will only consider whether the disclaimers are justified based on the State's informational interest.

### 3. Substantial Relation

Plaintiffs assert that the on-ad disclaimer requirements significantly burden their First Amendment rights in three ways and that these burdens are not justified by a substantial and narrowly tailored relationship between the disclaimers and the

---

[87] *Brumsickle*, 624 F.3d at 1005; *cf. Ams. for Prosperity Found.*, 141 S. Ct. at 2383 ("Under strict scrutiny, the government must adopt 'the least restrictive means of achieving a compelling state interest,' rather than a means substantially related to a sufficiently important interest." (citation omitted) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014))).

[88] *Ams. for Prosperity Found.*, 141 S. Ct. at 2383.

[89] *See* Docket 18-1 at 24.

[90] Docket 30 at 20.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 25 of 40

State's informational interest.[91]   The Court discusses each of Plaintiffs' claimed burdens in turn.

### a. Top-Three-Donor Disclaimer

Plaintiffs assert that the disclaimer requirements, particularly the top-three-donor disclaimer contained in Section 11 of the Measure, burden their First Amendment rights because they "force[] them to speak a message they do not want to voice."[92]   They maintain that the top-three-donor disclaimer is akin to the crisis pregnancy center notices invalidated in *NIFLA* because Plaintiffs "believe strongly in the right to privacy for citizens and would not include their donors' information in their advertisements if not forced to by the law."[93]

Given this burden, Plaintiffs contend that the top-three-donor disclaimer is not substantially related to an informational interest or narrowly tailored because the State's interest in informing the electorate is already served by other disclosure requirements; thus, the on-ad top-three-donor disclaimer "only provides, at best, a marginal gain in convenience for viewers to see these names on the ad itself, rather than having to trouble themselves to find it on the Internet."[94]   Further, Plaintiffs assert that "[t]he on-ad sponsor disclaimer (the name of the independent

---

[91] Docket 18-1 at 21, 26–27.

[92] Docket 18-1 at 16.

[93] Docket 18-1 at 16–17 ("Forcing an organization committed to limited government and personal freedom to announce the names of its donors in advertisements is similar to forcing pro-life groups to share information about abortion access.").

[94] Docket 18-1 at 19.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 26 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 26 of 40

28

expenditure committee) alone easily satisfies any information interest" and that conveying the top three donors on the ad may actually "decrease viewers' information by giving them a distorted view of the organization's overall donors."[95]

Defendants disagree with Plaintiffs' assessment of the burdens created by the top-three-donor disclaimer. They contend that *NIFLA* is not analogous because that case "was not about political disclaimers, and the disclaimers there were much more burdensome."[96] Further, Defendants maintain that there is a sufficiently substantial relation between the top-three-donor disclaimer requirement and the government's informational interest, asserting that: (1) the on-ad sponsor disclaimer alone is insufficient because "disclosing donor information prevents entities from 'hiding behind dubious and misleading names' . . . while trying to influence the outcome of elections";[97] and (2) including "[donor] information in the ads themselves advances [the government's informational

---

[95] Docket 18-1 at 20. In addition, Plaintiffs cite *McIntyre v. Ohio Elections Com'n*, 514 U.S. 334, 348–49 (1995), for the proposition that "[t]he simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." Docket 18-1 at 19. However, *McIntyre* is factually distinct from this litigation, as it involved "individuals acting independently and using only their own modest resources" to engage in unorganized political speech regarding ballot initiatives. *See* 514 U.S. at 351–52; *cf.* Docket 33 at 30 (Intervenor-Def.'s Mot. to Dismiss) ("Here, there are already minimum contribution and expenditure thresholds to protect limited and unsophisticated political speech from arguably burdensome requirements, and Ballot Measure 2 did not change Alaska's disclaimer and disclosure requirements for ballot initiatives." (footnote omitted)). Indeed, as the Supreme Court's more recent decision in *Citizens United* demonstrates, an informational interest can be sufficiently important to justify disclaimer requirements for electioneering communications made by independent expenditure entities. *See* 558 U.S. at 369–71.

[96] Docket 30 at 16.

[97] Docket 30 at 16 (quoting *McConnell*, 540 U.S. at 196–97).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 27 of 40

interest] more efficiently and effectively than requiring voters to search for disclosure forms online."[98]

In support of these contentions, Defendants cite *Gaspee Project v. Mederos*, a recent case in which the First Circuit applied exacting scrutiny to uphold a Maine law requiring on-ad disclaimers identifying the ad sponsor's top five donors.[99] In *Gaspee*, the First Circuit rejected the plaintiffs' arguments that the disclaimer "serve[d] no informational interest and [was] essentially redundant of [a separate] disclosure requirement."[100] The court determined that the on-ad disclaimer was "not entirely redundant to the donor information revealed by public disclosures" because it was "a more efficient tool for a member of the public who wishes to know the identity of the donors backing the speaker."[101] Further, the court noted that an on-ad disclaimer "may be more effective in generating discourse" because it "may elicit debate as to both the extent of donor influence on the message and the extent to which the top five donors are representative of the speaker's donor base."[102]

---

[98] Docket 30 at 17.

[99] 13 F.4th 79, 91 (1st Cir. 2021), *cert. denied*, Case No. 21-890, 2022 WL 1205841 (U.S. Apr. 25, 2022); *see also* Docket 30 at 17–18.

[100] *Gaspee Project*, 13 F.4th at 91.

[101] *Id.* ("The public is 'flooded with a profusion of information and political messages,' and the on-ad donor disclaimer provides an instantaneous heuristic by which to evaluate generic or uninformative speaker names." (quoting *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 57 (5th Cir. 2011))).

[102] *Id.*

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 28 of 40

Balancing the burdens against the governmental interest, the Court finds that the on-ad top-three-donor disclaimer requirement is substantially related to the important governmental interest in an informed electorate and is narrowly tailored to further that interest. The Court agrees with Defendants that the burden here on independent expenditure entities is much lower than in *NIFLA*, where pro-life pregnancy crisis centers were required to "inform women how they can obtain state-subsidized abortions," which was "the very practice that [they] are devoted to opposing."[103] Here, while Plaintiffs may hold broad ideological concerns about privacy, the on-ad top-three-donor disclaimer does not require them to convey a message that is directly contrary to whatever political statement they seek to make in their electioneering communications.

With regard to the substantial relation between the burdens created by the on-ad top-three-donor disclaimer requirement and the government's informational interest, the Court finds the reasoning of the First Circuit in *Gaspee Project* persuasive. While voters have access to donor information through the required disclosures to the APOC, the on-ad placement of some of that information provides a far more efficient and effective form of disclosure. As the Supreme Court noted in *Citizens United*, there is value in the "prompt disclosure" of such information, as it "can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and

---

[103] *NIFLA*, 138 S. Ct. at 2371.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 29 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 29 of 40

31

supporters."[104]  Given the modest nature of the burden imposed by the on-ad top-three-donor disclaimer requirement and the fact that exacting scrutiny does not require that the government use the least restrictive means possible, there is a sufficient relationship between the government's informational interest and the on-ad top-three-donor disclaimer requirement to withstand constitutional scrutiny.[105] Plaintiffs are unlikely to succeed on the merits of Count II based on the on-ad top-three-donor disclaimer requirement.

### b. Out-of-State Disclaimer

Plaintiffs challenge the out-of-state disclaimer requirement in Section 12 of the Measure as unduly burdensome because it discriminates against nonresidents without sufficient justification, asserting that "[o]ut-of-state campaign contribution restrictions like Alaska's are routinely invalidated by courts."[106]  Plaintiffs primarily rely on *Thompson v. Hebdon*, a recent decision in which the Ninth Circuit held that Alaska's nonresident aggregate contribution limit, which barred candidates from accepting more than $3,000 per year from non-Alaskans, violated the First

---

[104] *Citizens United*, 558 U.S. at 371.

[105] *See Family PAC*, 685 F.3d at 809 (upholding disclosure requirements when they "impose[d] only modest burdens on First Amendment rights, while serving a governmental interest in an informed electorate that is of the utmost importance").

[106] Docket 18-1 at 23–25 (citing *Thompson v. Hebdon*, 7 F.4th 811 (9th Cir. 2021); *Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2004); *SD Voice v. Noem*, 380 F. Supp. 3d 939 (D.S.D. 2019)). Plaintiffs also cite two cases regarding bans on out-of-state petition circulators.  Docket 18-1 at 26 (citing *We the People PAC v. Bellows*, 519 F. Supp. 3d 13 (D. Me. 2021), *appeal filed*, Case No. 21-1149 (1st Cir. Feb. 23, 2021); *Citizens in Charge v. Gale*, 810 F. Supp. 2d 916 (D. Neb. 2011)).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 30 of 40

Amendment.[107]  There, the court concluded that the contribution limit did not serve an anti-corruption interest and that even if it did, the limit was not sufficiently tailored to serve that interest.[108]

Plaintiffs assert that there is not a substantial relation between the out-of-state disclaimer and the State's informational interest because "the donors to independent expenditure groups are already disclosed to the state, and to the public on the state's website, so one can easily determine whether any particular group draws it support from outside Alaska."[109]  Further, they maintain that the disclaimer requirement is not narrowly tailored due to the Measure's over-inclusive definition of "outside-funded entity": a group that takes donations from a true source with a principal place of business outside Alaska.[110]  Plaintiffs suggest that "one's principal place of business is a poor proxy for one's interest in Alaska's elections," particularly because a donor may have "significant operations in Alaska" while "happening to be headquartered elsewhere."[111]

Defendants disagree, maintaining that the out-of-state disclaimer is "narrowly tailored to the important state interest in informing voters," particularly when entities use misleading names, such as "Families of the Last Frontier," that

---

[107] 7 F.4th at 824.

[108] *See id.* at 824–25.

[109] Docket 18-1 at 26.

[110] Docket 18-1 at 27.

[111] Docket 18-1 at 27.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 31 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 31 of 40

33

imply that they are primarily funded by Alaska residents.[112] While Defendants acknowledge that donors with an out-of-state principal place of business may still have a valid interest in Alaska's elections, they note that those donors are not barred from participating—the Measure only requires disclosure.[113]

As Defendants note, *Thompson* and the other cases that Plaintiffs cite concerned contribution limits or bans on non-resident petition circulators rather than the type of disclaimer requirement at issue here.[114] While the out-of-state disclaimer places some burden on political speech, it is not nearly as burdensome as an outright ban or cap on contributions or certain political activities. It does not limit how much out-of-state donors can give, nor does it even directly burden out-of-state donors; rather, it burdens independent expenditure entities that receive over a certain percentage of their funds from out-of-state donors. Thus, given the relatively minimal burden it imposes, there is a sufficiently substantial relation between the out-of-state disclaimer and the State's informational interest.

With respect to tailoring, the Court again finds the reasoning of *Gaspee Project* instructive. While there are other avenues for voters to learn about independent expenditure entities' funding sources, an on-ad disclaimer makes that

---

[112] Docket 30 at 19–20; *see, e.g.*, Docket 33 at 11–12, 12 n.57 (citing Docket 33-1 at 4, 20, ¶¶ 11, 20 (Kendall Aff.)) (noting that Families of the Last Frontier received over 99.5% of its funding from out-of-state donations in 2018).

[113] Docket 30 at 20.

[114] Docket 30 at 19 ("The plaintiffs' arguments about this all rest on the mistaken premise that this disclaimer is analytically equivalent to banning or limiting the quantity of out-of-state speech in Alaska's elections.").

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 32 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 32 of 40

34

information far more accessible and presents it at a highly useful time for voters attempting to weigh competing political messages. And though an entity's principal place of business may be an imperfect proxy for its interest in Alaska's elections, it is likely an accurate measure in most cases; exacting scrutiny does not require a perfect fit between a state's important informational interest and the means used to further that interest. Thus, the Court finds that the out-of-state disclaimer has a substantial relation to Defendants' informational interest and is narrowly tailored to further that interest. Plaintiffs are unlikely to succeed on the merits of Count II based on the out-of-state disclaimer requirement.

### c. Ad Space

Plaintiffs also assert that all three disclaimers, taken together, "restrict[] their ability to speak their preferred message" because the disclaimers consume substantial ad space.[115] They primarily rely on *American Beverages Association v. City & County of San Francisco*, a case in which the Ninth Circuit overturned a district court's denial of a preliminary injunction against enforcement of a mandatory health warning on ads for sugar-sweetened beverages.[116] There, the Ninth Circuit held that the disclaimer impermissibly compelled speech because the warning was required to "occupy at least 20% of the advertisement," but expert

---

[115] Docket 18-1 at 16, 22.

[116] 916 F.3d 749, 754 (9th Cir. 2019); Docket 18-1 at 22; Docket 39 at 11–12.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 33 of 40

testimony showed that a 10% warning would have sufficed.[117]  Thus, "the 20% requirement [was] not justified and [was] unduly burdensome when balanced against its likely burden on protected speech."[118]

Defendants respond that Plaintiffs "offer no evidence to support their conclusory assertions that the disclaimers will take up too much space in their advertisements."[119]

The Court finds that *American Beverage Association* is not controlling here, as that case concerned commercial speech.  Different considerations are at play when regulating political advertisements, and the State's interest in an informed electorate may justify more burdensome disclaimers.  Indeed, in *Citizens United*, the disclaimer requirement upheld by the Supreme Court required the plaintiff to devote four seconds of a ten-second ad to a disclaimer—a full 40% of the ad space.[120]  There, the Supreme Court explicitly rejected the plaintiff's argument that the disclaimer was impermissible because it "decrease[d] both the quantity and

---

[117] 916 F.3d at 754, 757.

[118] *Id.* at 757.  However, the court was careful to note that its holding was based on the specific facts of the case; it "[did] not hold that a warning occupying 10% of product labels or advertisements necessarily is valid, nor [did it] hold that a warning occupying more than 10% of product labels or advertisements necessarily is invalid."  *Id.*

[119] Docket 30 at 17.

[120] *See Citizens United*, 558 U.S. at 320, 366, 371.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 34 of 40

effectiveness of the group's speech by forcing it to devote four seconds of each advertisement to the spoken disclaimer."[121]

Moreover, unlike in *American Beverage Association*, the disclaimers here are not required by law to take up a certain percentage of ad space; nor do Plaintiffs offer evidence that shorter or less prominent disclaimers would serve the State's informational interest equally well.[122] While Plaintiffs assert that the required disclaimers "easily and obviously consume 20 percent of a standard thirty- or sixty-second TV or radio ad,"[123] they do not supply one of their advertisements as an example or otherwise provide evidentiary support for this claim sufficient to demonstrate that a "substantial number of [the disclaimer requirements'] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[124]

In sum, the Court finds that Plaintiffs have not demonstrated that the ad space consumed by the three disclaimers is unduly burdensome in light of the vital informational interest served by those disclaimers. The specifics of how the disclaimers must be displayed or spoken are substantially related to the State's important informational interest and are narrowly tailored to serve that interest.

---

[121] *Id.* at 368.

[122] *Cf. Am. Beverages Ass'n*, 916 F.3d at 757.

[123] Docket 39 at 11.

[124] *Ams. for Prosperity Found.*, 141 S. Ct. at 2387.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 35 of 40

Plaintiffs are thus unlikely to succeed on the merits of Count II based on the ad space consumed by the disclaimers.[125]

### C. Count III

In Count III, Plaintiffs challenge Sections 6, 9, 14, and 18 of Ballot Measure 2. Together, these sections require an independent expenditure entity to identify the "true source" of all contributions it receives of over $2,000. Plaintiffs assert that "[c]ompelling primary and secondary donor disclosure violates the First Amendment."[126] Plaintiffs contend that Ballot Measure 2's "true source" requirement burdens speech in multiple significant ways, including by demanding that recipients disclose information they may not have, limiting who an independent expenditure entity may solicit funds from, and sweeping uninterested third parties into Alaskan elections.[127] Plaintiffs also assert that "Ballot Measure 2 violates [the] freedom of private association by compelling independent expenditure groups to track and disclose not only their own donors, but also donors to those donors, and

---

[125] The Court has applied the more stringent "likelihood of success on the merits" analysis to the Plaintiffs' challenges to the disclaimer requirements; however, applying the more relaxed "substantial question" analysis would yield the same result. Even assuming, without deciding, that the "balance of hardships tips *sharply* in [their] favor," Plaintiffs have not carried their burden at this stage of the litigation to demonstrate that an adequately "serious question" exists with regard to the disclaimer requirements.

[126] Docket 40 at 20.

[127] Docket 18-1 at 30–31.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 36 of 40

donors to those donors' donors, reaching out indefinitely to what it defines as the 'true source' of the money."[128]

### 1. Standard of Review

Plaintiffs assert, and Defendants do not contest, that exacting scrutiny applies to Claim III.[129] The Court applies that standard to the challenged sections.

### 2. Sufficiently Important Governmental Interest

As discussed above, the Court finds that the State has a sufficiently important governmental interest in providing voters with information related to the funding of political advertisements by independent expenditure entities.

### 3. Substantial Relation

Plaintiffs contend that the recipient disclosure obligations of Ballot Measure 2 are not substantially related to the government's stated interest because these sections "could have been more narrowly tailored by only requiring disclosure of donors who actively participating [sic] in determining how these funds are used."[130] Plaintiffs assert that because the "'true source' requirement is not 'tied with precision' or 'carefully tailored' to actual electoral activity," these sections of Ballot Measure 2 fail to meet the exacting scrutiny standard.[131] Plaintiffs assert

---

[128] Docket 18-1 at 28.

[129] Docket 18-1 at 28; Docket 30 at 21–27.

[130] Docket 40 at 21, ¶ 105 (citing *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009)).

[131] Docket 18-1 at 29.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 37 of 40

that the First Amendment protects major contributors to independent expenditure entities from being required to disclose the "true source" of the contribution to the independent expenditure entity, that is in turn required by these sections of Ballot Measure 2 to report this information to the State.

Defendants respond that the State and its voters have an important interest in knowing who is contributing to independent expenditure entities.[132] And the ABE maintains that "there is no constitutional right to make 'dark money' contributions."[133]

The Court finds that Ballot Measure 2's "true source" definition, together with its requirement that independent expenditure entities report these true sources to the State, are both substantially related and narrowly tailored to fulfill the State's informational interest in informing voters about the actual identity of those trying to influence the outcome of elections.

The Court further notes that Plaintiffs' hypothetical examples have not demonstrated that the true source disclosure requirements in Sections 6, 9, 14, and 18 are inadequately tailored. Plaintiffs lack standing to maintain an action based on hypothetical scenarios by non-parties to this action. And the Ninth Circuit

---

[132] Docket 30 at 21.

[133] Docket 33 at 35.

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 38 of 40

has stressed that courts are not to "speculate about 'hypothetical' or 'imaginary' cases" when evaluating a facial challenge to a disclosure requirement.[134]

For these reasons, the Court finds that the true source reporting requirements in Sections 6, 9, 14, and 18 of Ballot Measure 2 withstand review under exacting scrutiny, and thus Plaintiffs are not likely to succeed on the merits of Claim III.[135]

## CONCLUSION

Preliminary injunctive relief is an extraordinary remedy, and in the context of elections, the Supreme Court has recognized that "lower federal courts should ordinarily not alter . . . election rules on the eve of an election."[136]  Plaintiffs waited over one year to seek preliminary injunctive relief; such "[a] delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief."[137]  As set forth above, the Court has determined that Plaintiffs have not demonstrated a likelihood of success on any of the three counts pleaded in their

---

[134] *Yamada*, 786 F.3d at 1201 (9th Cir. 2015) (citing *Wash. State Grange*, 552 U.S. at 450).

[135] The Court has applied the more stringent "likelihood of success on the merits" analysis to the Plaintiffs' challenges to the true source reporting requirements; however, applying the more relaxed "substantial question" analysis would yield the same result.  Even assuming, without deciding, that the "balance of hardships tips *sharply* in [their] favor," Plaintiffs have not carried their burden at this stage of the litigation to demonstrate that an adequately "serious question" exists with regard to the true source reporting requirements.

[136] *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam); *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 574 U.S. 951 (2014)).

[137] *See Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 39 of 40

complaint. Because the failure to meet any *Winter* factor warrants denial of a motion for preliminary injunctive relief, the Court does not address the remaining three *Winter* factors.

In light of the foregoing, IT IS ORDERED that Plaintiffs' motions for a preliminary injunction at Docket 7 and Docket 18 are DENIED.

DATED this 14th day of July, 2022 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

Case No. 3:22-cv-00077-SLG, *Smith, et al. v. Helzer, et al.*
Order re Motions for Preliminary Injunction
Page 40 of 40

Case 3:22-cv-00077-SLG   Document 48   Filed 07/14/22   Page 40 of 40

42

Scott M. Kendall (AK No. 0405019)
Jahna M. Lindemuth (AK No. 9711068)
Cashion, Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, Alaska 99501
Phone: (907) 222-7932
Fax: (907) 222-7938
scott@cashiongilmore.com
jahna@cashiongilmore.com


*Attorneys for Intervenor-Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DOUG SMITH, ET AL., | Case No. 3:22-CV-00077-SLG |
| Plaintiffs, | |
| v. | |
| ANNE HELZER, IN HER OFFICIAL CAPACITY AS CHAIR OF THE ALASKA PUBLIC OFFICES COMMISSION, ET AL., | **ALASKANS FOR BETTER ELECTIONS' MOTION TO DISMISS** |
| Defendants, | |
| and | |
| ALASKANS FOR BETTER ELECTIONS, INC., | |
| Intervenor-Defendant. | |

## I.     <u>INTRODUCTION</u>

Plaintiffs are asking this Court to do what no other court has done before: create a constitutional right to hide the source of political contributions.  Plaintiffs assert that the

First Amendment gives individuals the right to anonymously contribute unlimited sums of money to independent expenditure organizations ("IEOs") to sway elections, even though individuals contributing directly to a candidate are not allowed the same anonymity.

This case presents a facial challenge to Ballot Measure 2's disclosure provisions that have been in effect for more than a year. And although the U.S. Supreme Court has struck down certain *limits* or *caps* on contributions, it has specifically approved *disclosure* requirements as a less restrictive, necessary, and constitutionally sound curative option. Because the First Amendment simply does not grant individuals or corporations the right to anonymously give unlimited sums of money to influence elections, Ballot Measure 2's disclosure provisions fall squarely within the bounds of the Constitution.

Plaintiffs specifically challenge Ballot Measure 2's: (1) 24-hour disclosure requirement for contributors to IEOs; (2) mandatory on-ad disclaimers, including a disclaimer if an IEO receives the majority of its contributions from outside of Alaska; and (3) the requirement to disclose a contribution's "true source" rather than reporting just a pass-through intermediary. Because these provisions in Alaska's election laws — adopted by ballot initiative — are constitutionally sound as a matter of law, this Court should dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

## II.    **FACTUAL BACKGROUND**

### A.    **Voters Enact Ballot Measure 2 In November 2020.**

#### 1. **Alaska's prior campaign finance disclosure system.**

As the Ninth Circuit has previously recognized, "Alaska has a long history of regulating political influence and campaign finance."[1] Because Ballot Measure 2 modified Alaska's campaign finance laws, it is worth explaining how Alaska's campaign finance rules operated prior to Ballot Measure 2's enactment.[2]

For background, an IEO is any entity that is required to report because it makes "independent expenditure[s]"[3] "to influence the outcome of an election."[4] By law, an IEO's expenditures are "made without the direct or indirect consultation or cooperation

---

[1]    *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 777 (9th Cir. 2006).

[2]    *See generally* former AS 15.13.010-.400 (2020). The full text of Ballot Measure 2 is provided as Exhibit A to the Affidavit of Scott M. Kendall for ease of reference. *See generally* Alaska's Better Elections Initiative [hereinafter Ballot Measure 2] (Exhibit A *to* Affidavit of Scott M. Kendall (May 16, 2022) [hereinafter Kendall Aff.]). Ballot Measure 2 was incorporated by reference, but apparently not provided, in Plaintiffs' complaint. *See* Complaint at ¶ 15 (Apr. 7, 2022) (Doc. 1). The remaining exhibits and information in Mr. Kendall's affidavit are provided as additional background information for the Court, and to show Plaintiffs' lack of irreparable harm for Alaskans for Better Elections' concurrently-filed opposition to Plaintiffs' motion for preliminary injunction. *See generally* Kendall Aff.

[3]    Former AS 15.13.400(10) (2020); *see also* AS 15.13.400(11).

[4]    *See* former AS 15.13.400(8)(B), (13) (2020); *see also* AS 15.13.400(9)(B), (14). The corollary to a "group" under federal law is a so-called "SuperPAC." The Federal Election Commission created the new class of independent expenditure-only political committees, i.e., "SuperPACs," in response to a D.C. Circuit decision. *See generally* *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc); FEC Advisory Op. 2010-11 (Commonsense Ten) at 2-3.

with . . . a candidate" the IEO either supports or opposes.[5]    IEOs are required to register prior to making any independent expenditures,[6] and must file periodic public reports about their contributions and expenditures.[7]

Relevant here are four key aspects of Alaska law prior to Ballot Measure 2's enactment.  First, no "person or group [could] . . . make a contribution anonymously, using a fictious name, or using the name of another."[8]  But because Ballot Measure 2's definition of "true source" had not yet been adopted,[9] IEOs routinely received contributions from other organizations that obscured where their money actually came from.[10]

Second, IEOs were required to make a number of disclosures on their ads, including: (1) its "three largest contributors . . . during the 12-month period before the date of the

---

[5]    *See* former AS 15.13.400(10) (2020); *see also* AS 15.13.400(11).  It is worth noting that because 501(c)(3) nonprofit organizations are prohibited from influencing elections, those nonprofit organizations cannot make contributions to IEOs.  *See* 26 U.S.C. § 501(c)(3) (stating that such organizations shall "not participate in, or intervene in . . . any political campaign on behalf of (or in opposition to) any candidate for public office"); *see also* AS 15.13.074(f).

[6]    *See* AS 15.13.052(a); *see also* AS 15.13.050(a).  Nongroup entities are also prohibited from soliciting or accepting contributions to influence "the outcome of an election unless the potential contributor is notified that the contribution may be used for that purpose."  *See* AS 15.13.074(i).

[7]    *See* former AS 15.13.110 (2020); *see also* former AS 15.13.135 (2020).

[8]    *See* former AS 15.13.074(b) (2020).

[9]    *See* AS 15.13.400(19).

[10]    For example, one IEO received $3 million before Ballot Measure 2's effective date, and the public will never know where, exactly, that money came from.  *See* James Brooks, *National Republican group sidesteps new disclosure law with $3 million donation in Alaska governor's race*, ANCHORAGE DAILY NEWS (Feb. 18, 2022), https://www.adn.com/politics/2022/02/17/national-republican-group-sidesteps-new-disclosure-law-with-3-million-donation-in-alaska-governors-race/.

communication";[11] (2) "the name and title" of an IEO's "principal officer,"[12] along with "a statement" from them "approving the communication";[13] (3) specific language explaining who the communication "was paid for by";[14] and (4) a certification that the communication "is not authorized, paid for, or approved by the candidate."[15]  Prior to Ballot Measure 2, there was no requirement that the above-mentioned disclosures "remain onscreen throughout the entirety of" certain communications,[16] or that IEOs must disclaim if a majority "of its aggregate contributions" came from "outside Alaska."[17]

Third, IEOs were required to report all "contributions in excess of $50 in the aggregate during a calendar year,"[18] and contributors to ballot initiative groups were also required to independently file a report regarding any contribution of $500 or more within 30 days, even though the group receiving the donation would also report it.[19]  Before Ballot Measure 2 contributors to IEOs, unlike contributors to ballot initiative groups, were *not* required to independently report.[20]

---

[11]      *See* AS 15.13.090(a)(2)(C); *see also* AS 15.13.090(e) ("In no case shall a person be required to identify more than three contributors under (a)(2)(C) of this section.").

[12]      *See* AS 15.13.090(a)(2)(A).

[13]      *See* AS 15.13.090(a)(2)(B).

[14]      *See* former AS 15.13.090(c), (d) (2020).

[15]      *See* AS 15.13.135(b)(2).

[16]      *See* former AS 15.13.090 (2020); *see also* AS 15.13.090(c).

[17]      *See* former AS 15.13.090 (2020); *see also* AS 15.13.090(g); AS 15.13.400(15).

[18]      *See* AS 15.13.040(e)(5)(A).

[19]      *See* AS 15.13.040(k).  This requirement went into effect once a contributor made "a total of $500 or more" in contributions to such groups.  *See id.*

[20]      *See* former AS 15.13.040 (2020).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 5 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 5 of 38
47

Finally, IEOs were required to make periodic publicly-available reports of contributions and expenditures,[21] including reports "not later than 10 days after an independent expenditure has been made."[22] IEOs were also required to report any additional contribution or expenditure "that exceeds $250 . . . made within nine days of the election" within 24 hours.[23] Prior to Ballot Measure 2, the 24-hour reporting requirement did not apply to any contributions or expenditures that fell outside the nine-day period before an election.[24]

As further context, after Ballot Measure 2's passage, the Ninth Circuit struck down individual campaign contribution limits for candidates and groups.[25] As a result of that decision, there are currently *no* campaign contribution limits in Alaska; individuals can now make unlimited monetary contributions directly to candidates.[26] *However*, corporations cannot make such donations to candidates,[27] and all donations from

---

[21]    AS 15.13.110(a).

[22]    AS 15.13.110(h).

[23]    *See* AS 15.13.110(b); *see also* AS 15.13.110(h).

[24]    *See* former AS 15.13.110 (2020).

[25]    *See Thompson v. Hebdon*, 7 F.4th 811, 816 (9th Cir. 2021). The previous campaign contribution limit was $500. *See id.* at 816-17; *see also* former AS 15.13.070 (2020) (struck down, in part, by *Thompson*, 7 F.4th at 816).

[26]    *See* Advisory Opinion Decision, Alaska Public Offices Commission ("APOC"), AO No. 21-09 (Mar. 3, 2022) (Exhibit B *to* Kendall Aff.). Corporations may still make contributions to IEOs. *See* AS 15.13.040(r).

[27]    *See* AS 15.13.065(a).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 6 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 6 of 38
48

individuals *must* be made in the name of the person who is actually the source of the funds.[28]

### 2. Ballot Measure 2's changes to Alaska's campaign finance disclosure laws.

A group of nonpartisan Alaskans formed Alaskans for Better Elections, Inc. ("ABE") in 2019 to file Ballot Measure 2, an election reform ballot initiative.[29] Ballot Measure 2 proposed "three substantive changes to" "Alaska's election laws by: (1) replacing Alaska's [prior] party-based primary system with an open, nonpartisan primary; (2) establishing ranked-choice voting in general elections; and (3) adopting new disclosure and disclaimer requirements for [IEOs] and their donors."[30] And in November 2020, Alaskans voted to enact Ballot Measure 2 in an election with record turnout.[31] Although Ballot Measure 2's disclosure and disclaimer provisions went into effect in February 2021, the first elections where the open primary and ranked-choice voting provisions apply will take place this summer and fall.[32]

---

[28]    *See* AS 15.13.074(b) ("A person or group may not make a contribution anonymously, using a fictitious name, or using the name of another.").

[29]    *See Meyer v. Alaskans for Better Elections*, 465 P.3d 477, 490 (Alaska 2020).

[30]    *Id.* at 490, 498.

[31]    *See* 2020 General Election, Election Summary Report, Official Results, https://www.elections.alaska.gov/results/20GENR/data/sovc/ElectionSummaryReportRPT24.pdf (Nov. 30, 2020) [hereinafter 2020 General Election Results]. Because the State certified Ballot Measure 2's win on November 30, its provisions went into effect on February 28, 2021. *See* Alaska Const. art. XI, § 6 ("An initiated law becomes effective ninety days after certification[.]").

[32]    The Alaska Supreme Court recently upheld a facial challenge to the other two substantive components of Ballot Measure 2: the top-four open nonpartisan primary and

Ballot Measure 2's proposed modifications to Alaska's campaign disclosure laws were featured prominently in its title,[33] ballot statement,[34] and intent language,[35] and were designed to help ensure "that voters have adequate and accurate information about who is paying for campaign communications to influence their vote."[36] Relevant here are three of Ballot Measure 2's reforms to Alaska's disclosure and disclaimer requirements now challenged by Plaintiffs.

First, Ballot Measure 2 added new disclosure requirements for all contributions to an IEO that exceed "$2,000 in the aggregate during a calendar year."[37] Those new

---

ranked-choice voting for general elections. *See* Complaint at ¶ 19; *see also Kohlhaas v. State*, S-18210, Order (Alaska Jan. 19, 2022).

[33] Ballot Measure 2 at 1 (Exhibit A *to* Kendall Aff.) ("An Act prohibiting the use of dark money by [IEOs] working to influence candidate elections in Alaska and requiring additional disclosures by these groups[.]").

[34] *See* Ballot Language for Ballot Measure 2 (Exhibit C *to* Kendall Aff.) ("[Ballot Measure 2] would . . . require additional disclosures for contributions to [IEOs] and relating to the sources of contributions. It would also require a disclaimer on paid election communications by [IEOs] funded by a majority of out of state money.").

[35] *See* Ballot Measure 2 at 2 (Exhibit A *to* Kendall Aff.) ("The people of Alaska have the right to know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska. This right requires the prompt, accessible, comprehensible, and public disclosure of the true and original sources of funds used to influence these elections, and is essential to the rights of free speech, assembly, and petition guaranteed by the First Amendment to the United States Constitution and shall be construed broadly.").

[36] *Meyer*, 465 P.3d at 499 (citations omitted). IEOs, and "dark money" groups, have become more prevalent since the U.S. Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010). "[N]early $1.4 billion worth of [independent expenditures] were made during the 2016 election cycle, compared to $143.7 million in the 2008 cycle and $63.9 million in the 2004 cycle." *See Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 344 (D.C. Cir. 2020).

[37] *See* AS 15.13.040(j)(3); *see also* AS 15.13.040(r); AS 15.13.074(b).

---

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 8 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 8 of 38

50

provisions apply to both the contributor and the receiving IEO,[38] requiring disclosure by both within 24 hours,[39] and apply to contributions made to entities that either are an IEO, intend to become an IEO, or were an IEO "in the previous election cycle."[40]

Second, Ballot Measure 2 modified Alaska's on-ad disclaimer requirements by: (1) requiring those disclaimers to "remain onscreen throughout the entirety of the communication" for "broadcast, cable, satellite, Internet[,] or other digital communication[s]";[41] and (2) adding a new on-ad disclaimer[42] for any IEO that "receive[s] more than 50 percent of its aggregate contributions from . . . outside Alaska."[43] Ballot Measure 2 *did not* modify Alaska's existing top-three contributor disclaimer,[44] and placed no limitation or cap on out-of-state contributions to IEOs.[45]

---

[38] *See* AS 15.13.040(r) (reporting requirement for contributors); AS 15.13.110(k) (reporting requirement for IEOs)

[39] *See* AS 15.13.040(r) (reporting requirement for contributors); AS 15.13.110(k) (reporting requirement for IEOs)

[40] *See* AS 15.13.040(r).

[41] *See* AS 15.13.090(c).

[42] *See* AS 15.13.090(g) ("A MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF ALASKA.").

[43] *See* AS 15.13.400(15).

[44] *See* AS 15.13.090(a)(2)(C). Alaska's "three largest contributors" disclaimer has been the law for over a decade. *See* ch. 36, § 13, SLA 2010. Ballot Measure 2 did clarify that the true source for an IEOs three largest contributors must now be disclosed. *See* AS 15.13.400(19).

[45] *See generally* Ballot Measure 2 (Exhibit A *to* Kendall Aff.).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 9 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 9 of 38

51

Finally, Ballot Measure 2 stated that the "true source" would need to be disclosed for all major ($2,000+) contributions to IEOs.[46] The "true source" of those contributions is defined as "the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services."[47] This definition specifically excludes "intermediary" entities.[48] Ballot Measure 2 established new civil penalties for contributors who fail to report their major contributions to IEOs,[49] but did not change the civil penalties for the IEOs who receive those contributions.[50] There was also a corollary prohibition against the giving or receiving of contributions to IEOs exceeding $2,000 "without disclosing the true source of the contribution."[51] And Ballot Measure 2 requires that the true source *of a contribution* be

---

[46]    *See* AS 15.13.400(19).  Ballot Measure 2 also defined "dark money" as "a contribution whose source or sources, whether from wages, investment income, inheritance, or revenue generated from selling goods or services, is not disclosed to the public."  *See* AS 15.13.400(5).

[47]    *See* AS 15.13.400(19).

[48]    *See id.* ("[A] person or legal entity who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source[.]").

[49]    *See* AS 15.13.390(a)(2) (imposing a $1,000 per day maximum civil penalty for failing to timely report a contribution to an IEO); AS 15.13.390(a)(3) (providing that a contributor who fails to accurately report the true source of the contribution "is subject to a civil penalty of not more than the amount of the contribution," unless it was intentional, at which point the civil penalty cannot be "more than three times the amount of the contribution in violation").

[50]    *See* AS 15.13.390(a)(1) (maintaining the $500 per day maximum civil penalty for any reporting violations made by IEOs).

[51]    *See* AS 15.13.074(b); *see also* AS 15.13.400(5) (defining "dark money").

disclosed[52] — not the true source of all funds in the contributor's possession — so contributing organizations can and have begun segregating accounts to ensure that donors know whether their identities could be disclosed given Ballot Measure 2's new disclosure requirements.[53]

### B. Plaintiffs File Suit Nearly 18 Months After Ballot Measure 2 Passed.

Plaintiffs include five individuals who have made major contributions to IEOs and ballot initiative groups in their own names for prior statewide elections,[54] along with two Plaintiff IEOs that have sought to influence the outcome of state and municipal elections.[55] One Plaintiff, Families of the Last Frontier ("FLF"), has previously received substantial sums of "dark money" from outside of Alaska[56] — including over 99.5% of the $409,000

---

[52]     *See* AS 15.13.040(r) ("For purposes of this subsection, the reporting contributor is required to report and certify the true sources *of the contribution*[.]" (emphasis added)).

[53]     *See* Revised Advisory Opinion, Thomas R. Lucas, APOC Campaign Disclosure Coordinator, AO No. 21-11-CD (May 5, 2022) (Exhibit D *to* Kendall Aff.); APOC's Proposed Changes to Title 2, Chapter 50 of the Alaska Administrative Code ("AAC"), at 2 (May 9, 2022) (Exhibit E *to* Kendall Aff.) (proposing the addition of paragraph (e) to 2 AAC 50.270 to clarify when an entity need not "report donations" pursuant to AS 15.13.110(k)); *see also* AS 15.13.374(e) (establishing a safe harbor to follow advisory opinions); Order Continuing Consideration of Advisory Opinion, APOC, AO No. 21-11-CD (Feb. 2, 2022) (Exhibit F *to* Kendall Aff.) (allowing entities to rely on Alaska's safe harbor provision so that separate accounting for contributions to an IEO will protect donor identities for a parent entity that does not make any contributions to IEOs).

[54]     *See* Complaint at ¶¶ 5-9.

[55]     *See id.* at ¶¶ 10-11.

[56]     *See id.* at ¶ 41 ("[I]n the past[, FLF's] donations from outside the [sic] Alaska have accounted for more than 50% of FLF's total revenue.").

it received in 2018[57] — and also acted as an "intermediary" by contributing some of that outside "dark money" to another IEO.[58]

Nearly a year and a half after Ballot Measure 2 passed — and while seeking a preliminary injunction and claiming imminent irreparable harm[59] — Plaintiffs filed this suit: a facial challenge to invalidate IEO campaign disclosure requirements on First Amendment grounds.[60]  Plaintiffs' claims fail as a matter of law.

## III.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[61]  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw

---

[57]    *See* Kendall Aff. at ¶ 11 (showing FLF receiving $407,000 in contributions from the "Republican State Leadership Committee"); *see also* Kendall Aff. at ¶ 20 (showing FLF receiving $409,000 in income for the 2018 campaign cycle).  FLF received similar amounts of outside "dark money" — over 96.5% — in 2019.  *See* Kendall Aff. at ¶ 12 (showing FLF receiving $70,000 in contributions from "GOPAC" in 2019); *see also* Kendall Aff. at ¶ 20 (showing FLF receiving $72,500 in income for the 2019 campaign cycle).

[58]    *See* Kendall Aff. at ¶ 13 (showing that FLF made $16,000 and $7,000 contributions (respectively) to the Council on Good Government, another IEO, in 2020).

[59]    *See generally* Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction (Apr. 25, 2022) (Doc. 18-1) [hereinafter Plaintiffs' Motion].

[60]    *See generally* Complaint.  Plaintiffs challenge Ballot Measure 2's: (1) contributor reporting requirements; (2) top contributor and majority out-of-state contribution disclaimers; and (3) "true source" definition and disclosure requirements.  *See id.* at ¶¶ 60-75.

[61]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 12 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 12 of 38

54

the reasonable inference that the defendant is liable for the misconduct alleged.'"[62] In addition to the complaint, courts may also consider "materials incorporated into the complaint by reference, and matters of which the court may take judicial notice."[63]

Courts are directed to "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."[64] But "the complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"[65] Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."[66]

Because Plaintiffs have brought a First Amendment facial challenge to provisions of Ballot Measure 2, they can succeed only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[67] "Facial challenges are disfavored for several reasons,"[68] because "they raise the risk of 'premature

---

[62]    *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

[63]    *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

[64]    *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citing *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007)).

[65]    *In re Riegel Pharms. Inc. Sec. Litig. Inter-Local Pension Fund GCC/IBT v. Deleage*, 697 F.3d 869, 875 (9th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

[66]    *Iqbal*, 556 U.S. at 678.

[67]    *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

[68]    *Washington State Grange*, 552 U.S. at 450.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 13 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 13 of 38
55

interpretation of statutes on the basis of factually barebones records,'"[69] "run contrary to the fundamental principle of judicial restraint,"[70] and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."[71]

## IV.   ARGUMENT

Plaintiffs claim that the First Amendment prohibits the State from requiring: (1) 24-hour reporting by contributors of over $2,000 to IEOs; (2) on-ad disclaimers of an IEO's top contributors and whether a majority of an IEO's funds have come from outside Alaska; and (3) disclosure of the true source of large contributions to such groups.[72]   They are wrong as a matter of law and cannot meet their burden for a facial challenge.

The First Amendment does not give major contributors to IEOs the ability to ignore reporting obligations.  The First Amendment does not give IEOs carte blanche to influence the outcome of elections while concealing who is paying for its campaign advertisements. And the First Amendment does not give major contributors to IEOs the right to remain anonymous.

The U.S. Supreme Court has repeatedly concluded that disclosure and disclaimer requirements for election communications do not violate the First Amendment; rather, they

---

[69]    *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)).

[70]    *Id.*

[71]    *Id.* at 451; *see also id.* ("We must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the . . . people.'" (first alteration in original) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006))).

[72]    *See* Complaint at ¶¶ 60-75; *see also* Plaintiffs' Motion at 7-33.

satisfy exacting scrutiny because they promote the government's, and the electorate's, need for information and their interest in informed elections. "The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech . . . in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."[73] Indeed, the First Circuit in *Gaspee Project v. Mederos* recently rejected a First Amendment challenge — very similar to Plaintiffs' — against a regime with lower reporting thresholds and more robust disclaimers than are at issue here. That regime included disclosures for contributions exceeding $1,000, and an on-ad disclaimer identifying the top *five* contributors to certain groups funding electioneering ads.[74] Because all of Ballot Measure 2's challenged campaign disclosure and disclaimer provisions easily satisfy exacting scrutiny, this Court should conclude that Plaintiffs have failed to state a claim for relief.

### A. Exacting Scrutiny Applies to Plaintiffs' First Amendment Claims Concerning Ballot Measure 2's Disclosure And Disclaimer Requirements.

Although regulations that actually cap or bar political speech (i.e., limits on contributions or expenditures) are subject to strict scrutiny,[75] disclaimer and disclosure requirements for election communications are subject only to exacting scrutiny under the First Amendment. "Recognizing the important information-enhancing role that disclosure

---

[73]     *Citizens United*, 558 U.S. at 371.

[74]     *See generally* 13 F.4th 79 (1st Cir. 2021), *cert. denied*, 2022 U.S. LEXIS 2127 (Apr. 25, 2022).

[75]     *See Citizens United*, 558 U.S. at 340.

laws play, the [U.S.] Supreme Court and [Ninth Circuit] have subjected laws requiring speakers to disclose information in the electoral context to a somewhat less demanding standard than strict scrutiny, described as 'exacting scrutiny.'"[76]  And while Plaintiffs appear to acknowledge in their motion for preliminary injunction that their First Amendment claims must satisfy exacting scrutiny,[77] they rely heavily on strict scrutiny cases either concerning campaign contribution limits or prohibitions — *not* disclosure or disclaimer requirements — or they rely on inapposite cases not involving political speech at all.[78]

As the U.S. Supreme Court has repeatedly confirmed, "provid[ing] the electorate with information 'as to where political campaign money comes from'" justifies electoral disclosure laws and promotes "the 'free functioning of our national institutions.'"[79] Although election "[d]isclaimer and disclosure requirements may burden the ability to speak, . . . they [importantly] 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'"[80]

---

[76]  *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1112 (9th Cir. 2019) (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)); *see Citizens United*, 558 U.S. at 366-67 (citing *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976) (per curiam)); *see also McConnell v. FEC*, 540 U.S. 93, 137 (2003), *rev'd on other grounds*, *Citizens United*, 558 U.S. 310 (noting that strict scrutiny is not appropriate in the context of election speech).

[77]  Plaintiffs occasionally appear to argue for strict scrutiny, a standard not applicable here.  *See* Plaintiffs' Motion at 15 n.2.

[78]  *See id.* at 7-33.

[79]  *Buckley*, 424 U.S. at 66 (quotations omitted).

[80]  *Citizens United*, 558 U.S. at 366 (first quoting *Buckley*, 424 U.S. at 64; then quoting *McConnell*, 540 U.S. at 201).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 16 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 16 of 38
58

The U.S. Supreme Court in *Buckley v. Valeo* explained that the governmental interests in disclosure of election spending include: (1) providing information; (2) deterring actual corruption or the appearance of corruption; and (3) permitting recordkeeping or easing the administrative burden for detecting violations.[81]  In particular, *Buckley* held that appropriately tailored laws requiring political committees to disclose information about all contributions over $100 "helps voters to define more of the candidates' constituencies,"[82] and thus those laws "serve[] informational functions" and do not violate the First Amendment.[83]  Similarly, in *McConnell v. FEC*, the Supreme Court upheld disclaimer and disclosure requirements to prevent electioneering spenders from "hiding behind dubious and misleading names" given "the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace."[84]

In *Citizens United v. FEC* — the most recent seminal U.S. Supreme Court case involving First Amendment challenges to disclaimer and disclosure requirements for election communications — the Court upheld the campaign disclosure and disclaimer

---

[81]    *See* 424 U.S. at 66-68; *see also id.* at 66-67 ("[D]isclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek . . . office.  It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches." (footnote omitted) (quotation omitted)).

[82]    *Id.* at 81.

[83]    *Id.* at 83-84.

[84]    540 U.S. at 197 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D. D.C. 2003)).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                        Page 17 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 17 of 38
59

requirement at issue under "exacting scrutiny," which it held "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."[85] The Supreme Court concluded in *Citizens United* that required disclaimers satisfied the First Amendment informational interest because such disclaimers "'provid[e] the electorate with information' and '[e]nsure that the voters are fully informed' about the person or group who is speaking."[86]

In the U.S. Supreme Court's more recent articulation of exacting scrutiny in *Americans for Prosperity Foundation v. Bonta* — a case which did *not* involve political speech — the Court further explained that, although "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest."[87] Because the disclosure requirements at issue in *Americans for Prosperity Foundation* did not involve political speech — where the Supreme Court has already held that the electorate has a

---

[85]    558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66) (citing *McConnell*, 540 U.S. at 231-32); *see also Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (reiterating that exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" (quoting *Doe*, 561 U.S. at 196)).

[86]    *Citizens United*, 558 U.S. at 368 (first alteration in original) (first quoting *McConnell*, 540 U.S. at 196; then quoting *Buckley*, 424 U.S. at 76) (citation omitted); *see also id.* ("At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party."); *id.* at 369 ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election.").

[87]    *See* 141 S. Ct. at 2383; *see also id.* at 2385 ("[E]xacting scrutiny requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and that the disclosure requirement be narrowly tailored to the interest it promotes." (quoting *Reed*, 561 U.S. at 196) (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960))).

competing constitutional right to information[88] — the government was also required to describe its interest and establish that the regulation in that case was narrowly tailored to the asserted interest.[89]

### B. Contributor Disclosure Requirements Are Constitutional.

Plaintiffs' first claim is that Ballot Measure 2's requirement that contributors report the true source of any contribution of $2,000 or more to an IEO within 24 hours is unconstitutional.[90]  In essence, Plaintiffs assert that this new requirement on contributors is overly burdensome, duplicative, and unjustifiable.[91]  But Plaintiffs' first count misses the mark.

Prior to Ballot Measure 2, IEOs and certain contributors were already required to report lower contributions within short timeframes.[92]  Ballot Measure 2's new disclosure requirements for major contributors to IEOs — that any contributor report the true source of any contribution of $2,000 or more to an IEO within 24 hours — satisfies exacting scrutiny and therefore does not run afoul of the First Amendment.

---

[88]     *See Citizens United*, 558 U.S. at 369; *McConnell*, 540 U.S. at 197.

[89]     *See Ams. for Prosperity Found.*, 141 S. Ct. at 2383.

[90]     *See* Complaint at ¶¶ 60-64.

[91]     *Id.*

[92]     *See* AS 15.13.040(e)(5)(A) (requiring IEOs to report all contributions of $50 or more within 10 days); AS 15.13.110(a), (h) (same); AS 15.13.110(b), (h) (requiring IEOs to report all contributions and expenditures of $250 or more within 24 hours if occurring within 9 days of an election); AS 15.13.040(k) (requiring contributors to ballot initiative groups to independently report any contribution of $500 or more within 30 days).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                                      Page 19 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 19 of 38
61

The U.S. Supreme Court has consistently recognized that the government has an interest in requiring disclosure of contributions.[93]  After all, in *Buckley*, the Court upheld disclosure of all contributions to political committees exceeding $100 (5% of Ballot Measure 2's threshold).[94]

The D.C. Circuit has upheld the application of the political committee disclosure requirements to entities making independent expenditures, because "the public has an interest in knowing who is speaking about a candidate and who is funding that speech."[95] And more recently, in *Gaspee Project*, the First Circuit concluded that a $1,000 disclosure threshold for disclosing contributions to organizations that spend more than $1,000 on

---

[93]      *See Citizens United*, 558 U.S. at 369 ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election."); *id.* at 371 ("The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of . . . entities in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."); *McConnell*, 540 U.S. at 196 ("[I]mportant state interests . . . — providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions — apply [to the law's] . . . disclosure requirements[.]" (footnote omitted)); *Buckley*, 424 U.S. at 66 ("[D]isclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters[.]" (quotation omitted)); *id.* at 68 ("[D]isclosure requirements, as a general matter, directly serve substantial governmental interests."); *see also* Plaintiffs' Motion at 7 ("The Supreme Court has recognized that laws requiring disclosure of campaign contributions . . . serve a governmental interest because 'disclosure helps voters to define more of the candidates' constituencies.'" (quoting *Buckley*, 424 U.S. at 81)).

[94]      *See Buckley*, 424 U.S. at 82-84.

[95]      *See SpeechNow.org*, 599 F.3d at 698; *see also id.* at 696 ("The Supreme Court has consistently upheld organizational and reporting requirements against facial challenges.").

election-related communications was narrowly tailored to the government's informational interest.[96]

Given these holdings, there is no question that the $2,000 "line" established by Ballot Measure 2 is both sufficiently related and narrowly tailored to the State's informational interest in contributors to IEOs,[97] especially given the State's prior $50, $250, and $500 reporting thresholds in other contexts (which include a contributor reporting requirement at one quarter the contribution amount established by Ballot Measure 2).[98]

Additionally, Ballot Measure 2's provisions that require major donors to IEOs report their contributions within 24 hours, rather than relying solely on disclosure by the IEOs, similarly satisfies exacting scrutiny. Obviously, the contributor will *always* be in a better position than the IEO to both identify the true source of its own contribution and quickly report it because obviously the contributor must receive the funds prior to donating

---

[96]    *See Gaspee Project*, 13 F.4th at 88-90, *cert. denied*, 2022 U.S. LEXIS 2127. Likewise, the first appellate decision that opened the door to unlimited contributions to SuperPACs unanimously upheld the reporting requirements applicable to such political committees. *See SpeechNow.org*, 599 F.3d at 696-99. All federal political committees must disclose the identity of their contributors who give more than $200 within a calendar year. *See* 52 U.S.C. § 30104(b)(3).

[97]    *See Buckley*, 424 U.S. at 83 (noting that any disclosure "line is necessarily a judgmental decision, best left in the context of this complex legislation to . . . discretion"); *see also Gaspee Project*, 13 F.4th at 88-90.

[98]    *See* AS 15.13.040(e)(5)(A) (requiring IEOs to report all contributions of $50 or more); AS 15.13.110(b) (requiring IEOs to report all contributions of $250 or more within 24 hours if they are made "within nine days of the election"); AS 15.13.110(h) (same); AS 15.13.040(k) (requiring those who contribute $500 or more to ballot initiative groups to independently report their contributions).

them to the IEO.[99]  The State has an interest in "prompt disclosure" for contributions to

IEOs,[100] and has previously required reporting within 24 hours.[101]  Moreover, quick

disclosures are more informative and useful to voters than post hoc reporting,[102] and help

enable voters to "react to th[at] speech"[103] and "make informed choices in the political

marketplace."[104]  Ballot Measure 2's reasonable burden on major donors to IEOs to report

their own large contributions within 24 hours, and to share information about the source of

those contributions to the receiving IEOs, satisfies exacting scrutiny.[105]

---

[99]   *See* AS 15.13.400(19).  That is part of why Ballot Measure 2's maximum civil penalties for violations by both contributors and IEOs are *not* identical, which reflect the inherent disparity in information between the two sides of these contributions.  *Compare* AS 15.13.390(a)(2)-(3) (establishing penalties for contributors to IEOs), *with* AS 15.13.390(a)(1) (outlining penalties for IEOs).  If anything, Ballot Measure 2's provisions could be seen as protecting IEOs from unknowingly reporting false information about the true source of contributions received by correctly placing the burden of disclosing the true source of a contribution on the contributor itself.  *See* AS 15.13.390(a).  Placing the responsibility of reporting on the contributor is also important when some IEOs (like FLF) serve as both an IEO *and* as a contributor.  *See* Kendall Aff. at ¶ 13 (showing that FLF made $16,000 and $7,000 in contributions to another IEO, the Council on Good Government, in 2020).

[100]   *See Citizens United*, 558 U.S. at 370 ("With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters.").

[101]   *See* AS 15.13.110(b), (h).

[102]   *See Yes on Prop B v. City & Cnty. of San Francisco*, 440 F. Supp. 3d 1049, 1059 (N.D. Cal. 2020).

[103]   *See Citizens United*, 558 U.S. at 371.

[104]   *See id.* at 367 (quoting *McConnell*, 540 U.S. at 197).

[105]   It is telling that Plaintiffs have failed to allege any unconstitutional burden about Alaska's existing reporting requirements for contributors to ballot initiative groups.  *See* AS 15.13.040(k).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 22 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 22 of 38

64

In moving for a preliminary injunction, Plaintiffs relied on inapposite cases. For starters, Plaintiffs take the U.S. Supreme Court's "prophylaxis-upon-prophylaxis" comment entirely out of context, which was not about disclosure at all;[106] instead, that language concerned a regime which imposed *limitations* on both contributions *and* expenditures, neither of which are at issue here.[107] And Plaintiffs fail to explain how *Americans for Prosperity Foundation* is at all relevant here.[108] That case involved neither disclosure to the public nor contributions related to elections. Rather, at issue was a tax regulation requiring confidential disclosure to the state Attorney General of top contributors to 501(c)(3) non-profit organizations (which do not engage in campaign speech); the rule did not require public disclosure, and the evidence showed that the government rarely (if ever) used the information provided.[109] The facts of *Americans for Prosperity Foundation* are fundamentally distinguishable from this case, where Ballot Measure 2 requires swift public disclosure of *campaign-related* contributions so that the electorate will know who is trying to influence their vote.

Finally, Plaintiffs' suggestion in their motion for preliminary injunction that contributors to IEOs will need access to a crystal ball is simply not true.[110] Alaska Statute 15.13.074(i) already requires certain IEOs to inform would-be contributors that

---

[106]    *See* Complaint at ¶ 62 (citing *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014)).

[107]    *See McCutcheon*, 572 U.S. at 221 (quoting *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 479 (2007)).

[108]    *See* Complaint at ¶ 73.

[109]    *See Ams. for Prosperity Found.*, 141 S. Ct. at 2380.

[110]    *See* Plaintiffs' Motion at 9.

they intend to influence the outcome of an election before soliciting any contributions,[111] and other IEOs (like Plaintiffs) are required to report and make their intentions clear prior to making any expenditures.[112]  Major contributors to IEOs simply do not make large donations over $2,000 without having a sense of how or whether their money will be used to influence an election, and would-be contributors must report such major contributions *only* if they reasonably believe the money will be used by an IE for election spending.[113] Moreover, Ballot Measure 2's "previous election cycle" lookback period not only provides a bright line to would-be contributors,[114] but also prevents an IEO from taking on massive amounts of debt during the campaign, only to have those debts conveniently paid for after the election to avoid all reporting requirements.[115]

Because Ballot Measure 2 has a higher disclosure threshold for contributions to IEOs than other regimes already found to satisfy exacting scrutiny, and places only reasonable burdens and obligations on major contributors to timely report their

---

[111]    AS 15.13.074(i) ("A nongroup entity may not solicit or accept a contribution to be used for the purpose of influencing the outcome of an election unless the potential contributor is notified that the contribution may be used for that purpose.").

[112]    *See* AS 15.13.050; *see also* AS 15.13.052; Complaint at ¶¶ 36, 48 (noting that Plaintiff IEOs have regularly registered).

[113]    *See* AS 15.13.040(r) (imposing a reporting requirement only on a contributor if they "know[] or ha[ve] reason to know [the receiving entity] is likely to make independent expenditures in one or more candidate elections in the current election cycle").

[114]    *See id.*

[115]    *See* Plaintiffs' Motion at 12 ("When a group stops speaking about candidates, the government's interest in knowing its donors also stops[.]"); *see also* Kendall Aff. at ¶¶ 16-17 (showing over $15,000 in contributions to an IE *after* an election, including $5,000 and $2,000 from Plaintiffs Smith and Griffin respectively).

contributions to IEOs, Ballot Measure 2's contributor disclosure provisions are both substantially related and narrowly tailored to the State's and electorate's informational interests. These provisions do not violate the First Amendment.

### C. Ballot Measure 2's On-Ad Disclaimers Are Constitutional.

Plaintiffs' second claim is that Alaska's on-ad disclaimer requirements, which were modified in part by Ballot Measure 2, are also unconstitutional.[116] Specifically, Plaintiffs argue that both a (non-existent) "top-5-donor disclaimer" and a factual statement about how a majority of an IEO's funds have come from outside of Alaska amount to improperly compelled speech.[117] Again, Plaintiffs are wrong. The provisions are constitutional.

Prior to Ballot Measure 2, Alaska law already required IEOs to include a number of disclaimers on ads.[118] All Ballot Measure 2 changed was to clarify that some disclaimers must now "remain onscreen throughout the entirety of the communication,"[119] and add a new disclaimer for any IEO that "receive[s] more than 50 percent of its . . . contributions . . . from outside Alaska."[120]

At the outset, despite Plaintiffs' oft-repeated refrain that Alaska's top-*five* contributor requirement is overly burdensome,[121] *no such requirement exists*. Rather,

---

[116]   *See* Complaint at ¶¶ 65-71.

[117]   *See id.*

[118]   *See* former AS 15.13.090(a)(2)(A)-(C) (2020); former AS 15.13.090(c), (d) (2020); AS 15.13.135(b)(2).

[119]   *See* AS 15.13.090(c).

[120]   *See* AS 15.13.400(15); *see also* AS 15.13.090(g).

[121]   *See* Complaint at ¶¶ 44, 55, 67; *see also* Plaintiffs' Motion at 4-5, 20-23.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 25 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 25 of 38

67

AS 15.13.090(a)(2)(C) still requires that an IEO only disclose its top-*three* contributors.[122]

Alaska's required contributor disclaimer is therefore 40% less "burdensome" than Plaintiffs believe. In any event, the First Circuit in *Gaspee Project* recently upheld Plaintiffs' imaginary top-five contributor disclaimer regime.[123] If a top-five contributor disclaimer does not violate the First Amendment — and the U.S. Supreme Court has declined to say otherwise[124] — then neither should Alaska's top-three contributor disclaimer, which is 40% less onerous.[125]

Beyond this, neither of Ballot Measure 2's (actual) changes to Alaska's disclaimer requirements — nor AS 15.13.090 — violate the First Amendment.[126] The new requirement that certain on-ad disclaimers "must remain onscreen throughout the entirety of the communication" simply provides a clarification that "broadcast, cable, satellite, Internet or other digital communication[s]" now have similar requirements to print or otherwise "static" ads.[127] Such contemporaneous disclosures are very informative and

---

[122]   AS 15.13.090(a)(2)(C) (requiring "identification of the name and city and state of residence or principal place of business . . . of each of the person's *three* largest contributors" (emphasis added)); *see also* AS 15.13.090(e) ("In no case shall a person be required to identify more than three contributors under (a)(2)(C) of this section.").

[123]   *See* 13 F.4th at 91-93.

[124]   *See Gaspee Project*, 2022 U.S. LEXIS 2127 (Apr. 25, 2022) (denying cert).

[125]   *See also Mass. Fiscal All. v. Sullivan*, No. 18-12119-RWZ, 2018 U.S. Dist. LEXIS 189403 at *7-*9 (D. Mass. Nov. 6, 2018) (upholding a top-five contributor requirement).

[126]   Although Plaintiffs appear to assert that the disclaimers required by AS 15.13.090 violate the First Amendment, they almost exclusively focused on Ballot Measure 2's changes to on-ad disclaimers. *See* Complaint at ¶¶ 65-71; Plaintiffs' Motion at 12-28.

[127]   *See* AS 15.13.090(c).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                          Page 26 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 26 of 38
68

useful to voters,[128] allowing voters to "react to th[at] speech" and "make informed choices in the political marketplace" without having to be familiar with researching online disclosure reports.[129]

In *Citizens United*, on an 8-1 vote,[130] the U.S. Supreme Court rejected an entity's First Amendment claim that it should not be "forc[ed] . . . to devote [time and space in] . . . each advertisement to [a] . . . disclaimer."[131]  As the *Citizens United* Court explained, "[w]ith the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters."[132]  There, the Court held that even a four-second audio disclaimer in a ten-second ad did not violate the First Amendment, even when the ad appeared to be promoting a movie about a candidate and not directly supporting or opposing the candidate.[133]  If an audio disclaimer can take up to 40% of an ad's running time without violating the First Amendment, then Ballot Measure 2's minor

---

[128]    *See Yes on Prop B*, 440 F. Supp. 3d at 1059 (citations omitted).

[129]    *See Citizens United*, 558 U.S. at 367, 371 (quoting *McConnell*, 540 U.S. at 197); *see also McConnell*, 540 U.S. at 258-59 (Scalia, J., concurring in part and dissenting in part) ("The premise of the First Amendment is that the American people are neither sheep nor fools, and hence fully capable of considering both the substance of the speech presented to them and its proximate and ultimate source.").

[130]    *See Citizens United*, 558 U.S. at 317 (explaining that eight Justices agreed with Part IV of the opinion, which pertained to disclaimer and disclosure requirements); *see also id.* at 366-71; *id.* at 395-96 (Stevens, J., concurring in part); *id.* at 480-85 (Thomas, J., dissenting in part).

[131]    *Id.* at 368.

[132]    *Id.* at 370.

[133]    *See id.* at 366-71.

---

tweaks to Alaska's disclaimer requirements certainly satisfy exacting scrutiny against Plaintiffs' facial challenge.

Further, the new on-ad disclaimer for an IEO that receives a majority of its funding from outside Alaska is reasonable given Alaska's extensive history of outside influence in elections and the public's resulting interest in such information.[134]  It is one thing for one Alaska voter to influence another, it is quite another for entities or persons with no ties to Alaska to influence the outcome of elections within the State.  An on-ad disclaimer about funding from outside Alaska "helps voters to define more of the [IEO's] constituencies,"[135] and thus "serves informational functions" that do not violate the First Amendment.[136]

The cases Plaintiffs cite to support their argument that Alaska's disclaimer regime violates the First Amendment are easily distinguishable.[137]  First, with respect to on-ad disclaimers more generally, Plaintiffs rely almost exclusively on compelled speech cases

---

[134]  *See Thompson v. Dauphinais*, 217 F. Supp. 3d 1023, 1029 (D. Alaska 2016), *rev'd in part*, *Thompson v. Hebdon*, 140 S. Ct. 348 (2019) ("[S]everal factors . . . make Alaska highly, if not uniquely, vulnerable to corruption in politics and government. . . .  A . . . factor is Alaska's almost complete reliance on one industry for a majority of its revenues."); *see also id.* at 1039 ("[T]he unique combination of Alaska's small population, geographic isolation, and great natural resources make it extremely dependent on outside industry and interests. . . .  [S]uch dependency makes Alaska especially vulnerable to exploitation by outside industry and interests[.]").  Although the Ninth Circuit has since struck down Alaska's limits on out-of-state contributions, the district court's underlying factual findings are still relevant to provide context for Ballot Measure 2's new on-ad disclaimer.  *See Thompson v. Hebdon*, 909 F.3d 1027, 1031 (9th Cir. 2018); *see also Thompson v. Hebdon*, 7 F.4th at 824-27.

[135]  *Buckley*, 424 U.S. at 81.

[136]  *Id.* at 83.

[137]  *See* Complaint at ¶¶ 68-70.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 28 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 28 of 38
70

that do not concern election-related speech at all.[138] The U.S. Supreme Court in those cases considered different (and less compelling) government interests that would have forced disclaimers that were directly contradictory to the underlying purpose of the organizations.[139] After all, forcing a pro-life organization to provide information that is categorically opposed to its mission has nothing to do with requiring a factual disclaimer about funding in election communications.[140] But when the Court has looked at disclaimers in the election context, the government's strong informational interest has been found to justify on-ad disclaimers, even when those disclaimers might dilute the IEO's stated goals.[141] And Plaintiffs' reliance on *McIntyre v. Ohio Elections Commission*[142] and *ACLU of Nevada v. Heller*[143] is also misplaced.[144] At issue in both of those cases was the ability of citizens to engage in *de minimus* and unorganized anonymous political speech for or

---

[138]   *See id.*; *see also* Plaintiffs' Motion at 12-23.

[139]   *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018) (concluding that a regulation requiring a pro-life organization to disclose ways to obtain an abortion violated the First Amendment); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (holding that the First Amendment's right to free association permits an organization to restrict who may participate in its parade).

[140]   *See generally NIFLA*, 138 S. Ct. 2361.

[141]   *See Citizens United*, 558 U.S. at 366-71; *McConnell*, 540 U.S. at 196-202; *Buckley*, 424 U.S. at 66-68; *see also Yes on Prop B*, 440 F. Supp. 3d at 1057 (distinguishing an election disclaimer from a commercial disclaimer at issue in *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749 (9th Cir. 2019)).

[142]   514 U.S. 334 (1995).

[143]   378 F.3d 979 (9th Cir. 2004).

[144]   *See* Plaintiffs' Motion at 18-19.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                    Page 29 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 29 of 38
71

against initiatives.[145]  Here, there are already minimum contribution and expenditure thresholds to protect limited and unsophisticated political speech from arguably burdensome requirements,[146] and Ballot Measure 2 did not change Alaska's disclaimer and disclosure requirements for ballot initiatives.[147]

Finally, Plaintiffs' repeated attempt to equate *outright limitations* on out-of-state contributions with Ballot Measure 2's *conditional disclaimer* about such contributions should be rejected.[148]  All of the cases cited by Plaintiffs concern unconstitutional limitations or bans on IEOs or candidates actually receiving out-of-state contributions.[149] *None* of those cases apply to Ballot Measure 2's requirement for factual, content-neutral disclaimers for IEOs that receive over 50% of their contributions from sources outside Alaska.[150]  Plaintiffs have also offered no evidence for their suggestion that a disclaimer of this kind is derogatory; their opinion may not be shared by other viewers.  And Plaintiffs are free to add whatever information they like about the source of their funds or why those

---

[145]    *See McIntyre*, 514 U.S. at 337-38 (concerning a small number of anonymous pamphlets for an initiative); *Heller*, 378 F.3d at 1000-02 (explaining why limited anonymous speech for ballot initiatives may be protected under the First Amendment).

[146]    *See* AS 15.13.110.

[147]    *See* AS 15.13.110(g).

[148]    *See* Complaint at ¶ 68; *see also* Plaintiffs' Motion at 23-28.

[149]    *See generally Thompson v. Hebdon*, 7 F.4th 811; *Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2002), *rev'd by Randall v. Sorrell*, 548 U.S. 230 (2006); *We the People PAC v. Bellows*, 519 F. Supp. 3d 13 (D. Me. 2021); *SD Voice v. Noem*, 380 F. Supp. 3d 939 (D. S.D. 2019).

[150]    AS 15.13.090(g).

sources are honorable.[151]  The required information is simply a fact that some voters will find useful and is far less restrictive than a limit or outright prohibition on out-of-state contributions.

Despite Plaintiffs' suggestion to the contrary, the First Amendment does not protect a "right" to conceal the sources of funding for campaign speech.  Just because Families of the Last Frontier would prefer not to disclaim that it actually receives the vast majority of its funds from outside the Last Frontier does not make Ballot Measure 2 unconstitutional.[152]  The State has an informational interest in providing voters with "the information needed to hold corporations and elected officials accountable for their positions and supporters,"[153] which includes Ballot Measure 2's disclaimer for when a majority of an IEO's contributions come from people or entities who are not from Alaska.[154]  That is why the U.S. Supreme Court has upheld disclaimer requirements in the past, recognizing that an IEO will still have the opportunity to try to explain the disclaimer

---

[151]    *See Meese v. Keane*, 481 U.S. 465, 467-68, 480-82 (1987) (concluding that requiring that a foreign film on acid rain being labeled as "political propaganda" did not violate the First Amendment, noting that film producers are free to include additional information about themselves to their viewers).

[152]    *See* Complaint at ¶ 41; *see also* Kendall Aff. at ¶¶ 11-12, 20 (showing that over 99.5% of FLF's contributions in 2018, and over 96.5% of its contributions in 2019, consisted of "dark money" from outside Alaska).  Indeed, FLF has "adopt[ed a] seductive name[]" to obscure its donors' true purposes and affiliations.  *See Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 298 (1981).  It speaks volumes that FLF wants to "hid[e] behind [a] dubious and misleading name[]" by not having to disclose that it, in fact, received a majority of its contributions from "families" outside Alaska.  *McConnell*, 540 U.S. at 197 (quoting *McConnell*, 251 F. Supp. 2d at 237).

[153]    *See Citizens United*, 558 U.S. at 370.

[154]    *See* AS 15.13.090(g).

to its viewers if it wishes.[155]  Disclaimers are a reasonable "cost" for unlimited free speech, and Ballot Measure 2's minor changes to Alaska's disclaimer requirements for IEOs satisfy exacting scrutiny.[156]

### D.  "True Source" Disclosure Requirements Are Constitutional.

Finally, Plaintiffs claim that the First Amendment protects them from disclosing the "true source" of major contributions to IEOs, mischaracterizing the requirement as having to disclose a "layered donor."[157]  Plaintiffs suggest that disclosing the "true source" of contributions of $2,000 or more to IEOs will improperly "chill" free speech, include unsuspecting true sources, improperly disclose valuable confidential donor lists to the public, and be overly burdensome.[158]  These arguments fail, and the provisions are constitutional.

Before Ballot Measure 2, no "person or group [could] . . . make a contribution anonymously, using a fictitious name, or using the name of another."[159]  But IEOs were still

---

[155]  *See Citizens United*, 558 U.S. at 366-70; *see also Meese*, 481 U.S. at 480-82.

[156]  *See Citizens United*, 558 U.S. at 371 ("The First Amendment protects political speech; and disclaimer permits citizens and shareholders to reach to the speech . . . in a proper way.").

[157]  *See* Complaint at ¶¶ 72-75.  This would only be the case if the contributor is an intermediary.  *See* AS 15.13.400(19).

[158]  *See* Complaint at ¶¶ 72-75.

[159]  *See* former AS 15.13.074(b) (2020); *see also* 52 U.S.C. § 30122 ("No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.").

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                    Page 32 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 32 of 38
74

able to receive "dark money" contributions from obscured sources.[160]  This loophole was fixed in Ballot Measure 2.

Rather than being over or under inclusive, Ballot Measure 2's "true source" reporting requirement more precisely tailors Alaska's disclosure regime to advance the State's informational interest.  The U.S. Supreme Court has explained that the whole purpose of disclaimer and disclosure requirements is to know who, exactly, is making contributions to influence the outcome of elections.[161]  Ballot Measure 2's true source definition gets at precisely that, goes no further than necessary, and only applies to major contributions ($2,000 or more) to IEOs.[162]  It is difficult to imagine a better fit to achieve the State's informational interest at issue here: the *real* source of political contributions.

---

[160]    *See* AS 15.13.400(19).   Indeed, FLF itself has both received and contributed substantial sums of "dark money" in the past.  *See* Kendall Aff. at ¶¶ 11-12, 20 (showing that over 99.5% of FLF's contributions in 2018, and over 96.5% of its contributions in 2019, consisted of "dark money" from outside Alaska); *see also* Kendall Aff. at ¶ 13 (showing that FLF made $16,000 and $7,000 contributions (respectively) to the Council on Good Government, yet another IEO).

[161]    *See Citizens United*, 558 U.S. at 367 ("[D]isclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending." (alteration in original) (quoting *Buckley*, 424 U.S. at 66)); *McConnell*, 540 U.S. at 196; *see also Buckley*, 424 U.S. at 67 ("Publicity is justly commended as a remedy for social and industrial diseases.  Sunlight is said to be the best of disinfectants[.]" (quotation omitted)); *Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000) (en banc) ("Proscription of conduit contributions (with the concomitant requirement that the true source of contributions be disclosed) would seem to be at the very core of the Court's analysis [in *Buckley*].").

[162]    *See* AS 15.13.040(r).  This is why Plaintiffs' characterization of Ballot Measure 2's "true source" definition as being a "secondary donor" requirement is misplaced.  *See* Plaintiffs' Motion at 28.  Ballot Measure 2's provisions do not require a contributor to report where the contribution came from ad infinitum.  Those provisions only require that the "true source" is disclosed — i.e., "the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                          Page 33 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 33 of 38
75

The U.S. Supreme Court has made it abundantly clear that voters and the government have an interest in knowing who contributes to IEOs, and precise tailoring of the "true source" requirement means the public will be less likely to mistake an intermediary for the real origin of funding.[163]  After all, the Court has recognized that disclosure and disclaimer requirements for IEOs are a constitutionally less restrictive way for the government to ensure transparency for the unlimited donations to IEOs influencing our elections.[164]  Prompt disclosure of the "true source" of contributions to IEOs serves that informational interest and enhances the government's ability to enforce the law.[165]

In sum, *every* informational interest implicated by a campaign finance regime is promoted when the true source of funds is revealed.  Without that disclosure, the publicly available information will be either misleading or incomplete, potentially defeating the anti-corruption and educational value of the information in the first place.

In contrast, Plaintiffs' expressed concerns in their motion for preliminary injunction about Ballot Measure 2's "true source" requirement make no sense.  In essence, Plaintiffs

---

goods or services" — and nothing more, unless the contribution comes from an intermediary.  *See* AS 15.13.400(19).  And each of the individual Plaintiffs would satisfy Ballot Measure 2's definition of "true source."  *See* Complaint at ¶¶ 5-9.

[163]  *See Citizens United*, 558 U.S. at 367; *see also McConnell*, 540 U.S. at 196.  For example, the IEO "Council on Good Government" received contributions from FLF in 2020, who in turn received contributions from the "Republican State Leadership Committee" and "GOPAC" in 2018 and 2019 respectively.  *See* Kendall Aff. at ¶¶ 11-13.

[164]  *See Citizens United*, 558 U.S. at 366-71; *SpeechNow.org*, 599 F.3d at 696.

[165]  For example, full disclosure of original sources helps ensure that foreign interests do not interfere in Alaska's elections.  *See* AS 15.13.068 (prohibiting foreign contributions or expenditures).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                Page 34 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 34 of 38
76

are asking this Court to conclude that there is a First Amendment right for a donor to anonymously give unlimited sums of money to influence the outcome of elections.[166]  But there is no constitutional right to make "dark money" contributions.  The U.S. Supreme Court has held that individuals and corporations may indeed give unlimited sums of money to entities who intend to influence the outcome of elections.[167]  However, in reaching this conclusion, the Court recognized that disclosure and disclaimer requirements are a constitutionally-valid and less restrictive way for the government to ensure transparency for the unlimited contributions.[168]  Plaintiffs cite no Court, *anywhere*, that has held donors making unlimited contributions to IEOs must be allowed to do so anonymously.[169]  There is no reason for this Court to be the first.

Additionally, Plaintiffs' claimed cascade of negative effects is a fantasy untethered to reality.  If an organization contributes to an IEO, that organization and the contributor will *only* need to disclose the true source (or sources) of that *contribution*, *not* the true source or sources of its entire budget or all of the money it has ever received.[170]  This is a reasonable limitation which requires disclosure only up to the amount of the contribution

---

[166]      *See* Plaintiffs' Motion at 28-33.

[167]      *See Citizens United*, 558 U.S. at 365-66; *see also SpeechNow.org*, 599 F.3d at 696.

[168]      *See Citizens United*, 558 U.S. at 366-71; *see also SpeechNow.org*, 599 F.3d at 698.

[169]      *See* Complaint at ¶¶ 72-75; *see also* Plaintiffs' Motion at 28-33.  Perhaps one reason for this is to "deter actual corruption and avoid the appearance of corruption."  *See Buckley*, 424 U.S. at 67; *see also* AS 15.13.068 (prohibiting foreign contributions or expenditures).

[170]      *See* AS 15.13.040(r).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 35 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 35 of 38
77

itself and not a penny more.[171] And not only would a church likely lose its nonprofit status if it gave to an IEO in the manner suggested by Plaintiffs,[172] but Plaintiffs' example of a realtor being listed as a true source would also run contrary to how organizations are able to support IEOs without making unsuspecting private donations public.[173] Alaska Statute 15.13.074(i) already requires certain IEOs to inform would-be contributors that they intend to influence the outcome of an election before soliciting any contributions,[174] and — as the State's proposed regulations confirm[175] — IEOs can create segregated accounts to allow donors to give to an account that is not used to make contributions to IEOs if the donor prefers.[176] In other words, realtors who donate to an organization that contributes to an IEO can make clear that their donations should not be used for election purposes; if and when that organization contributes to an IEO, those realtors who did not

---

[171]    *See id.* For example, if a $100 million organizational contributor made a $1 million contribution to an IEO, the IEO (and contributor) would only need to report the true source of $1 million. *See id.* This is not a "dramatic mismatch." *See Ams. for Prosperity Found.*, 141 S. Ct. at 2386.

[172]    *See* Plaintiffs' Motion at 29; *see also* 26 U.S.C. § 501(c)(3) (stating that such organizations shall "not participate in, or intervene in . . . any political campaign on behalf of (or in opposition to) any candidate for public office").

[173]    *See* Plaintiffs' Motion at 29-30.

[174]    AS 15.13.074(i).

[175]    *See* Exhibit E at 2 *to* Kendall Aff. (providing proposed regulation changes).

[176]    *See* Exhibits D, F *to* Kendall Aff. (providing advisory opinions on how an entity can engage in separate accounting so that certain contributions to IEOs will protect the identities of a parent entity's donors); *see also* AS 15.13.374(e)(3) (establishing a safe harbor to follow advisory opinions).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                   Page 36 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 36 of 38
78

want their donations to be used for election purposes will not be named as true sources. Ballot Measure 2 cannot account for outright fraud or misuse of funds.[177]

The First Amendment does not guarantee individuals and corporations the right to give misleading information about the source of campaign contributions. Ballot Measure 2's definition of "true source," which seeks to shine a light on the proliferation of "dark money" in politics, is both substantially related and narrowly tailored to achieve the State's informational interest in knowing and publishing the actual identity of those trying to influence the outcome of elections.

## V.     **CONCLUSION**

Under the Constitution, the electorate is entitled to know who is influencing Alaska's elections. The voters passed Ballot Measure 2 to ensure they had this transparency. As stated in Ballot Measure 2 itself:

> The people of Alaska have the right to know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska. This right requires the prompt, accessible, comprehensible, and public disclosure of the true and original sources of funds used to influence these elections, and is essential to the rights of free speech, assembly, and petition guaranteed by the First Amendment to the United States Constitution and shall be construed broadly.[178]

---

[177]    *See* Plaintiffs' Motion at 29-30; *see also* 26 U.S.C. § 501(c)(3); AS 15.13.074(i).

[178]    *See* Ballot Measure 2 at 2 (Exhibit A *to* Kendall Aff.).

Because the disclosure and disclaimer requirements in Ballot Measure 2 are constitutional, Plaintiffs have not stated a claim upon which relief can be granted. This Court should DISMISS Plaintiffs' claims.


CASHION GILMORE & LINDEMUTH
Attorneys for Defendants


DATE: <u>May 16, 2022</u>                    <u>/s/Scott M. Kendall</u>
                                            Scott M. Kendall
                                            Alaska Bar No. 0405019
                                            Jahna M. Lindemuth
                                            Alaska Bar No. 9711068

**ALASKA'S BETTER ELECTIONS INITIATIVE**

**AN INITIATIVE TO:**

**PROHIBIT THE USE OF DARK MONEY BY INDEPENDENT EXPENDITURE GROUPS WORKING TO INFLUENCE CANDIDATE ELECTIONS IN ALASKA AND REQUIRE ADDITIONAL DISCLOSURES BY THESE GROUPS; ESTABLISH A NONPARTISAN AND OPEN TOP FOUR PRIMARY ELECTION SYSTEM; CHANGE APPOINTMENT PROCEDURES FOR CERTAIN ELECTION BOARDS AND WATCHERS AND THE ALASKA PUBLIC OFFICES COMMISSION; ESTABLISH A RANKED-CHOICE GENERAL ELECTION SYSTEM; SUPPORT AN AMENDMENT TO THE UNITED STATES CONSTITUTION TO ALLOW CITIZENS TO REGULATE MONEY IN ELECTIONS; REPEAL SPECIAL RUNOFF ELECTIONS; REQUIRE CERTAIN NOTICES IN ELECTION PAMPHLETS AND POLLING PLACES; AND AMEND THE DEFINITION OF POLITICAL PARTY.**

**A BILL BY INITIATIVE**
**For an Act Entitled**

"An Act prohibiting the use of dark money by independent expenditure groups working to influence candidate elections in Alaska and requiring additional disclosures by these groups; establishing a nonpartisan and open top four primary election system for election to state executive and state and national legislative offices; changing appointment procedures relating to precinct watchers and members of precinct election boards, election district absentee and questioned ballot counting boards, and the Alaska Public Offices Commission; establishing a ranked-choice general election system; supporting an amendment to the United States Constitution to allow citizens to regulate money in Alaska elections; repealing the special runoff election for the office of United States Senator and United States Representative; requiring certain written notices to appear in election pamphlets and polling places; and amending the definition of 'political party'."

BE IT ENACTED BY THE PEOPLE OF THE STATE OF ALASKA:

**\*Section 1.** The uncodified law of the State of Alaska is amended by adding a section to read: FINDINGS AND INTENT. The People of the State of Alaska find:

(1) It is in the public interest of Alaska to improve the electoral process by increasing transparency, participation, access, and choice.

(2) The people of Alaska hold that political power and influence should not be allocated based on wealth. Instead, reasonable limits on the role of money in elections are necessary to secure the equal rights of Alaskans and to protect the integrity of Alaska elections. Several rulings of the United States Supreme Court have erroneously changed the meaning of the First Amendment to the United States Constitution so as to empower unlimited spending as "free speech" without proper consideration of factors such as the danger of corruption and the undermining of self-governance in Alaska by the undue influence of wealth, including from outside the state. These mistaken Supreme Court decisions have invalidated longstanding anti-corruption laws in Alaska. Alaska shall now affirm the rights and powers of its citizens by prohibiting the use of

1

ALASKA'S BETTER ELECTIONS INITIATIVE

dark money in its candidate elections and by supporting an amendment to the United States Constitution allowing citizens to regulate the raising and spending of money in elections.

(3) The people of Alaska have the right to know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska. This right requires the prompt, accessible, comprehensible, and public disclosure of the true and original sources of funds used to influence these elections, and is essential to the rights of free speech, assembly, and petition guaranteed by the First Amendment to the United States Constitution and shall be construed broadly.

(4) It is in the public interest of Alaska to adopt a primary election system that is open and nonpartisan, which will generate more qualified and competitive candidates for elected office, boost voter turnout, better reflect the will of the electorate, reward cooperation, and reduce partisanship among elected officials.

(5) It is in the public interest of Alaska to adopt a general election system that reflects the core democratic principle of majority rule. A ranked-choice voting system will help ensure that the values of elected officials more broadly reflect the values of the electorate, mitigate the likelihood that a candidate who is disapproved by a majority of voters will get elected, encourage candidates to appeal to a broader section of the electorate, allow Alaskans to vote for the candidates that most accurately reflect their values without risking the election of those candidates that least accurately reflect their values, encourage greater third-party and independent participation in elections, and provide a stronger mandate for winning candidates.

**\*Sec. 2.** AS 15.10.120(c) is amended to read:

(c) An election supervisor shall appoint one nominee of the political party **or political group with the largest number of registered voters at the time of the preceding gubernatorial election** [OF WHICH THE GOVERNOR IS A MEMBER] and one nominee of the political party **or political group with** [THAT RECEIVED] the second largest number of registered voters at the time of [VOTES STATEWIDE IN] the preceding gubernatorial election. **However, the election supervisor may appoint a qualified person registered as a member of a third political party or political group or as a nonpartisan or undeclared voter if** [IF] a party district committee or state party central committee of the party **or group with the largest number of registered voters** [OF WHICH THE GOVERNOR IS A MEMBER] or the party **or group with** [THAT RECEIVED] the second largest number of **registered voters at the time of** [VOTES STATEWIDE IN] the preceding gubernatorial election fails to present the names prescribed by (b) of this section by April 15 of a regular election year or at least 60 days before a special **primary** election [, THE ELECTION SUPERVISOR MAY APPOINT ANY QUALIFIED INDIVIDUAL REGISTERED TO VOTE].

**\*Sec. 3.** AS 15.10.170 is amended to read:

**Sec. 15.10.170. Appointment and privileges of watchers.** (a) The precinct party committee, where an organized precinct committee exists, or the party district committee where no organized precinct committee exists, or the state party chairperson where neither a precinct nor a party district committee exists, may appoint one or more persons as watchers in each precinct and counting center for any election. Each candidate [NOT REPRESENTING A POLITICAL PARTY] may appoint one or more watchers for each precinct or counting center in the

2

**ALASKA'S BETTER ELECTIONS INITIATIVE**

candidate's respective district or the state for any election. Any organization or organized group that sponsors or opposes an initiative, referendum, or recall may have one or more persons as watchers at the polls and counting centers after first obtaining authorization from the director. A state party chairperson, a precinct party committee, a party district committee, or a candidate [NOT REPRESENTING A POLITICAL PARTY OR ORGANIZATION OR ORGANIZED GROUP] may not have more than one watcher on duty at a time in any precinct or counting center. A watcher must be a United States citizen. The watcher may be present at a position inside the place of voting or counting that affords a full view of all action of the election officials taken from the time the polls are opened until the ballots are finally counted and the results certified by the election board or the data processing review board. The election board or the data processing review board may require each watcher to present written proof showing appointment by the precinct party committee, the party district committee, the organization or organized group, or the candidate the watcher represents [THAT IS SIGNED BY THE CHAIRPERSON OF THE PRECINCT PARTY COMMITTEE, THE PARTY DISTRICT COMMITTEE, THE STATE PARTY CHAIRPERSON, THE ORGANIZATION OR ORGANIZED GROUP, OR THE CANDIDATE REPRESENTING NO PARTY].

(b) In addition to the watchers appointed under (a) of this section, in a primary election **or** [,] special **primary** election **or special election** under AS 15.40.140, [OR SPECIAL RUNOFF ELECTION UNDER AS15.40.141,] each candidate may appoint one watcher in each precinct and counting center.

**\*Sec. 4.** AS 15.13.020(b) is amended to read:

(b) The governor shall appoint two members of each of the two political parties **or political groups with the largest number of registered voters at the time of** [WHOSE CANDIDATE FOR GOVERNOR RECEIVED THE HIGHEST NUMBER OF VOTES IN] the most recent preceding general election at which a governor was elected. The two appointees from each of these two parties **or groups** shall be chosen from a list of four names to be submitted by the central committee of each party **or group.**

**\*Sec. 5.** AS 15.13.020(d) is amended to read:

(d) Members of the commission serve staggered terms of five years, or until a successor is appointed and qualifies. The terms of no two members who are members of the same political party **or political group** may expire in consecutive years. A member may not serve more than one term. However, a person appointed to fill the unexpired term of a predecessor may be appointed to a successive full five-year term.

**\*Sec. 6.** AS 15.13.040(j)(3) is amended to read:

(3) for all contributions described in (2) of this subsection, the name, address, date, and amount contributed by each contributor, [AND] for all contributions described in (2) of this subsection in excess of $250 in the aggregate during a calendar year, the principal occupation and employer of the contributor**, and for all contributions described in (2) of this subsection in excess of $2,000 in the aggregate during a calendar year, the true source of such contributions and all intermediaries, if any, who transferred such funds, and a certification from the treasurer that the report discloses all of the information required by this paragraph.**

3

### ALASKA'S BETTER ELECTIONS INITIATIVE

**\*Sec. 7.** AS 15.13.040 is amended by adding a new subsection to read:

(s) Every individual, person, nongroup entity, or group that contributes more than $2,000 in the aggregate in a calendar year to an entity that made one or more independent expenditures in one or more candidate elections in the previous election cycle, that is making one or more independent expenditures in one or more candidate elections in the current election cycle, or that the contributor knows or has reason to know is likely to make independent expenditures in one or more candidate elections in the current election cycle shall report making the contribution or contributions on a form prescribed by the commission not later than 24 hours after the contribution that requires the contributor to report under this subsection is made. The report must include the name, address, principal occupation, and employer of the individual filing the report and the amount of the contribution, as well as the total amount of contributions made to that entity by that individual, person, nongroup entity, or group during the calendar year. For purposes of this subsection, the reporting contributor is required to report and certify the true sources of the contribution, and intermediaries, if any, as defined by AS 15.13.400(18). This contributor is also required to provide the identity of the true source to the recipient of the contribution simultaneously with providing the contribution itself.

**\*Sec. 8.** AS 15.13.070 is amended by adding a new subsection to read:

(g) Where contributions are made to a joint campaign for governor and lieutenant governor,

(1) An individual may contribute not more than $1,000 per year; and

(2) A group may contribute not more than $2,000 per year.

**\*Sec. 9.** AS 15.13.074(b) is amended to read:

(b) A person or group may not make a contribution anonymously, using a fictitious name, or using the name of another. **Individuals, persons, nongroup entities, or groups subject to AS 15.13.040(s) may not contribute or accept $2,000 or more of dark money as that term is defined in AS 15.13.400(17), and may not make a contribution while acting as an intermediary without disclosing the true source of the contribution as defined in AS 15.13.400(18).**

**\*Sec. 10.** AS 15.13.074(c) is amended to read:

(c) A person or group may not make a contribution

(1) to a candidate or an individual who files with the commission the document necessary to permit that individual to incur certain election-related expenses as authorized by AS 15.13.100 when the office is to be filled at a general election before the date that is 18 months before the general election;

(2) to a candidate or an individual who files with the commission the document necessary to permit that individual to incur certain election-related expenses as authorized by AS 15.13.100 for an office that is to be filled at a special election or municipal election before the date that is 18 months before the date of the regular municipal election or that is before the date of the proclamation of the special election at which the candidate or individual seeks election to public office; or

(3) to any candidate later than the 45th day

4

## ALASKA'S BETTER ELECTIONS INITIATIVE

(A) after the date of the primary **or special primary** election if the candidate was [ON THE BALLOT AND WAS] not **chosen to appear on the general or special election ballot** [NOMINATED] at the primary **or special primary** election; or

(B) after the date of the general **or special** election, or after the date of a municipal or municipal runoff election.

**\*Sec. 11.** AS 15.13.090(c) is amended to read:

(c) To satisfy the requirements of (a)(1) of this section and, if applicable, (a)(2)(C) of this section, a communication that includes a print or video component must have the following statement or statements placed in the communication so as to be easily discernible**, and in a broadcast, cable, satellite, internet or other digital communication the statement must remain onscreen throughout the entirety of the communication**; the second statement is not required if the person paying for the communication has no contributors or is a political party:

This communication was paid for by (person's name and city and state of principal place of business). The top contributors of (person's name) are (the name and city and state of residence or principal place of business, as applicable, of the largest contributors to the person under AS 15.13.090(a)(2)(C)).

**\*Sec. 12.** AS 15.13.090 is amended by adding a new subsection to read:

(g) To satisfy the requirements of (a)(1) of this section and, if applicable, (a)(2)(C) of this section, a communication paid for by an outside-funded entity as that term is defined in AS 15.13.400(19) that includes a print or video component must have the following statement placed in the communication so as to be easily discernible, and in a broadcast, cable, satellite, internet or other digital communication the statement must remain onscreen throughout the entirety of the communication; the statement is not required if the outside entity paying for the communication has no contributors or is a political party: "A MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF ALASKA."

**\*Sec. 13.** AS 15.13.110(f) is amended to read:

(f) During the year in which the election is scheduled, each of the following shall file the campaign disclosure reports in the manner and at the times required by this section:

(1) a person who, under the regulations adopted by the commission to implement AS 15.13.100, indicates an intention to become a candidate for elective state executive or legislative office;

(2) [A PERSON WHO HAS FILED A NOMINATING PETITION UNDER AS 15.25.140 - 15.25.200 TO BECOME A CANDIDATE AT THE GENERAL ELECTION FOR ELECTIVE STATE EXECUTIVE OR LEGISLATIVE OFFICE;

(3)] a person who campaigns as a write-in candidate for elective state executive or legislative office at the general election; and

**(3)** [(4)] a group or nongroup entity that receives contributions or makes expenditures on behalf of or in opposition to a person described in **(1) or (2)** [(1) - (3)] of this subsection, except as provided for certain independent expenditures by nongroup entities in AS 15.13.135(a).

5

ALASKA'S BETTER ELECTIONS INITIATIVE

**\*Sec. 14.** AS 15.13.110 is amended by adding a new subsection to read:

(k) Once contributions from an individual, person, nongroup entity, or group to an entity that made one or more independent expenditures in one or more candidate elections in the previous election cycle, that is making one or more independent expenditures in one or more candidate elections in the current election cycle, or that the contributor knows or has reason to know is likely to make independent expenditures in one or more candidate elections in the current election cycle exceed $2,000 in a single year, that entity shall report that contribution, and all subsequent contributions, not later than 24 hours after receipt. For purposes of this subsection, the entity is required to certify and report the true source, and all intermediaries if any, of the contribution as defined by AS 15.13.400(18).

**\*Sec. 15.** AS 15.13.390(a) is amended to read:

**(1)** A person who fails to register when required by AS 15.13.050(a) or who fails to file a properly completed and certified report within the time required by AS 15.13.040, 15.13.060(b) — (d), 15.13.110(a)(1), (3), or (4), (e), or (f) is subject to a civil penalty of not more than $50 a day for each day the delinquency continues as determined by the commission subject to right of appeal to the superior court. A person who fails to file a properly completed and certified report within the time required by AS 15.13.110(a)(2) or 15.13.110(b) is subject to a civil penalty of not more than $500 a day for each day the delinquency continues as determined by the commission subject to right of appeal to the superior court**;**

**(2) A person who, whether as a contributor or intermediary, delays in reporting a contribution as required by AS 15.13.040(s) is subject to a civil penalty of not more than $1,000 a day for each day the delinquency continues as determined by the commission subject to right of appeal to the superior court;**

**(3) A person who, whether as a contributor or intermediary, misreports or fails to disclose the true source of a contribution in violation of AS 15.13.040(s) or AS 15.13.074(b) is subject to a civil penalty of not more than the amount of the contribution that is the subject of the misreporting or failure to disclose. Upon a showing that the violation was intentional, a civil penalty of not more than three times the amount of the contribution in violation may be imposed. These penalties as determined by the commission are subject to right of appeal to the superior court;**

**(4)** A person who violates a provision of this chapter, except [A PROVISION REQUIRING REGISTRATION OR FILING OF A REPORT WITHIN A TIME REQUIRED] as otherwise specified in this section, is subject to a civil penalty of not more than $50 a day for each day the violation continues as determined by the commission, subject to right of appeal to the superior court[.]**; and**

**(5)** An affidavit stating facts in mitigation may be submitted to the commission by a person against whom a civil penalty is assessed. However, the imposition of the penalties prescribed in this section or in AS 15.13.380 does not excuse that person from registering or filing reports required by this chapter.

**\*Sec. 16.** AS 15.13.400(4) is amended to read:

(4) "contribution"

6

**ALASKA'S BETTER ELECTIONS INITIATIVE**

(A) means a purchase, payment, promise or obligation to pay, loan or loan guarantee, deposit or gift of money, goods, or services for which charge is ordinarily made, and includes the payment by a person other than a candidate or political party, or compensation for the personal services of another person, that is rendered to the candidate or political party, and that is made for the purpose of

(i) influencing the nomination or election of a candidate;

(ii) influencing a ballot proposition or question; or

(iii) supporting or opposing an initiative proposal application filed with the lieutenant governor under AS 15.45.020;

(B) does not include

(i) services provided without compensation by individuals volunteering a portion or all of their time on behalf of a political party, candidate, or ballot proposition or question;

(ii) ordinary hospitality in a home;

(iii) two or fewer mass mailings before each election by each political party describing <u>members of the party running as candidates for public office in that election</u> [THE PARTY'S SLATE OF CANDIDATES FOR ELECTION], which may include photographs, biographies, and information about the [PARTY'S] candidates;

(iv) the results of a poll limited to issues and not mentioning any candidate, unless the poll was requested by or designed primarily to benefit the candidate;

(v) any communication in the form of a newsletter from a legislator to the legislator's constituents, except a communication expressly advocating the election or defeat of a candidate or a newsletter or material in a newsletter that is clearly only for the private benefit of a legislator or a legislative employee;

(vi) a fundraising list provided without compensation by one candidate or political party to a candidate or political party; or

(vii) an opportunity to participate in a candidate forum provided to a candidate without compensation to the candidate by another person and for which a candidate is not ordinarily charged;

**\*Sec. 17.** AS 15.13.400 is amended by adding a new paragraph to read:

(17) "dark money" means a contribution whose source or sources, whether from wages, investment income, inheritance, or revenue generated from selling goods or services, is not disclosed to the public. Notwithstanding the foregoing, to the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source.

**\*Sec. 18.** AS 15.13.400 is amended by adding a new paragraph to read:

(18) "true source" means the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services. A person or legal entity who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source. Notwithstanding the foregoing, to

7

ALASKA'S BETTER ELECTIONS INITIATIVE

the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source.

**\*Sec. 19.** AS 15.13.400 is amended by adding a new paragraph to read:

(19) "outside-funded entity" means an entity that makes one or more independent expenditures in one or more candidate elections and that, during the previous 12-month period, received more than 50 percent of its aggregate contributions from true sources, or their equivalents, who, at the time of the contribution, resided or had their principal place of business outside Alaska.

**\*Sec. 20.** AS 15.15 is amended by adding a new section to read:

**Sec. 15.15.005. Top four nonpartisan open primary.** A voter qualified under AS 15.05 may cast a vote for any candidate for each elective state executive and state and national legislative office, without limitations based on the political party or political group affiliation of either the voter or the candidate.

**\*Sec. 21.** AS 15.15.030(5) is amended to read:

(5) The names of the candidates [AND THEIR PARTY DESIGNATIONS] shall be placed in separate sections on the state general election ballot under the office designation to which they were nominated. **If a candidate is registered as affiliated with a political party or political group, the** [THE] party affiliation, if any, **may** [SHALL] be designated after the name of the candidate, **upon request of the candidate. If a candidate has requested designation as nonpartisan or undeclared, that designation shall be placed after the name of the candidate. If a candidate is not registered as affiliated with a political party or political group and has not requested to be designated as nonpartisan or undeclared, the candidate shall be designated as undeclared.** The lieutenant governor and the governor shall be included under the same section. Provision shall be made for voting for write-in [AND NO-PARTY] candidates within each section. Paper ballots for the state general election shall be printed on white paper.

**\*Sec. 22.** AS 15.15.030 is amended by adding new paragraphs to read:

(14) The director shall include the following statement on the ballot:

A candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or group or that the party or group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the political party or political group.

(15) Instead of the statement provided by (14) of this section, when candidates for President and Vice-President of the United States appear on a general election ballot, the director shall include the following statement on the ballot:

A candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or political group or that the political party or political group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the party or group. The election for President and Vice-President of the United States is different. Some candidates for President and Vice-President are the official nominees of their political party.

8

EXHIBIT A

**ALASKA'S BETTER ELECTIONS INITIATIVE**

(16)  The director shall design the general election ballots so that the candidates are selected by ranked-choice voting.

(17)  The  director shall design the general election ballot to direct the voter to mark candidates in order of preference and to mark as many choices as the voter wishes, but not to assign the same ranking to more than one candidate for the same office.

**\*Sec. 23.**  AS 15.15.060 is amended by adding a new subsection to read:
(e) In each polling place, the director shall require to be posted, in a location conspicuous to a person who will be voting, the following notice, written in bold:

A candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or group or that the party or group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the party or group.

**\*Sec. 24.**  AS 15.15.350 is amended by adding new subsections to read:
(c) All general elections shall be conducted by ranked-choice voting.
(d) When counting ballots in a general election, the election board shall initially tabulate each validly cast ballot as one vote for the highest-ranked continuing candidate on that ballot or as an inactive ballot. If a candidate is highest-ranked on more than one-half of the active ballots, that candidate is elected and the tabulation is complete. Otherwise, tabulation proceeds in sequential rounds as follows:

(1)  if two or fewer continuing candidates remain, the candidate with the greatest number of votes is elected and the tabulation is complete; otherwise, the tabulation continues under (2) of this subsection;

(2)  the candidate with the fewest votes is defeated, votes cast for the defeated candidate shall cease counting for the defeated candidate and shall be added to the totals of each ballot's next-highest-ranked continuing candidate or considered an inactive ballot under (g)(2) of this section, and a new round begins under (1) of this subsection.

(e)  When counting general election ballots,

(1)  a ballot containing an overvote shall be considered an inactive ballot once the overvote is encountered at the highest ranking for a continuing candidate;

(2) if a ballot skips a ranking, then the election board shall count the next ranking. If the next ranking is another skipped ranking, the ballot shall be considered an inactive ballot once the second skipped ranking is encountered; and

(3)  In the event of a tie between the final two continuing candidates, the procedures in AS 15.15.460 and AS 15.20.430 - 15.20.530 shall apply to determine the winner of the general election. In the event of a tie between two candidates with the fewest votes, the tie shall be resolved by lot to determine which candidate is defeated.

(f)  The election board may not count an inactive ballot for any candidate.

(g)  In this section,

(1)  "continuing candidate" means a candidate who has not been defeated;

(2) "inactive ballot" means a ballot that is no longer tabulated, either in whole or in part, by the division because it does not rank any continuing candidate, contains an

9

EXHIBIT A

ALASKA'S BETTER ELECTIONS INITIATIVE

overvote at the highest continuing ranking, or contains two or more sequential skipped rankings before its highest continuing ranking;

(3) "overvote" means an instance where a voter has assigned the same ranking to more than one candidate;

(4) "ranking" or "ranked" means the number assigned by a voter to a candidate to express the voter's choice for that candidate; a ranking of "1" is the highest ranking, followed by "2," and then "3," and so on;

(5) "round" means an instance of the sequence of voting tabulation in a general election;

(6) "skipped ranking" means a blank ranking on a ballot on which a voter has ranked another candidate at a subsequent ranking.

**\*Sec. 25.** AS 15.15.360(a) is amended to read:

(a) The election board shall count ballots according to the following rules:

(1) A voter may mark a ballot only by filling in, making "X" marks, diagonal, horizontal, or vertical marks, solid marks, stars, circles, asterisks, checks, or plus signs that are clearly spaced in the oval opposite the name of the candidate, proposition, or question that the voter desires to designate. **In a general election, a voter may mark a ballot that requires the voter to vote for candidates in order of ranked preference by the use of numerals that are clearly spaced in one of the ovals opposite the name of the candidate that the voter desires to designate.**

(2) A failure to properly mark a ballot as to one or more candidates does not itself invalidate the entire ballot.

(3) [IF A VOTER MARKS FEWER NAMES THAN THERE ARE PERSONS TO BE ELECTED TO THE OFFICE, A VOTE SHALL BE COUNTED FOR EACH CANDIDATE PROPERLY MARKED.

**(4)** [(5)] The mark specified in (1) of this subsection shall be counted only if it is substantially inside the oval provided, or touching the oval so as to indicate clearly that the voter intended the particular oval to be designated.

**(5)** [(6)] Improper marks on the ballot may not be counted and do not invalidate marks for candidates properly made.

**(6)** [(7)] An erasure or correction invalidates only that section of the ballot in which it appears.

**(7)** [(8)] A vote marked for the candidate for President or Vice-President of the United States is considered and counted as a vote for the election of the presidential electors.

(9) [REPEALED]
(10) [REPEALED]
(11) [REPEALED]
(12) [REPEALED]

**\*Sec. 26.** AS 15.15.370 is amended to read:

**Sec. 15.15.370. Completion of ballot count; certificate.** When the count of ballots is completed, and in no event later than the day after the election, the election board shall make a certificate in duplicate of the results. The certificate includes the number of votes cast for

10

**ALASKA'S BETTER ELECTIONS INITIATIVE**

each candidate, **including, for a candidate in a general election, the number of votes at each round of the ranked-choice tabulation process under AS 15.15.350, and the number of votes** for and against each proposition, yes or no on each question, and any additional information prescribed by the director. The election board shall, immediately upon completion of the certificate or as soon thereafter as the local mail service permits, send in one sealed package to the director one copy of the certificate and the register. In addition, all ballots properly cast shall be mailed to the director in a separate, sealed package. Both packages, in addition to an address on the outside, shall clearly indicate the precinct from which they come. Each board shall, immediately upon completion of the certification and as soon thereafter as the local mail service permits, send the duplicate certificate to the respective election supervisor. The director may authorize election boards in precincts in those areas of the state where distance and weather make mail communication unreliable to forward their election results by telephone, telegram, or radio. The director may authorize the unofficial totaling of votes on a regional basis by election supervisors, tallying the votes as indicated on duplicate certificates. To **ensure** [ASSURE] adequate protection, the director shall prescribe the manner in which the ballots, registers, and all other election records and materials are thereafter preserved, transferred, and destroyed.

**\*Sec. 27.** AS 15.15.450 is amended to read:

      **Sec. 15.15.450. Certification of state ballot counting review.** Upon completion of the state ballot counting review**,** the director shall certify the person receiving the largest number of votes for the office for which that person was **nominated or elected, as applicable,** [A CANDIDATE AS ELECTED TO THAT OFFICE] and shall certify the approval of a justice or judge not rejected by a majority of the voters voting on the question. The director shall issue to the elected candidates and approved justices and judges a certificate of their election or approval. The director shall also certify the results of a proposition and other question except that the lieutenant governor shall certify the results of an initiative, referendum, or constitutional amendment.

**\* Sec. 28.** AS 15.20.081(a) is amended to read:

      (a) A qualified voter may apply in person, by mail, or by facsimile, scanning, or other electronic transmission to the director for an absentee ballot under this section. Another individual may apply for an absentee ballot on behalf of a qualified voter if that individual is designated to act on behalf of the voter in a written general power of attorney or a written special power of attorney that authorizes the other individual to apply for an absentee ballot on behalf of the voter. The application must include the address or, if the application requests delivery of an absentee ballot by electronic transmission, the telephone electronic transmission number, to which the absentee ballot is to be returned, the applicant's full Alaska residence address, and the applicant's signature. However, a person residing outside the United States and applying to vote absentee in federal elections in accordance with AS 15.05.011 need not include an Alaska residence address in the application. A person may supply to a voter an absentee ballot application form with a political party or group affiliation indicated only if the voter is already registered as affiliated with the political party or group indicated. [ONLY THE VOTER OR THE INDIVIDUAL DESIGNATED BY THE VOTER IN A WRITTEN POWER OF ATTORNEY UNDER THIS SUBSECTION MAY MARK THE VOTER'S CHOICE OF PRIMARY BALLOT ON AN

ALASKA'S BETTER ELECTIONS INITIATIVE

APPLICATION. A PERSON SUPPLYING AN ABSENTEE BALLOT APPLICATION FORM MAY NOT DESIGN OR MARK THE APPLICATION IN A MANNER THAT SUGGESTS CHOICE OF ONE BALLOT OVER ANOTHER, EXCEPT THAT BALLOT CHOICES MAY BE LISTED ON AN APPLICATION AS AUTHORIZED BY THE DIVISION.] The application must be made on a form prescribed or approved by the director. The voter or registration official shall supply the application directly to the division of elections. For purposes of this subsection, "directly to the division of elections" means that an application may not be submitted to any intermediary that could control or delay the submission of the application to the division or gather data on the applicant from the application form. However, nothing in this subsection is intended to prohibit a voter from giving a completed absentee ballot application to a friend, relative, or associate for transfer to the United States Postal Service or a private commercial delivery service for delivery to the division.

**\*Sec. 29.** AS 15.20.081(h) is amended to read:

(h)  Except as provided in AS 15.20.480, an absentee ballot returned by mail from outside the United States or from an overseas voter qualifying under AS 15.05.011 that has been marked and mailed not later than election day may not be counted unless the ballot is received by the election supervisor not later than the close of business on the

(1)  10th day following a primary election or special **primary** election under AS 15.40.140; or

(2)  15th day following a general election [, SPECIAL RUNOFF ELECTION,] or special election, other than a special **primary** election described in (1) of this subsection.

**\*Sec. 30.** AS 15.20.190(a) is amended to read:

(a)  Thirty days before the date of an election, the election supervisors shall appoint, in the same manner provided for the appointment of election officials prescribed in AS 15.10, district absentee ballot counting boards and district questioned ballot counting boards, each composed of at least four members. At least one member of each board must be a member of the same political party **or political group with the largest number of registered voters at the time of the preceding gubernatorial election** [OF WHICH THE GOVERNOR IS A MEMBER], and at least one member of each board must be a member of the political party **or political group with the second largest number of registered voters at the time of** [WHOSE CANDIDATE FOR GOVERNOR RECEIVED THE SECOND LARGEST NUMBER OF VOTES IN] the preceding gubernatorial election. The district boards shall assist the election supervisors in counting the absentee and questioned ballots and shall receive the same compensation paid election officials under AS 15.15.380.

**\*Sec. 31.** AS 15.20.203(i) is amended to read:

(i)  The director shall mail the materials described in (h) of this section to the voter not later than

(1)  10 days after completion of the review of ballots by the state review board for a primary election [,] or [FOR] a special **primary** election under AS 15.40.140 [THAT IS FOLLOWED BY A SPECIAL RUNOFF ELECTION];

12

**ALASKA'S BETTER ELECTIONS INITIATIVE**

(2)  60 days after certification of the results of a general election [,SPECIAL RUNOFF ELECTION,] or special election other than a special **primary** election described in (1) of this subsection.

**\*Sec. 32.** AS 15.20.203(j) is amended to read:

(j)  The director shall make available through a free access system to each absentee voter a system to check to see whether the voter's ballot was counted and, if not counted, the reason why the ballot was not counted. The director shall make this information available through the free access system not less than

(1)  10 days after certification of the results of a primary election [,] or a special **primary** election under AS 15.40.140 [THAT IS FOLLOWED BY A SPECIAL RUNOFF ELECTION]; and

(2)  30 days after certification of the results of a general or special election, other than a special **primary** election described in (1) of this subsection.

**\*Sec. 33.** AS 15.20.207(i) is amended to read:

(i)  The director shall mail the materials described in (h) of this section to the voter not later than

(1)  10 days after completion of the review of ballots by the state review board for a primary election [,] or [FOR] a special **primary** election under AS 15.40.140 [THAT IS FOLLOWED BY A SPECIAL RUNOFF ELECTION];

(2)  60 days after certification of the results of a general or special election, other than a special **primary** election described in (1) of this subsection.

**\*Sec. 34.** AS 15.20.207(k) is amended to read:

(k)  The director shall make available through a free access system to each voter voting a questioned ballot a system to check to see whether the voter's ballot was counted and, if not counted, the reason why the ballot was not counted. The director shall make this information available through the free access system not less than

(1) 10 days after certification of the results of a primary election [,] or a special **primary** election under AS 15.40.140 [THAT IS FOLLOWED BY A SPECIAL RUNOFF ELECTION]; and

(2) 30 days after [THE] certification of the results of a general or special election, other than a special **primary** election described in (1) of this subsection.

**\*Sec. 35.** AS 15.20.211(d) is amended to read:

(d)  The director shall mail the materials described in (c) of this section to the voter not later than

(1) 10 days after completion of the review of ballots by the state review board for a primary election [,] or [FOR] a special **primary** election under AS 15.40.140 [THAT IS FOLLOWED BY A SPECIAL RUNOFF ELECTION];

(2) 60 days after certification of the results of a general or special election, other than a special **primary** election described in (1) of this subsection.

**\*Sec. 36.** AS 15.20.211(f) is amended to read:

13

ALASKA'S BETTER ELECTIONS INITIATIVE

(f) The director shall make available through a free access system to each voter whose ballot was subject to partial counting under this section a system to check to see whether the voter's ballot was partially counted and, if not counted, the reason why the ballot was not counted. The director shall make this information available through the free access system not less than

(1) 10 days after certification of the results of a primary election [,] or a special **primary** election under AS 15.40.140 [THAT IS FOLLOWED BY A SPECIAL RUNOFF ELECTION]; and

(2) 30 days after [THE] certification of the results of a general or special election, other than a special **primary** election described in (1) of this subsection.

**\*Sec. 37.** AS 15.25.010 is amended to read:

Sec. 15.25.010. Provision for primary election. Candidates for the elective state executive and state and national legislative offices shall be nominated in a primary election by direct vote of the people in the manner prescribed by this chapter. **The primary election does not serve to determine the nominee of a political party or political group but serves only to narrow the number of candidates whose names will appear on the ballot at the general election. Except as provided in AS 15.25.100(d), only the four candidates who receive the greatest number of votes for any office shall advance to the general election** [THE DIRECTOR SHALL PREPARE AND PROVIDE A PRIMARY ELECTION BALLOT FOR EACH POLITICAL PARTY. A VOTER REGISTERED AS AFFILIATED WITH A POLITICAL PARTY MAY VOTE THAT PARTY'S BALLOT. A VOTER REGISTERED AS NONPARTISAN OR UNDECLARED RATHER THAN AS AFFILIATED WITH A PARTICULAR POLITICAL PARTY MAY VOTE THE POLITICAL PARTY BALLOT OF THE VOTER'S CHOICE UNLESS PROHIBITED FROM DOING SO UNDER AS 15.25.014. A VOTER REGISTERED AS AFFILIATED WITH A POLITICAL PARTY MAY NOT VOTE THE BALLOT OF A DIFFERENT POLITICAL PARTY UNLESS PERMITTED TO DO SO UNDER AS 15.25.014].

**\*Sec. 38.** AS 15.25.030(a) is amended to read:

(a) A person [MEMBER OF A POLITICAL PARTY] who seeks to become a candidate [OF THE PARTY] in the primary election **or a special primary election** shall execute and file a declaration of candidacy. The declaration shall be executed under oath before an officer authorized to take acknowledgments and must state in substance

(1) the full name of the candidate;

(2) the full mailing address of the candidate;

(3) if the candidacy is for the office of state senator or state representative, the house or senate district of which the candidate is a resident;

(4) the office for which the candidate seeks nomination;

(5) the [NAME OF THE] political party **or political group with whom the candidate is registered as affiliated, or whether the candidate would prefer a nonpartisan or undeclared designation placed after the candidate's name on the ballot** [OF WHICH THE PERSON IS A CANDIDATE FOR NOMINATION];

(6) the full residence address of the candidate, and the date on which residency at that address began;

(7) the date of the primary election **or special primary election** at which the candidate seeks nomination;

14

EXHIBIT A
Page 14 of 25

ALASKA'S BETTER ELECTIONS INITIATIVE

(8) the length of residency in the state and in the district of the candidate;

(9) that the candidate will meet the specific citizenship requirements of the office for which the person is a candidate;

(10) that the candidate is a qualified voter as required by law;

(11) that the candidate will meet the specific age requirements of the office for which the person is a candidate; if the candidacy is for the office of state representative, that the candidate will be at least 21 years of age on the first scheduled day of the first regular session of the legislature convened after the election; if the candidacy is for the office of state senator, that the candidate will be at least 25 years of age on the first scheduled day of the first regular session of the legislature convened after the election; if the candidacy is for the office of governor or lieutenant governor, that the candidate will be at least 30 years of age on the first Monday in December following election or, if the office is to be filled by special election under AS 15.40.230 - 15.40.310, that the candidate will be at least 30 years of age on the date of certification of the results of the special election; or, for any other office, by the time that the candidate, if elected, is sworn into office;

(12) that the candidate requests that the candidate's name be placed on the primary **or special primary** election ballot;

(13) that the required fee accompanies the declaration;

(14) that the person is not a candidate for any other office to be voted on at the primary or general election and that the person is not a candidate for this office under any other declaration of candidacy or nominating petition;

(15) the manner in which the candidate wishes the candidate's name to appear on the ballot;

**(16) if the candidacy is for the office of the governor, the name of the candidate for lieutenant governor running jointly with the candidate for governor; and**

**(17) if the candidacy is for the office of lieutenant governor, the name of the candidate for governor running jointly with the candidate for lieutenant governor.**

[(16) THAT THE CANDIDATE IS REGISTERED TO VOTE AS A MEMBER OF THE POLITICAL PARTY WHOSE NOMINATION IS BEING SOUGHT].

**\*Sec. 39.** AS 15.25.060 is repealed and reenacted to read:

**Sec. 15.25.060. Preparation and distribution of ballots.** The primary election ballots shall be prepared and distributed by the director in the manner prescribed for general election ballots except as specifically provided otherwise for the primary election. The director shall prepare and provide a primary election ballot that contains all of the candidates for elective state executive and state and national legislative offices and all of the ballot titles and propositions required to appear on the ballot at the primary election. The director shall print the ballots on white paper and place the names of all candidates who have properly filed in groups according to offices. The order of the placement of the names for each office shall be as provided for the general election ballot. Blank spaces may not be provided on the ballot for the writing or pasting in of names.

**\*Sec. 40.** AS 15.25.100 is repealed and reenacted to read:

**Sec. 15.25.100. Placement of candidates on general election ballot.** (a) Except as provided in (b)-(g) of this section, of the names of candidates that appear on the primary

15

## ALASKA'S BETTER ELECTIONS INITIATIVE

election ballot under AS 15.25.010, the director shall place on the general election ballot only the names of the four candidates receiving the greatest number of votes for an office. For purposes of this subsection and (b) of this section, candidates for lieutenant governor and governor are treated as a single paired unit.

(b) If two candidates tie in having the fourth greatest number of votes for an office in the primary election, the director shall determine under (g) of this section which candidate's name shall appear on the general election ballot.

(c) Except as otherwise provided in (d) of this section, if a candidate nominated at the primary election dies, withdraws, resigns, becomes disqualified from holding office for which the candidate is nominated, or is certified as being incapacitated in the manner prescribed by this section after the primary election and 64 days or more before the general election, the vacancy shall be filled by the director by replacing the withdrawn candidate with the candidate who received the fifth most votes in the primary election.

(d) If the withdrawn, resigned, deceased, disqualified, or incapacitated candidate was a candidate for governor or lieutenant governor, the replacement candidate is selected by the following process:

(1) if the withdrawn, resigned, deceased, disqualified, or incapacitated candidate was the candidate for governor, that candidate's lieutenant governor running mate becomes the candidate for governor, thereby creating a vacancy for the lieutenant governor candidate;

(2) when any vacancy for the lieutenant governor candidate occurs, the candidate for governor shall select a qualified running mate to be the lieutenant governor candidate and notify the director of that decision.

(e) The director shall place the name of the persons selected through this process as candidates for governor and lieutenant governor on the general election ballot.

(f) For a candidate to be certified as incapacitated under (c) of this section, a panel of three licensed physicians, not more than two of whom may be of the same party, shall provide the director with a sworn statement that the candidate is physically or mentally incapacitated to an extent that would, in the panel's judgment, prevent the candidate from active service during the term of office if elected.

(g) If the director is unable to make a determination under this section because the candidates received an equal number of votes, the determination may be made by lot under AS 15.20.530.

*Sec. 41. AS 15.25.105(a) is amended to read:

(a) If a candidate does not appear on the primary election ballot or is not successful in advancing to the general election and wishes to be a candidate in the general election, the candidate may file as a write-in candidate. Votes for a write-in candidate may not be counted unless that candidate has filed a letter of intent with the director stating

(1) the full name of the candidate;

(2) the full residence address of the candidate and the date on which residency at that address began;

(3) the full mailing address of the candidate;

(4) the [NAME OF THE] political party or political group **with whom the candidate is registered as affiliated, or whether the candidate would prefer a**

16

**ALASKA'S BETTER ELECTIONS INITIATIVE**

nonpartisan or undeclared designation. [OF WHICH THE CANDIDATE IS A MEMBER, IF ANY];

     (5) if the candidate is for the office of state senator or state representative, the house or senate district of which the candidate is a resident;

     (6) the office that the candidate seeks;

     (7) the date of the election at which the candidate seeks election;

     (8) the length of residency in the state and in the house district of the candidate;

     (9) the name of the candidate as the candidate wishes it to be written on the ballot by the voter;

     (10) that the candidate meets the specific citizenship requirements of the office for which the person is a candidate;

     (11) that the candidate will meet the specific age requirements of the office for which the person is a candidate; if the candidacy is for the office of state representative, that the candidate will be at least 21 years of age on the first scheduled day of the first regular session of the legislature convened after the election; if the candidacy is for the office of state senator, that the candidate will be at least 25 years of age on the first scheduled day of the first regular session of the legislature convened after the election; if the candidacy is for the office of governor or lieutenant governor, that the candidate will be at least 30 years of age on the first Monday in December following election or, if the office is to be filled by special election under AS 15.40.230 - 15.40.310, that the candidate will be at least 30 years of age on the date of certification of the results of the special election; or, for any other office, by the time that the candidate, if elected, is sworn into office;

     (12) that the candidate is a qualified voter as required by law; and

     (13) that the candidate is not a candidate for any other office to be voted on at the general election and that the candidate is not a candidate for this office under any other nominating petition or declaration of candidacy.

**\*Sec. 42.** AS 15.25.105(b) is amended to read:

     (b) If a write-in candidate is running for the office of governor, the candidate must file a joint letter of intent together with a candidate for lieutenant governor. [BOTH CANDIDATES MUST BE OF THE SAME POLITICAL PARTY OR GROUP.]

**\*Sec. 43.** AS 15.30.010 is amended to read:

     **Sec. 15.30.010. Provision for selection of electors.** Electors of President and Vice President of the United States are selected by election at the general election in presidential election years[.] , in the manner and as determined by the ranked-choice method of tabulating votes described in AS 15.15.350—15.15.370.

**\*Sec. 44.** AS 15.40.140 is amended to read:

     **Sec. 15.40.140. Condition of calling special primary election and special election.** When a vacancy occurs in the office of United States senator or United States representative, the governor shall, by proclamation, call a special **primary** election to be held on a date not less

17

EXHIBIT A
Page 97 of 25

97

ALASKA'S BETTER ELECTIONS INITIATIVE

than 60, nor more than 90, days after the date the vacancy occurs, to be followed by a special election on the first Tuesday that is not a state holiday occurring not less than 60 days after the special primary election [UNDER AS 15.40.142(a)]. However, in an election year in which a candidate for that office is not regularly elected, if the vacancy occurs on a date that is not less than 60, nor more than 90, days before [OR IS ON OR AFTER] the date of

(1) the primary election, the [IN THE GENERAL ELECTION YEAR DURING WHICH A CANDIDATE TO FILL THE OFFICE IS REGULARLY ELECTED, THE GOVERNOR MAY NOT CALL A] special primary election shall be held on the date of the primary election with the subsequent special election to be held on the date of the general election; or

(2) the general election, the special primary election shall be held on the date of the general election with the subsequent special election to be held on the first Tuesday that is not a state holiday occurring not less than 60 days after the special primary and general election.


*Sec. 45. AS 15.40.160 is amended to read:
    Sec. 15.40.160. Proclamation. The governor shall issue the proclamation calling the special primary election and special election at least 50 days before the
    [(1)] special primary election [; AND
    (2)  IF A SPECIAL RUNOFF ELECTION IS REQUIRED UNDER AS 15.40.141(a), SPECIAL RUNOFF ELECTION].

*Sec. 46. AS 15.40.165 is amended to read:
    Sec. 15.40.165. Term of elected senator. At the special election, [OR, AS PROVIDED BY AS 15.40.141, AT THE SPECIAL RUNOFF ELECTION,] a United States senator shall be elected to fill the remainder of the unexpired term. The person elected shall take office on the date the United States Senate meets, convenes, or reconvenes following the certification of the results of the special election [OR SPECIAL RUNOFF ELECTION] by the director.

*Sec. 47. AS 15.40.170 is amended to read:
    Sec. 15.40.170. Term of elected representative. At the special election, [OR, AS PROVIDED BY AS 15.40.141, AT THE SPECIAL RUNOFF ELECTION,] a United States representative shall be elected to fill the remainder of the unexpired term. The person elected shall take office on the date the United States house of representatives meets, convenes, or reconvenes following the certification of the results of the special election [OR SPECIAL RUNOFF ELECTION] by the director.

*Sec. 48. AS 15.40.190 is amended to read:
    Sec. 15.40.190. Requirements of petition for [NO-PARTY] candidates. Petitions for the nomination of candidates must be executed under oath, [NOT REPRESENTING A POLITICAL PARTY SHALL BE SIGNED BY QUALIFIED VOTERS OF THE STATE EQUAL IN NUMBER TO AT LEAST ONE PERCENT OF THE NUMBER OF VOTERS WHO CAST BALLOTS IN THE PRECEDING GENERAL ELECTION AND SHALL] state in substance that which is required for a declaration of candidacy

18

EXHIBIT A

ALASKA'S BETTER ELECTIONS INITIATIVE

<u>under AS 15.25.030, and include the fee required under AS 15.25.050(a)</u> [NOMINATION PETITIONS BY AS 15.25.180].

**\*Sec. 49.** AS 15.40.220 is amended to read:

**Sec. 15.40.220. General provisions for conduct of <u>the</u> special <u>primary</u> election and special [RUNOFF] election.** Unless specifically provided otherwise, all provisions regarding the conduct of the <u>primary election and</u> general election shall govern the conduct of the special <u>primary</u> election and [THE] special [RUNOFF] election of the United States senator or United States representative, including provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities; provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from work to vote; provisions for the counting, reviewing, and certification of returns; [PROVISION FOR RUNNING AS, VOTING FOR, AND COUNTING BALLOTS FOR A WRITE-IN CANDIDATE;] provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.

**\*Sec. 50.** AS 15.40.230 is amended to read:

**Sec. 15.40.230. Condition and time of calling <u>special primary election and</u> special election.** When a person appointed to succeed to the office of lieutenant governor succeeds to the office of acting governor, the acting governor shall, by proclamation, call a special <u>primary</u> election to be held on a date not less than 60, nor more than 90, days after the date the vacancy in the office of the governor occurred <u>and a subsequent special election to be held on the first Tuesday that is not a state holiday occurring not less than 60 days after the special primary election.</u> However, if the vacancy occurs on a date that is less than 60 days before or is on or after the date of the primary election in years in which a governor is regularly elected, the acting governor shall serve the remainder of the unexpired term and may not call a special election.

**\*Sec. 51.** AS 15.40.240 is amended to read:

**Sec. 15.40.240. Conditions for holding special <u>primary election and special</u> election with primary or general election.** If the vacancy occurs on a date not less than 60, nor more than 90, days before the date of the primary <u>election in an election year in which a governor is not regularly elected, the acting governor shall, by proclamation, call the special primary election to be held on the date of the primary election and the special election to be held on the date of the general election,</u> [IN YEARS IN WHICH A GOVERNOR IS REGULARLY ELECTED] or<u>,</u> if the vacancy occurs on a date not less than 60, nor more than 90, days before the date the [PRIMARY ELECTION OR] general election in election years in which a governor is not regularly elected, the acting governor shall, by proclamation, call the special <u>primary</u> election to be held on the date of the [PRIMARY ELECTION OR] general election <u>with the subsequent special election to be held on the first Tuesday that is not a state holiday occurring not less than 60 days after the special primary and general election</u>.

**\*Sec. 52.** AS 15.40.250 is amended to read:

19

EXHIBIT A

ALASKA'S BETTER ELECTIONS INITIATIVE

**Sec. 15.40.250. Proclamation of <u>special primary election and</u> special election.** The acting governor shall issue the proclamation <u>calling the special primary election and special election</u> at least 50 days before the <u>special primary</u> election.

**\*Sec. 53.** AS 15.40.280 is amended to read:
**Sec. 15.40.280. Requirements of petition for [NO-PARTY] candidates.** Petitions for the nomination of candidates <u>must be executed under oath,</u> [NOT REPRESENTING A POLITICAL PARTY SHALL BE SIGNED BY QUALIFIED VOTERS OF THE STATE EQUAL IN NUMBER TO AT LEAST ONE PERCENT OF THE NUMBER OF VOTERS WHO CAST BALLOTS IN THE PRECEDING GENERAL ELECTION, SHALL INCLUDE NOMINEES FOR THE OFFICE OF GOVERNOR AND LIEUTENANT GOVERNOR, AND SHALL] state in substance that which is required for <u>a declaration of candidacy under AS 15.25.030, and include the fee required under AS 15.25.050(a)</u> [NOMINATION PETITIONS BY AS 15.25.180].

**\*Sec. 54.** AS 15.40.310 is amended to read:
**Sec. 15.40.310. General provisions for conduct of <u>the special primary election and</u> special election.** Unless specifically provided otherwise, all provisions regarding the conduct of the <u>primary and</u> general election shall govern the conduct of the special <u>primary election and special</u> election of the governor and lieutenant governor, including provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities; provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from work to vote; provisions for the counting, reviewing, and certification of returns; provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.

**\*Sec. 55.** AS 15.40.330 is amended to read:
**Sec. 15.40.330. Qualification and confirmation of appointee.** (a) The appointee shall meet the qualifications of a member of the legislature as prescribed in Sec. 2, art. II, of the state constitution, <u>and, if the predecessor in office was a member of a political party or political group at the time of the vacancy, (1)</u> shall be a member of the same political party <u>or political group</u> as [THAT WHICH NOMINATED] the predecessor in office<u>; [,]</u> and <u>(2)</u> shall be subject to confirmation by a majority of the members of the legislature who are members of the same political party <u>or political group as</u> [WHICH NOMINATED] the predecessor in office and of the same house as was the predecessor in office. If the predecessor in office was not <u>a member of</u> [NOMINATED BY] a political party or <u>political group at the time of the vacancy or,</u> if no other member of the predecessor's political party <u>or political group</u> is a member of the predecessor's house of the legislature, the governor may appoint any qualified person. If the appointee is not a member of a political party <u>or political group, as provided in (b) of this section,</u> the appointment is not subject to confirmation. If the appointee is a member of a political party <u>or political group,</u> the appointment is subject to confirmation as provided by <u>(b) of</u> this section for the confirmation of political party <u>or political group</u> appointees.
(b) A member of a political party <u>or political group</u> is a person who supports the political program of a <u>political</u> party <u>or political group.</u> The <u>absence of a political party or political group designation after a candidate's name on an election ballot</u> [FILING FOR OFFICE OF A

20

**ALASKA'S BETTER ELECTIONS INITIATIVE**

CANDIDATE AS AN INDEPENDENT OR NO-PARTY CANDIDATE] does not preclude a candidate from being a member of a political party **or political group**. Recognition of **a** [AN INDEPENDENT OR NO-PARTY] candidate as a member of a **political** party **or political group** caucus of members of the legislature at the legislative session following the election of the [INDEPENDENT OR NO-PARTY] candidate is recognition of that person's **political** party **or political group** membership **for the purposes of confirmation under this section** [AT THE TIME FILINGS WERE MADE BY PARTY CANDIDATES FOR THE PRECEDING GENERAL ELECTION].

**\*Sec. 56.** AS 15.40.380 is amended to read:

    **Sec. 15.40.380. Conditions for part-term senate appointment and special election.** If the vacancy is for an unexpired senate term of more than two years and five full calendar months, the governor shall call a special **primary election and a special** election by proclamation**,** and the appointment shall expire on the date the state senate first convenes or reconvenes following the certification of the results of the special election by the director.

**\*Sec. 57.** AS 15.40.390 is amended to read:

    **Sec. 15.40.390. Date of special primary election and special election.** The special **primary** election to fill a vacancy in the state senate shall be held on the date of the first **primary** [GENERAL] election held more than **60 days** [THREE FULL CALENDAR MONTHS] after the senate vacancy occurs**, and the special election shall be held on the date of the first general election thereafter**.

**\*Sec. 58.** AS 15.40.400 is amended to read:

    **Sec. 15.40.400. Proclamation of special primary election and special election.** The governor shall issue the proclamation calling the **special primary election and** special election at least 50 days before the **special primary** election.

**\*Sec. 59.** AS 15.40.440 is amended to read:

    **Sec. 15.40.440. Requirements of petition for [NO-PARTY] candidates.** Petitions for the nomination of candidates [NOT REPRESENTING A POLITICAL PARTY SHALL BE SIGNED BY QUALIFIED VOTERS EQUAL IN NUMBER TO AT LEAST ONE PERCENT OF THE NUMBER OF VOTERS WHO CAST BALLOTS IN THE PROPOSED NOMINEE'S RESPECTIVE HOUSE OR SENATE DISTRICT IN THE PRECEDING GENERAL ELECTION. A NOMINATING PETITION MAY NOT CONTAIN LESS THAN 50 SIGNATURES FOR ANY DISTRICT, AND] must **be executed under oath**, state in substance that which is required in **a declaration of candidacy under AS 15.25.030, and include the fee required under AS 15.25.050(a)** [PETITIONS FOR NOMINATION BY AS 15.25.180].

**\*Sec. 60.** AS 15.40.470 is amended to read:

    **Sec. 15.40.470. General provision for conduct of the special primary election and special election.** Unless specifically provided otherwise, all provisions regarding the conduct of the **primary election and** general election shall govern the conduct of the special **primary election and special** election of state senators, including provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities; provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from

21

EXHIBIT A

**ALASKA'S BETTER ELECTIONS INITIATIVE**

work to vote; provisions for the counting, reviewing, and certification of returns; provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.

**\*Sec. 61.** AS 15.45.190 is amended to read:
    **Sec. 15.45.190. Placing proposition on ballot.** The lieutenant governor shall direct the director to place the ballot title and proposition on the election ballot of the first statewide general, special, special **primary** [RUNOFF], or primary election that is held after
        (1) the petition has been filed;
        (2) a legislative session has convened and adjourned; and
        (3) a period of 120 days has expired since the adjournment of the legislative session.

**\*Sec. 62.** AS 15.45.420 is amended to read:
    **Sec. 15.45.420. Placing proposition on ballot.** The lieutenant governor shall direct the director to place the ballot title and proposition on the election ballot for the first statewide general, special, special **primary** [RUNOFF], or primary election held more than 180 days after adjournment of the legislative session at which the act was passed.

**\*Sec. 63.** AS 15.58.010 is amended to read:
    **Sec. 15.58.010. Election pamphlet.** Before each state general election, and before each state primary, special, or special **primary** [RUNOFF] election at which a ballot proposition is scheduled to appear on the ballot, the lieutenant governor shall prepare, publish, and mail at least one election pamphlet to each household identified from the official registration list. The pamphlet shall be prepared on a regional basis as determined by the lieutenant governor.

**\*Sec. 64.** AS 15.58.020(a) is amended by adding a new paragraph to read:
    (13) the following statement written in bold in a conspicuous location:

        Each candidate may designate the political party or political group that the candidate is registered as affiliated with. A candidate's political party or political group designation on a ballot does not imply that the candidate is nominated or endorsed by the party or political group or that the party or group approves of or associates with that candidate.

        In each race, you may vote for any candidate listed. If a primary election was held for a state office, United States senator, or United States representative, the four candidates who received the most votes for the office in the primary election advanced to the general election. However, if one of the four candidates who received the most votes for an office at the primary election died, withdrew, resigned, was disqualified, or was certified as incapacitated 64 days or more before the general election, the candidate who received the fifth most votes for the office advanced to the general election.

        At the general election, each candidate will be selected through a ranked-choice voting process and the candidate with the greatest number of votes will be

22

**ALASKA'S BETTER ELECTIONS INITIATIVE**

elected. For a general election, you must rank the candidates in the numerical order of your preference, ranking as many candidates as you wish. Your second, third, and subsequent ranked choices will be counted only if the candidate you ranked first does not receive enough votes to continue on to the next round of counting, so ranking a second, third, or subsequent choice will not hurt your first-choice candidate. Your ballot will be counted regardless of whether you choose to rank one, two, or more candidates for each office, but it will not be counted if you assign the same ranking to more than one candidate for the same office.

**\*Sec. 65.** AS 15.58.020(b) is amended to read:

(b) Each primary, special, or special **primary** [RUNOFF] election pamphlet shall contain only the information specified in (a)(6) and (a)(9) of this section for each ballot measure scheduled to appear on the primary, special, or special **primary** [RUNOFF] election ballot.

**\*Sec. 66.** AS 15.58.020 is amended by adding a new subsection to read:

(c) Notwithstanding (a) of this section, if a pamphlet is prepared and published under AS 15.58.010 for a

(1) primary election, the pamphlet must contain the following statement written in bold in a conspicuous location, instead of the statement provided by (a)(13) of this section:

In each race, you may vote for any candidate listed. The four candidates who receive the most votes for a state office, United States senator, or United States representative will advance to the general election. However, if, after the primary election and 64 days or more before the general election, one of the four candidates who received the most votes for an office at the primary election dies, withdraws, resigns, is disqualified, or is certified as incapacitated, the candidate who received the fifth most votes for the office will advance to the general election.

Each candidate may designate the political party or political group that the candidate is registered as affiliated with. A candidate's political party or political group designation on a ballot does not imply that the candidate is nominated or endorsed by the party or group or that the party or group approves of or associates with that candidate;

(2) a special primary election, the pamphlet must contain the following statement written in bold in a conspicuous location, instead of the statement provided by (a)(13) of this section:

In each race, you may vote for any candidate listed. The four candidates who receive the most votes for a state office or United States senator will advance to the special election. However, if, after the special primary election and 64 days or more before the special election, one of the four candidates who received the most votes for a state office or United States senator at the primary election dies, withdraws, resigns, is disqualified, or is certified as incapacitated, the

23

ALASKA'S BETTER ELECTIONS INITIATIVE

candidate who received the fifth most votes for the office will advance to the general election. Each candidate may designate the political party or political group that the candidate is registered as affiliated with. A candidate's political party or political group designation on a ballot does not imply that the candidate is nominated or endorsed by the party or group or that the party or group approves of or associates with that candidate.

**Sec. 67.** AS 15.58.030(b) is amended to read:
    (b) Not [NO] later than July 22 of a year in which a state general election will be held, an individual who becomes a candidate for the office of United States senator, United States representative, governor, lieutenant governor, state senator, or state representative under AS 15.25.030 [OR 15.25.180] may file with the lieutenant governor a photograph and a statement advocating the candidacy. [AN INDIVIDUAL WHO BECOMES A CANDIDATE FOR THE OFFICE OF UNITED STATES SENATOR, UNITED STATES REPRESENTATIVE, GOVERNOR, LIEUTENANT GOVERNOR, STATE SENATOR, OR STATE REPRESENTATIVE BY PARTY PETITION FILED UNDER AS 15.25.110 MAY FILE WITH THE LIEUTENANT GOVERNOR A PHOTOGRAPH AND A STATEMENT ADVOCATING THE CANDIDACY WITHIN 10 DAYS OF BECOMING A CANDIDATE.]

**Sec. 68.** AS 15.80.010(9) is amended to read:
    (9) "federal election" means a general, special, special **primary** [RUNOFF], or primary election held solely or in part for the purpose of selecting, nominating, or electing a candidate for the office of President, Vice-President, presidential elector, United States senator, or United States representative;

**Sec. 69.** AS 15.80.010(27) is amended to read:
    (27) "political party" means an organized group of voters that represents a political program and
    (A) that [NOMINATED A CANDIDATE FOR GOVERNOR WHO RECEIVED AT LEAST THREE PERCENT OF THE TOTAL VOTES CAST FOR GOVERNOR AT THE PRECEDING GENERAL ELECTION OR] has registered voters in the state equal in number to at least three percent of the total votes cast for governor at the preceding general election;
    (B) if the office of governor was not on the ballot at the preceding general election but the office of United States senator was on that ballot, that [NOMINATED A CANDIDATE FOR UNITED STATES SENATOR WHO RECEIVED AT LEAST THREE PERCENT OF THE TOTAL VOTES CAST FOR UNITED STATES SENATOR AT THAT GENERAL ELECTION OR] has registered voters in the state equal in number to at least three percent of the total votes cast for United States senator at that general election; or
    (C) if neither the office of governor nor the office of United States senator was on the ballot at the preceding general election, that [NOMINATED A CANDIDATE FOR UNITED STATES REPRESENTATIVE WHO RECEIVED AT LEAST THREE PERCENT OF THE TOTAL VOTES CAST FOR UNITED STATES REPRESENTATIVE AT THAT GENERAL ELECTION OR] has registered voters in the state equal in number to at least three percent of the total votes cast for United States representative at that general election;

**Sec. 70.** AS 15.80.010 is amended by adding a new paragraph to read:

24

**ALASKA'S BETTER ELECTIONS INITIATIVE**

(46) "ranked-choice voting" means, in a general election, the method of casting and tabulating votes in which voters rank candidates in order of preference and in which tabulation proceeds in sequential rounds in which (a) a candidate with a majority in the first round wins outright, or (b) last-place candidates are defeated until there are two candidates remaining, at which point the candidate with the greatest number of votes is declared the winner of the election.

**\*Sec. 71.** AS 39.50.020(b) is amended to read:
(b) A public official or former public official other than an elected or appointed municipal officer shall file the statement with the Alaska Public Offices Commission. Candidates for the office of governor and lieutenant governor and, if the candidate is not subject to AS 24.60, the legislature shall file the statement under AS 15.25.030 [OR 15.25.180]. Municipal officers, former municipal officers, and candidates for elective municipal office, shall file with the municipal clerk or other municipal official designated to receive their filing for office. All statements required to be filed under this chapter are public records.

**\*Sec. 72.** AS 15.25.014, 15.25.056, 15.25.110, 15.25.120, 15.25.130, 15.25.140, 15.25.150, 15.25.160, 15.25.170, 15.25.180, 15.25.185, 15.25.190, 15.25.200; AS 15.40.141, 15.40.142, 15.40.150, 15.40.200, 15.40.210, 15.40.290, 15.40.300, 15.40.450, and 15.40.460 are repealed.

**\*Sec. 73.** The provisions of this act are independent and severable. If any provision of this act, or the applicability of any provision to any person or circumstance, shall be held to be invalid by a court of competent jurisdiction, the remainder of this act shall not be affected and shall be given effect to the fullest extent possible.

**\*Sec. 74.** The uncodified law of the State of Alaska is amended by adding a new section to read:

TRANSITION; VOTER EDUCATION AS TO CHANGES MADE TO STATE ELECTION SYSTEMS
THROUGH ADOPTION OF A RANKED-CHOICE VOTING SYSTEM.

For a period of not less than two calendar years immediately following the effective date of this Act, the director of elections shall, in a manner reasonably calculated to educate the public, inform voters of the changes made to the state's election systems in this Act.

25

DocuSign Envelope ID: 46D358FB-B7DD-4EAA-B343-8188C22C688A

In the United States District Court
For the District of Alaska

| | |
|---|---|
| Doug Smith, et al., | |
| Plaintiffs, | **Declaration** |
| v. | |
| Anne Helzer, et al., | |
| Defendants, | |

I, Steve Strait, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.     I am a citizen and resident of the State of Alaska, am over 18 years of age, and am competent to make this Declaration.

2.     I am an officer of Plaintiff Families of the Last Frontier, and authorized to testify on its behalf.

3.     I am a business owner and citizen who cares deeply about Alaska and the issues most important to it.

4.     Both I and Families of the Last Frontier believe strongly in the right of private association and the compelled disclosures required by Initiative 2 would be in conflict with my principles and the principles of our organization.

5.     Families of the Last Frontier has received money from a variety of sources over the years. Listing our top five donors would represent an arbitrary sample that is not representative of the individuals and entities that support our work.

6.     Families of the Last Frontier also solicits donations from outside the state of Alaska, and in some calendar years these donations have been in excess of 50% of our revenue.

7.     However, if any of the citizens who support us donate $2,000 or more to our organization, they will now be subject to the disclosure and reporting requirements of Initiative 2.

DocuSign Envelope ID: 46D358FB-B7DD-4E4A-B343-8188C22C689A

8.     I fear that publicity listing our donors support of Families of the Last Frontier may lead to reprisals against our donors and their business interests in the current climate of cancel culture.

9.     The burdensome additional requirements added by Initiative 2 are a serious and compelling disincentive for potential donors to our organization.

10.     I believe that the disclosure and reporting requirements of Initiative 2 abridge my organizations rights, and our donors rights, under the constitution to speech and association.

11.     Without relief from this court, many donors will be forced to either forgo giving to Families of the Last Frontier, or do so subject to a disclosure and reporting regime that I believe violates our rights.

DocuSigned by:

*Steve Strait*

9BACC5364E3A4A1...

Steve Strait

4/26/2022

Date

2

In the United States District Court
For the District of Alaska

Doug Smith, et al.,

                 Plaintiffs,

     v.

Anne Helzer, et al.,

               Defendants,

**Declaration**

I, Trevor Shaw, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.     I am a citizen and resident of the State of Alaska, am over 18 years of age, and am competent to make this Declaration.

2.     In addition to serving as a Plaintiff in this case in my individual capacity, am an officer of Plaintiff Alaska Free Market Collation, and authorized to testify on its behalf.

3.     I am a business owner and citizen who cares deeply about Alaska and the issues most important to it.

4.     I have given to independent expenditure groups and candidates in past elections, including approximately $6,646 in donations in 2018, $4,647 in 2019, and $6,850 in 2020. These donations included a mix of cash and in-kind contributions to causes I support.

5.     Both I and the Alaska Free Market Coalition believe strongly in the right of private association and the compelled disclosures required by Initiative 2 would be in conflict with my principles and the principles of our organization.

6.     Alaska Free Market Coalition has received money from a variety of sources over the years. Listing our top five donors would represent an arbitrary sample that is not necessarily representative of the individuals and entities that support our work.

7.     I would like to continue to give similar or even greater amounts to the causes that are important to me, including during the 2022 election cycle.

8.     However, if I give $2,000 or more to an independent expenditure group, I will now be subject to the disclosure and reporting requirements of Initiative 2.

9.     I fear that being publicity associated with my donations may lead to reprisals against me and my business interests in the current climate of cancel culture.

10.     The burdensome additional requirements added by Initiative 2 are a serious and compelling disincentive for potential donors like myself.

11.     I believe that the disclosure and reporting requirements of Initiative 2 abridge my rights under the Constitution to speech and association.

12.     Without relief from this court, I will be forced to either forgo giving to important causes in Alaska, or do so subject to a disclosure and reporting regime that I believe violates my rights.

DocuSigned by:

*Trevor Shaw*

—5D064950E948462...
_____
Trevor Shaw

3/30/2022
_____
Date

Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N. Street, Suite 100
Anchorage, Alaska 99501
Email: crichards@alaskaprofessionalservices.com

Daniel R. Suhr (WI No. 1056658)
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjusticecenter.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **Smith** et al., | |
| Plaintiffs, | |
| | Case No. 3:22-cv-00077-SLG |
| v. | |
| **Helzer** et al., | NOTICE OF APPEAL: PRELIMINARY INJUNCTION APPEAL |
| Defendants. | |

Notice is hereby given that Plaintiffs Doug Smith, et al., appeal to the United States Court of Appeals for the Ninth Circuit the Order denying their motion for a preliminary injunction entered by this Court on July 14, 2022 (Docket 48). Plaintiffs draw the Court's attention to Circuit Rule 3-3(a) regarding docketing of such notices.

Dated: July 21, 2022

Daniel R. Suhr (WI No. 1056658)*
Liberty Justice Center
Email: dsuhr@libertyjusticecenter.org

*Counsel for Plaintiffs*

* *pro hac vice*

/s/ Craig W. Richards
Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N. Street, Suite 100
Anchorage, Alaska 99501
Email: crichards@
alaskaprofessionalservices.com

2

STAYED

# U.S. District Court
# United States District Court for the District of Alaska (Anchorage)
# CIVIL DOCKET FOR CASE #: 3:22-cv-00077-SLG

| | |
|---|---|
| Smith et al v. Helzer et al | Date Filed: 04/06/2022 |
| Assigned to: Sharon L. Gleason | Jury Demand: None |
| Cause: 42:1983 Prisoner Civil Rights | Nature of Suit: 950 Constitutional - State Statute |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Doug Smith**                    represented by    **Craig W. Richards**
                                                   Law Office of Craig Richards
                                                   810 N Street Ste. 100
                                                   Anchorage, AK 99501
                                                   907-306-9878
                                                   Email:
                                                   crichards@alaskaprofessionalservices.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Daniel Robert Suhr**
                                                   Liberty Justice Center
                                                   190 S. LaSalle Street, Suite 1500
                                                   Chicago, IL 60603
                                                   414-588-1658
                                                   Email: dsuhr@libertyjusticecenter.org
                                                   *LEAD ATTORNEY*
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Griffin**                represented by    **Craig W. Richards**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Daniel Robert Suhr**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *PRO HAC VICE*
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Allen Vezey**                   represented by    **Craig W. Richards**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*

ATTORNEY TO BE NOTICED

**Daniel Robert Suhr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Albert Haynes**        represented by    **Craig W. Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Robert Suhr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Trevor Shaw**        represented by    **Craig W. Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Robert Suhr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Families of the Last Frontier**        represented by    **Craig W. Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Robert Suhr**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alaska Free Market Coalition**        represented by    **Craig W. Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Robert Suhr**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**V.**

<u>**Defendant**</u>

| | |
|---|---|
| **Anne Helzer** | represented by **Jessica Moats Alloway** |
| *in her official capacity as chair of the* | State of Alaska, Department of Law (Anch - |
| *Alaska Public Offices Commission* | suite 200) |

**Anne Helzer**
*in her official capacity as chair of the*
*Alaska Public Offices Commission*

represented by **Jessica Moats Alloway**
State of Alaska, Department of Law (Anch - suite 200)
Office of the Attorney General, Civil Division
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
907-269-5232
Fax: 907-279-2834
Email: jessie.alloway@alaska.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly D. Rodgers**
State of Alaska, Department of Law (Anch - suite 200)
Office of the Attorney General, Civil Division
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
907-269-6612
Fax: 907-258-4978
Email: kimber.rodgers@alaska.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura F. Fox**
State of Alaska, Department of Law (Anch - suite 200)
Office of the Attorney General, Civil Division
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
907-269-5722
Fax: 907-279-2834
Email: laura.fox@alaska.gov
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Van Lawrence**
*official capacities as members of the Alaska*
*Public Offices Commissions*

represented by **Jessica Moats Alloway**
(See above for address)
*TERMINATED: 04/20/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly D. Rodgers**
(See above for address)

*TERMINATED: 04/20/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Richard Stillie, Jr**
*official capacities as members of the Alaska*
*Public Offices Commissions*

represented by **Jessica Moats Alloway**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly D. Rodgers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura F. Fox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Suzanne Hancock**
*official capacities as members of the Alaska*
*Public Offices Commissions*

represented by **Jessica Moats Alloway**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly D. Rodgers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura F. Fox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dan LaSota**
*official capacities as members of the Alaska*
*Public Offices Commissions*

represented by **Jessica Moats Alloway**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kimberly D. Rodgers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura F. Fox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lanette Blodgett**
*Commissioner, Alaska Public Offices*

represented by **Jessica Moats Alloway**
(See above for address)
*LEAD ATTORNEY*

*Commission*
*TERMINATED: 06/06/2022*

*ATTORNEY TO BE NOTICED*

**Kimberly D. Rodgers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura F. Fox**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Alaskans for Better Elections, Inc.**      represented by **Jahna M. Lindemuth**
Cashion Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, AK 99501
907-274-0666
Fax: 907-277-4657
Email: jahna@cashiongilmore.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott M. Kendall**
Cashion Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, AK 99501
907-222-7932
Fax: 907-222-7938
Email: scott@cashiongilmore.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/07/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AAKDC-3234011.), filed by All Plaintiffs.(Richards, Craig) (Entered: 04/07/2022) |
| 04/07/2022 | 2 | Civil Cover Sheet. (Richards, Craig) (Entered: 04/07/2022) |
| 04/08/2022 | 3 | **JWS TEXT ORDER**: The assigned judge recuses from presiding in this case. It has been randomly reassigned to Hon. Sharon L. Gleason. Henceforth, the case number will be 3:22-cv-00077-SLG.(RMC, COURT STAFF) (Entered: 04/08/2022) |
| 04/10/2022 | 4 | MOTION for Leave to Appear as Pro Hac Vice (Non-Resident ) Attorney Daniel R. Suhr. ( Pro Hac Vice Admission fee $250.00 paid. Receipt number AAKDC-3235276.) by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey. (Attachments: # 1 Appendix)(Richards, Craig) (Entered: 04/10/2022) |
| 04/11/2022 | 5 | CLERK'S NOTICE re 4 Application to Appear Pro Hac Vice. The Application to Appear Pro Hac Vice by Daniel R. Suhr, at docket 4 , is authorized under D.Ak. LR 83.1(d). (JLH, COURT STAFF) (Entered: 04/11/2022) |

| 04/12/2022 | 6 | MOTION to Intervene by Alaskans for Better Elections, Inc.. (Attachments: # 1 Affidavit, # 2 Proposed Order)(Kendall, Scott) (Entered: 04/12/2022) |
|---|---|---|
| 04/12/2022 | | Docket Annotation re 6 Motion to Intervene as Defendant: The parties are advised that the role of the proposed Intervenor Defendant has been changed from Intervenor Defendant to Movant until the Motion to Intervene has been decided. (JLH, COURT STAFF) (Entered: 04/12/2022) |
| 04/14/2022 | 7 | MOTION for Preliminary Injunction by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey. (Richards, Craig) Modified on 7/21/2022 to remove reference to intervenor party. (JLH, COURT STAFF) (Entered: 04/14/2022) |
| 04/14/2022 | 8 | MOTION for Leave to File Excess Pages *Unopposed* by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey.(Richards, Craig) Modified on 7/21/2022 to remove reference to intervenor party. (JLH, COURT STAFF) (Entered: 04/14/2022) |
| 04/14/2022 | 9 | Unissued summons re Defendant S. Hancock, (Attachments: # 1 Unissued Summons re Defendant Helzer, # 2 Unissued Summons re Defendant Stillie, # 3 Unissued Summons re Defendant Lawrence, # 4 Unissued Summons re Defendant LaSota)(LMH, COURT STAFF) (Entered: 04/14/2022) |
| 04/14/2022 | | Summons Issued as to Suzanne Hancock, Anne Helzer, Dan LaSota, Van Lawrence, and Richard Stillie, Jr. (LMH, COURT STAFF) (Entered: 04/14/2022) |
| 04/15/2022 | 10 | Notice to Counsel re 7 MOTION for Preliminary Injunction. A review of the document submitted at dkt 7 confirms that it is over 25 pages in length. If a CHAMBERS copy of the document has not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 5.4 and the Administrative Policies and Procedures, you are required to provide the court with a CHAMBERS copy of your filing at dkt 7. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (JLH, COURT STAFF) (Entered: 04/15/2022) |
| 04/15/2022 | 11 | NOTICE of Appearance by Kimberly D. Rodgers on behalf of Kimberly Rodgers State of Alaska, Attorney General's Office (Rodgers, Kimberly) (Entered: 04/15/2022) |
| 04/15/2022 | 12 | NOTICE of Appearance by Jessica Moats Alloway on behalf of Jessica Alloway State of Alaska, Attorney General's Office (Alloway, Jessica) (Entered: 04/15/2022) |
| 04/18/2022 | 13 | NOTICE *Notice of Substitution of Party* by Jessica Alloway State of Alaska, Attorney General's Office (Alloway, Jessica) (Entered: 04/18/2022) |
| 04/18/2022 | 14 | RESPONSE to Motion (Non-Opposition) re 6 MOTION to Intervene *Defendants' Response to Motion to Intervene* filed by Jessica Alloway State of Alaska, Attorney General's Office. (Alloway, Jessica) (Entered: 04/18/2022) |
| 04/19/2022 | 15 | **SLG TEXT ORDER**: Plaintiffs *Motion to Exceed Page Limits* at Docket 8 is GRANTED. The *Motion for Preliminary Injunction* at Docket 7 is ACCEPTED as filed. (CFR, CHAMBERS STAFF) (Entered: 04/19/2022) |
| 04/20/2022 | | Docket Annotation: Lanette Blodgett, Commissioner, Alaska Public Offices Commission, substituted for Van Lawrence (official capacities as members of the Alaska Public Offices Commissions) pursuant to FRCvP 25(d) (JLH, COURT STAFF) (Entered: 04/20/2022) |
| 04/21/2022 | 16 | **ORDER RE INITIAL SCHEDULING & PLANNING CONFERENCE REPORT:** Counsel for plaintiff shall serve and file the Rule 26 Meeting Report within 21 days of service of this order. Signed by Judge Sharon L. Gleason on 4/21/22. (JLH, COURT STAFF) (Entered: 04/21/2022) |

| 04/22/2022 | 17 | Notice to Counsel re 7 MOTION for Preliminary Injunction. A review of the document submitted at dkt 7 confirms that it is over 25 pages in length. If a CHAMBERS copy of the document has not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 5.4 and the Administrative Policies and Procedures, you are required to provide the court with a CHAMBERS copy of your filing at dkt 7. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (JLH, COURT STAFF) (Entered: 04/22/2022) |
|---|---|---|
| 04/25/2022 | 18 | MOTION for Preliminary Injunction by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey. (Attachments: # 1 Supplement Memorandum in Support, # 2 Proposed Order Proposed Order, # 3 Affidavit Griffin Declaration, # 4 Affidavit FLF Declaration, # 5 Affidavit Haynes Declaration, # 6 Affidavit Shaw Declaration, # 7 Affidavit Smith Declaration, # 8 Affidavit Vezey Declaration)(Richards, Craig) (Entered: 04/25/2022) |
| 04/28/2022 | 19 | Notice to Counsel re 18 MOTION for Preliminary Injunction filed by Families of the Last Frontier, Trevor Shaw, Robert Griffin, Albert Haynes, Alaska Free Market Coalition, Doug Smith, Allen Vezey. A review of the document submitted at dkt 18 confirms that it is over 25 pages in length. If a CHAMBERS copy of the document has not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 5.4 and the Administrative Policies and Procedures, you are required to provide the court with a CHAMBERS copy of your filing at dkt 18. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (JLH, COURT STAFF) (Entered: 04/28/2022) |
| 05/02/2022 | 20 | MOTION Schedule re 18 MOTION for Preliminary Injunction *Unopposed* by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey. (Attachments: # 1 Proposed Order)(Richards, Craig) (Entered: 05/02/2022) |
| 05/02/2022 | 21 | ERRATA *Corrected FLF Declaration #18-4* by Families of the Last Frontier 18 MOTION for Preliminary Injunction filed by Families of the Last Frontier, Trevor Shaw, Robert Griffin, Albert Haynes, Alaska Free Market Coalition, Doug Smith, Allen Vezey. (Richards, Craig) (Entered: 05/02/2022) |
| 05/03/2022 | 22 | **ORDER** granting 6 Motion to Intervene. Answer due within 7 days. Signed by Judge Sharon L. Gleason on 5/3/22. (JLH, COURT STAFF) (Entered: 05/03/2022) |
| 05/03/2022 | 23 | NOTICE of Appearance by Laura F. Fox on behalf of All Defendants (Fox, Laura) (Entered: 05/03/2022) |
| 05/04/2022 | 24 | **SLG TEXT ORDER:** Plaintiffs' unopposed Motion for Briefing Schedule and Argument at Docket 20 is GRANTED. Defendants' response to the motion for preliminary injunction is due **May 15, 2022.** Plaintiffs' reply is due **May 31, 2022.** Oral argument on the motion at Docket 18 is scheduled for **June 13, 2022,** at 1:00 p.m. in Courtroom 2 before Judge Sharon L. Gleason. Each side will be allowed 20 minutes for oral argument. (JLH, COURT STAFF) (Entered: 05/04/2022) |
| 05/06/2022 | 25 | MOTION for Extension of Time to File Response/Reply *Unopposed Motion for Extension of Time to Respond* by Anne Helzer. (Attachments: # 1 Proposed Order)(Alloway, Jessica) (Entered: 05/06/2022) |
| 05/06/2022 | 26 | MOTION for Extension of Time to File Response/Reply *Unopposed Motion for Extension of Time to Respond* by Alaskans for Better Elections, Inc.. (Attachments: # 1 Proposed Order)(Kendall, Scott) (Entered: 05/06/2022) |
| 05/10/2022 | 27 | **SLG TEXT ORDER:** Defendants' unopposed Motion for Extension of Time to Respond at Docket 25 is GRANTED. Intervenor-Defendant's unopposed Motion for Extension of |

| | | |
|---|---|---|
| | | Time to Respond at Docket [26](#) is GRANTED. Defendant and Intervenor-Defendant's responses to the complaint are due **May 16, 2022.** Responses to the motion for a preliminary injunction are due **May 16, 2022.** (JLH, COURT STAFF) (Entered: 05/10/2022) |
| 05/16/2022 | [28](#) | REPORT of Rule 26(f) Planning Meeting. (Richards, Craig) (Entered: 05/16/2022) |
| 05/16/2022 | [29](#) | MOTION for Leave to File Excess Pages *Unopposed Motion to File Overlength Opposition to Motion For Preliminary Injunction* by Anne Helzer. (Attachments: # [1](#) Proposed Order)(Fox, Laura) (Entered: 05/16/2022) |
| 05/16/2022 | [30](#) | RESPONSE in Opposition re [18](#) MOTION for Preliminary Injunction *Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction* filed by Anne Helzer. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B)(Fox, Laura) (Entered: 05/16/2022) |
| 05/16/2022 | [31](#) | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *State Defendants' Motion to Dismiss (Fed. R. Civ. P. 12(b)(6)* by Anne Helzer.(Alloway, Jessica) (Entered: 05/16/2022) |
| 05/16/2022 | [32](#) | MOTION for Leave to File Excess Pages by Alaskans for Better Elections, Inc.. (Attachments: # [1](#) Proposed Order Granting Motion to Accept Over-Length Brief) (Kendall, Scott) (Entered: 05/16/2022) |
| 05/16/2022 | [33](#) | MOTION to Dismiss by Alaskans for Better Elections, Inc.. (Attachments: # [1](#) Affidavit Affidavit of Scott M. Kendall)(Kendall, Scott) (Entered: 05/16/2022) |
| 05/16/2022 | [34](#) | RESPONSE in Opposition re [18](#) MOTION for Preliminary Injunction *Intervenor-Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction* filed by Alaskans for Better Elections, Inc.. (Attachments: # [1](#) Proposed Order Denying Plaintifs' Motion for Preliminary Injunction)(Kendall, Scott) (Entered: 05/16/2022) |
| 05/18/2022 | 35 | Notice to Counsel re [31](#) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and [30](#) Response in Opposition to Motion filed by Anne Helzer. A review of the documents submitted at dkt 30 and 31 confirm they are over 25 pages in length. If a CHAMBERS copy of the documents have not been forwarded to the Court, counsel is reminded that, pursuant to D.Ak.LR 5.4 and the Administrative Policies and Procedures, you are required to provide the court with a CHAMBERS copy of your filings at dkt 30 and 31. The CHAMBERS copy must be attached to a copy of the Notice of Electronic Filing and must be printed with the ECF pdf footer on each page. (JLH, COURT STAFF) (Entered: 05/18/2022) |
| 05/18/2022 | 36 | **SLG TEXT ORDER**: Defendants Unopposed Motion to File Overlength Opposition to the Motion for Preliminary Injunction at Docket [29](#) is GRANTED. The brief at Docket [30](#) is ACCEPTED as filed. (CFR, CHAMBERS STAFF) (Entered: 05/18/2022) |
| 05/18/2022 | 37 | **SLG TEXT ORDER**: Intervenor-Defendant Alaskans for Better Elections, Inc.s Motion to Accept Over-Length Brief at Docket [32](#) is GRANTED. The filing at Docket [33](#) is ACCEPTED as filed. (CFR, CHAMBERS STAFF) (Entered: 05/18/2022) |
| 05/18/2022 | 38 | **SLG TEXT ORDER**: In light of the parties request in their Scheduling and Planning Conference Report at Docket [28](#) , a Scheduling and Planning Order will not be issued by the Court at this time. Within 7 days of the Courts ruling on the Motion for Preliminary Injunction at Docket [18](#) , the Motion to Dismiss at Docket [31](#) and the Motion to Dismiss at Docket [33](#) , the parties shall jointly file a status report to update the Court regarding further proceedings in this matter. (CFR, CHAMBERS STAFF) (Entered: 05/18/2022) |
| 05/31/2022 | [39](#) | REPLY to Response to Motion re [7](#) MOTION for Preliminary Injunction filed by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, |

| | | Trevor Shaw, Doug Smith, Allen Vezey. (Richards, Craig) Modified on 6/1/2022 to link to dkt 18. (JLH, COURT STAFF) (Entered: 05/31/2022) |
|---|---|---|
| 06/06/2022 | [40](#) | AMENDED COMPLAINT against All Defendants, filed by All Plaintiffs.(Richards, Craig) (Entered: 06/06/2022) |
| 06/08/2022 | 41 | **SLG TEXT ORDER:** The Oral Argument set for **6/13/2022 at 1:00 PM is MOVED to Anchorage Courtroom 3** before Judge Sharon L. Gleason. (JDS, COURT STAFF) (Entered: 06/08/2022) |
| 06/10/2022 | [42](#) | Joint MOTION for Extension of Time to File Response/Reply *Unopposed Joint Motion for Extension of Time to Respond* by Alaskans for Better Elections, Inc.. (Attachments: # [1](#) Proposed Order Granting Motion for Extension of Time to Respond)(Kendall, Scott) (Entered: 06/10/2022) |
| 06/13/2022 | 44 | MINUTE ENTRY for proceedings held before Judge Sharon L. Gleason: Motion Hearing held 1:01 PM to 1:57 PM on 6/13/2022 re [18](#) MOTION for Preliminary Injunction. Court and counsel heard oral argument on Plaintiff's Motion for Preliminary Injunction [18](#) . Matter taken UNDER ADVISEMENT. Written ruling to issue. APPEARANCES: Craig W. Richards, PLT; Daniel Robert Suhr, PLT; Laura F. Fox, DEF; Kimberly D. Rodgers, DEF; Scott M. Kendall, DEF; Sonja L. Reeves, Official Court Reporter. (HJR, COURT STAFF) Modified on 6/27/2022 to clarify appearance. (JLH, COURT STAFF) (Entered: 06/13/2022) |
| 06/14/2022 | 45 | **SLG TEXT ORDER**: The Unopposed Joint Motion for Extension of Time to Respond at Docket [42](#) is GRANTED. Defendants and Intervenor-Defendant shall respond to Plaintiffs First Amended Complaint (Dkt. [40](#) ) no later than **July 1, 2022.** (CFR, CHAMBERS STAFF) (Entered: 06/14/2022) |
| 07/01/2022 | [46](#) | MOTION to Dismiss *Plaintiffs' First Amended Complaint* by Alaskans for Better Elections, Inc.. (Attachments: # [1](#) Affidavit Scott M. Kendall)(Kendall, Scott) (Entered: 07/01/2022) |
| 07/01/2022 | [47](#) | State Defendants' Motion to Dismiss Amended Complaint (Fed. R. Civ. P. 12(b)(6)) by Anne Helzer.(Fox, Laura) Modified on 7/1/2022 to correct event and clarify docket text. (JLH, COURT STAFF) (Entered: 07/01/2022) |
| 07/14/2022 | [48](#) | **ORDER** denying [7](#) and [18](#) Motions for Preliminary Injunction. Signed by Judge Sharon L. Gleason on 7/14/22. (JLH, COURT STAFF) (Entered: 07/14/2022) |
| 07/21/2022 | [49](#) | NOTICE *of Appeal* by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey (Richards, Craig) Modified on 7/21/2022 to remove reference to intervenor party. (JLH, COURT STAFF) (Entered: 07/21/2022) |
| 07/21/2022 | [50](#) | MOTION to Stay *Unopposed* by Alaska Free Market Coalition, Families of the Last Frontier, Robert Griffin, Albert Haynes, Trevor Shaw, Doug Smith, Allen Vezey.(Richards, Craig) Modified on 7/21/2022 to remove reference to intervenor party. (JLH, COURT STAFF) (Entered: 07/21/2022) |
| 07/22/2022 | [51](#) | **ORDER** granting [50](#) Motion to Stay: All briefing on the pending motions to dismiss are **STAYED**. Within 14 days of the Ninth Circuit's ruling, the parties shall file a report with this Court regarding the statusof further proceedings in this action. Signed by Judge Sharon L. Gleason on 7/22/22. (RMC, COURT STAFF) (Entered: 07/22/2022) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 07/29/2022 12:24:23 | | | |
| **PACER Login:** | danielsuhr | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-00077-SLG |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |