No. 22-35612

## IN THE U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT

Doug Smith, et al.,
*Plaintiffs - Appellants*,

v.

Anne Helzer, et al.,
*Defendants - Appellees*,

and

Alaskans for Better Elections, Inc.,
*Intervenor-Defendant - Appellee.*

On appeal from the U.S. District Court
for the District of Alaska, Anchorage
No. 3:22-cv-00077-SLG
Hon. Sharon L. Gleason

## ANSWERING BRIEF OF STATE APPELLEES ANNE HELZER ET AL.

Laura Fox
Assistant Attorney General
Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK 99501
(907) 269-6612
laura.fox@alaska.gov

*Attorney for State Appellees*
Anne Helzer, et al.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ........................................................3

ADDENDUM TO BRIEFS ................................................................3

STATEMENT OF ISSUES ................................................................3

STATEMENT OF THE CASE..............................................................5

    I.    Alaska's campaign finance laws, recently amended by initiative in 2020, include disclosure and disclaimer requirements. ........................5

    II.    In April 2022, Smith sued to challenge Alaska's disclosure and disclaimer requirements and moved for a preliminary injunction. ......11

    III.    In July 2022, the district court denied Smith's motion for a preliminary injunction. ........................................................13

SUMMARY OF THE ARGUMENT ....................................................18

STANDARDS OF REVIEW ..............................................................20

ARGUMENT ................................................................................22

    I.    The district court did not err in finding that Smith failed to show likely success on the merits of Count I, the challenge to donor disclosure. ..........................................................................22

        A.    The donor disclosure law is subject to exacting scrutiny and furthers sufficiently important state interests..........................23

        B.    The donor disclosure law is narrowly tailored.........................27

            1.    The donor disclosure law is not unduly repetitive............. 29

            2.    The donor disclosure law is not temporally overbroad. ........................................................ 32

i

3. The donor disclosure law is not overly burdensome. ........................................................ 36

II. The district court did not err in finding that Smith failed to show likely success on the merits of Count II, the challenge to the disclaimers. ........................................................... 39

A. The disclaimers are also subject to exacting—not strict—scrutiny, and further a sufficiently important state interest. ......40

B. The donor disclaimer is narrowly tailored. ...............................44

C. The out-of-state disclaimer is narrowly tailored. ......................51

CONCLUSION ........................................................................54

STATEMENT OF RELATED CASES (Circuit Rule 28-2.6) ................................55

CERTIFICATE OF SERVICE ........................................................56

ADDENDUM CONTENTS ........................................................1

ADDENDUM ........................................................................2

# TABLE OF AUTHORITIES

## CASES

*ACLU of Nevada v. Heller,*
    378 F.3d 979 (9th Cir. 2004) .......................................................................41

*Alaska Right to Life Comm. v. Miles*,
    441 F.3d 773 (9th Cir. 2006) ..................................................................5, 46

*American Beverage Association v. City and County of San Francisco*,
    916 F.3d 749 (9th Cir. 2019) ................................................................49, 50

*Americans for Prosperity Found. v. Bonta*,
    141 S. Ct. 2373 (2021)...................................................................... *passim*

*Buckley v. Valeo*,
    424 U.S. 1 (1976)..................................................1, 2, 24, 25, 26, 27

*California Pro-Life Council, Inc. v. Getman*,
    328 F.3d 1088 (9th Cir. 2003) .....................................................................47

*Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*,
    556 F.3d 1021 (9th Cir. 2009) ................................................................27, 37

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*,
    782 F.3d 520 (9th Cir. 2015) .......................................................................41

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)........................................................................ *passim*

*Doe v. Kelly*,
    878 F.3d 710 (9th Cir. 2017) .......................................................................21

*Fed. Election Comm'n v. Cruz*,
    142 S. Ct. 1638 (2022)................................................................................32

*First Nat'l Bank v. Bellotti*,
    435 U.S. 765 (1978)....................................................................................24

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) .......................................................................20

*Gaspee Project v. Mederos*,
    13 F.4th 79 (1st Cir. 2021), *cert. denied* 142 S. Ct. 1638 (2022)..........*passim*

*Gregorio T. By & Through Jose T. v. Wilson*,
    59 F.3d 1002 (9th Cir. 1995) ................................................................20, 21

iii

*Hill v. Colorado*,
530 U.S. 703 (2000)......................................................................37

*Human Life of Wash., Inc. v. Brumsickle*,
624 F.3d 990 (9th Cir. 2010) ...........................................25, 42, 48

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
515 U.S. 557 (1995)................................................................43, 44

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010)......................................................................39

*Jones v. Bonta*,
34 F.4th 704 (9th Cir. 2022) ........................................................21

*Kohlhaas v. State*,
Case No. S-18210 (Alaska Jan. 19, 2022).............................10, 11

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)......................................................................20

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2003)................................................................*passim*

*McCutcheon v. Fed. Election Comm'n*,
572 U.S. 185 (2014).....................................................2, 6, 31, 32

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995)......................................................................45

*Montanans for Cmty. Dev. v. Mangan*,
735 Fed. App'x 280 (9th Cir. 2018) ............................................41

*National Institute of Family & Life Advocates v. Becerra (NIFLA)*,
138 S. Ct. 2361 (2018)............................................................42, 43

*Nat'l Org. for Marriage v. McKee*,
649 F.3d 34 (1st Cir. 2011)....................................................25, 27

*Norbert v. City & Cnty. of San Francisco*,
10 F.4th 918 (9th Cir. 2021) ..................................................21, 22

*Riley v. National Federation of the Blind*,
487 U.S. 781 (1988)......................................................................48

*San Franciscans Supporting Prop B v. Chiu*,
Case No. 22-cv-02785-CRB, 2022 WL 1786573 (N.D. Cal. June 1, 2022)
.............................................................................................................
..............................................................................41, 47, 50, 55

iv

*Shelton v. Tucker*,
364 U.S. 479 (1960)....................................................................35

*SpeechNow.org v. Fed. Election Comm'n*,
599 F.3d 686 (D.C. Cir. 2010)....................................................26

*Sports Form, Inc. v. United Press Int'l*,
686 F.2d 750 (9th Cir.1982) .......................................................21

*State v. Alaska Civil Liberties Union*,
978 P.2d 597 (Alaska 1999) ..........................................................5

*Sw. Voter Registration Educ. Project v. Shelley*,
344 F.3d 914 (9th Cir. 2003) ......................................................20

*Thompson v. Hebdon*,
909 F.3d 1027 (9th Cir. 2018) ...............................................52, 53

*United States v. Harriss*,
347 U.S. 612 (1954).....................................................................47

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008).................................................................22, 51

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008)........................................................................17

*Wis. Right to Life, Inc. v. Barland*,
751 F.3d 804 (7th Cir. 2014) ......................................................36

*Wooley v. Maynard*,
430 U.S. 705 (1977).....................................................................43

*Worley v. Fla. Sec'y of State*,
717 F.3d 1238 (11th Cir. 2013) ...................................................45

*Yamada v. Snipes*,
786 F.3d 1182 (9th Cir. 2015) ..................................27, 36, 41, 45

*Yes on Prop B v. City & Cty. of San Francisco*,
440 F. Supp. 3d 1049 (N.D. Cal. 2020), *appeal dismissed as moot*, 826 F. App'x 648 (9th Cir. 2020) ............................................................50

**FEDERAL STATUTES**

52 U.S.C. § 30104 ................................................................27, 31

**ALASKA STATUTES**

AS 01.10.060.................................................................................8

AS 15.13.040............................................................................*passim*

AS 15.13.052..........................................................................29, 34

AS 15.13.068.................................................................................26

AS 15.13.084.................................................................................8

AS 15.13.090................................................................6, 7, 10, 40, 50

AS 15.13.110..........................................................................9, 31

AS 15.13.135.................................................................................5

AS 15.13.374.................................................................................51

AS 15.13.400.................................................5, 6, 8, 10, 28, 30

**ALASKA REGULATIONS**

2 AAC 50.258 ...............................................................................30

2 AAC 50.270 ...............................................................................7

**LEGISLATIVE HISTORY**

1974 Alaska Sess. Laws ch. 76 .................................................6

1996 Alaska Sess. Laws ch. 48 .................................................5

2010 Alaska Sess. Laws ch. 36 ..........................................6, 7, 8

2020 Alaska Laws Initiative Meas. 2........................................9

**OTHER AUTHORITIES**

11A C. Wright, A. Miller, & M. Kane,
*Federal Practice and Procedure* § 2948 (2d ed.1995)...........................20

AO 21-11-CD, *The Alaska Center*,
https://aws.state.ak.us/ApocReports/Paper/Download.aspx?ID=23802 (June 20, 2022) ......................................................................29

AO 22-01-CD, *The Elias Law Group on behalf of "The Organization,"*
https://aws.state.ak.us/ApocReports/Paper/Download.aspx?ID=23803 (June 20, 2022) ......................................................................29

L. Brandeis, *Other People's Money* (National Home Library Foundation ed. 1933) ....................................................................................................................27

# INTRODUCTION

This spring, a group of plaintiffs (collectively, "Smith") sued the members of the Alaska Public Offices Commission ("APOC" or "the State"), challenging several campaign finance disclosure and disclaimer laws. Alaskans enacted some of the challenged provisions recently via Ballot Measure 2; others have been in place for years. These laws are not, as Smith suggests, an "attempt by government to stifle or control" political speech to the detriment of "the marketplace of ideas." Op. Br. 1. On the contrary, Alaska's *voters*—who passed Ballot Measure 2 by initiative—seek to enhance the marketplace of ideas by shedding more light on who is lobbying for their votes. Disclosure of election spending is "a reasonable and minimally restrictive method of furthering First Amendment values . . ."[1] Unlike contribution or expenditure limits, disclosure and disclaimer laws—as the Supreme Court explained in *Citizens United v. FEC*—"impose no ceiling on campaign-related activities" and "do not prevent anyone from speaking."[2]

The district court correctly concluded that Smith is unlikely to succeed on the merits—and is thus not entitled to a preliminary injunction—because federal courts have upheld disclosure and disclaimer laws for decades, praising them as a

---

[1]     *Buckley v. Valeo*, 424 U.S. 1, 82 (1976).

[2]     558 U.S. 310, 366 (2010) (quoting *Buckley*, 424 U.S. at 64, and *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 201 (2003)).

less burdensome alternative to limiting speech.[3] Nothing in recent Supreme Court decisions calls this longstanding precedent into question. Indeed, the First Circuit recently rejected similar First Amendment challenges to similar laws in *Gaspee Project v. Mederos*, and the Supreme Court denied certiorari.[4] The fundamental flaw in Smith's case is that—as demonstrated by the history of federal court decisions upholding political disclosure and disclaimer laws[5]—there is simply no constitutional right to hide the sources of political spending from voters.

Given the established validity of political disclosure and disclaimer laws, Smith could not justify the extraordinary and drastic remedy of a preliminary injunction in this case without showing that Alaska's laws are especially—and unduly—burdensome. Not only that, but because Smith's lawsuit is a purely facial challenge, Smith must show that a "substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly

---

[3]  *Citizens United*, 558 U.S. at 369 ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech."); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 223 (2014) ("[D]isclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech.").

[4]  *See* 13 F.4th 79, 82 (1st Cir. 2021) (upholding a Rhode Island statute requiring the disclosure of donations over $1,000 and top-donor disclaimers); *cert. denied*, 142 S. Ct. 2647 (Apr. 25, 2022).

[5]  *See Buckley*, 424 U.S. at 75-76; *McConnell*, 540 U.S. at 196-98; *Citizens United*, 558 U.S. at 368-71.

legitimate sweep."[6] But Smith produced no evidence in the district court that could justify finding that even a single identified application of the challenged laws is unconstitutional. The district court did not abuse its discretion in denying a preliminary injunction, and this Court should affirm.

## JURISDICTIONAL STATEMENT

The State agrees with Smith's statement about this Court's jurisdiction.

## ADDENDUM TO BRIEFS

The necessary statutes that are not already reproduced in Smith's addendum are reproduced in an addendum at the end of this brief.

## STATEMENT OF ISSUES

1. *Donor disclosure*. Alaska law requires a person who contributes $2,000 or more in a calendar year to an entity that made independent expenditures in candidate elections in the current or previous election cycle (or is likely to do so in the current cycle) to report the contribution within 24 hours. The parties agree that the district court correctly chose exacting scrutiny as the First Amendment test for this law. Did the district court abuse its discretion in applying this test and denying a preliminary injunction because Smith failed to show likely success on the merits of a facial challenge to this law?

---

[6]     *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021).

2. *Scrutiny for disclaimers*. Are Alaska's on-ad disclaimer requirements subject to strict scrutiny even though the Supreme Court applied exacting scrutiny to disclaimers in *Citizens United*, as this Court has since recognized?

3. *Disclaimers*. Alaska law requires that ads include a "paid for by" disclaimer indicating the entity responsible, its city and principal place of business, and its top three contributors. Entities receiving most of their funding from outside Alaska must include that information in some ads. Did the district court, applying exacting scrutiny, abuse its discretion in denying a preliminary injunction because Smith failed to show likely success on the merits of a facial First Amendment challenge to these disclaimer laws?

# STATEMENT OF THE CASE

**I.    Alaska's campaign finance laws, recently amended by initiative in 2020, include disclosure and disclaimer requirements.**

At times "public confidence and trust in the integrity of the legislature" in Alaska has been "disturbingly low."[7] The legislature overhauled Alaska's campaign finance laws in 1996 to "restore the public's trust in the electoral process and to foster good government."[8] The legislature—and the voters via ballot initiatives—have continued to refine the laws since then.

After *Citizens United*,[9] the legislature updated Alaska's campaign finance laws to comply with the Supreme Court's decision. Previously, Alaska law limited who could make "independent expenditures" in candidate elections to individuals, groups, and non-group entities.[10] This excluded corporations and labor unions.[11] In *Citizens United*, the Supreme Court held "the Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not

---

[7]    *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 777 (9th Cir. 2006) (quoting *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 602 (Alaska 1999); *see also* 1996 Alaska Sess. Laws ch. 48, § 1(a)(3) (finding that "organized special interests are responsible for raising a significant portion of all election campaign funds and may thereby gain an undue influence over election campaigns and elected officials, particularly incumbents").

[8]    *Miles*, 441 F.3d at 778 (quoting 1996 Alaska Sess. Laws ch. 48, § 1(b)).

[9]    558 U.S. 310 (2010).

[10]    AS 15.13.135(a) (2009).

[11]    *See* AS 15.13.400(8), (11), (13) (2009).

suppress that speech altogether."[12] So Alaska adjusted. Rather than prohibiting corporate political speech, it followed the path blessed by the Supreme Court and began relying more heavily on disclaimer and disclosure requirements.[13]

First, the Alaska Legislature modified the disclaimers required on communications under AS 15.13.090. Since 1974, Alaska has required a "paid for by" disclaimer for all communications intended to influence the election of a candidate.[14] In 2010, the legislature amended AS 15.13.090 to add more requirements and to extend these provisions to corporations and labor unions by using the word "person," which includes such entities.[15] As of the 2010 legislation, the disclaimer had to include the person's address or principal place of business; and for a person other than an individual or candidate, (1) the name and title of the principal officer; (2) the name, city, and state of residence or principal place of

---

[12]     *Citizens United*, 558 U.S. at 319.

[13]     *See id.* at 369 ("The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech."); *McCutcheon*, 572 U.S. at 223 ("[D]isclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech.").

[14]     1974 Alaska Sess. Laws ch. 76, § 1 ("All advertisements, billboards, handbills, paid-for television and radio announcements and other communications intended to influence the election of a candidate shall be signed or identified by the words 'paid for by' followed by the name and address of the candidate or campaign treasurer of the candidate or group on whose behalf the communication appears.").

[15]     2010 Alaska Sess. Laws ch. 36, §§ 13-14; AS 15.13.400(14) (2010).

business of the top three contributors; and (3) a statement that the principal officer approved the communication.[16] In addition, videos—which contain both sound and visual components—must include written and audio disclaimers, providing all the information required for each type of component.[17]

Second, the Alaska Legislature amended the disclosure requirements for independent expenditures to require corporations and labor unions to provide source information as well as information about expenditures.[18] The expenditure-reporting statutes and regulations pre-dating *Citizens United* already covered "every individual, person, nongroup entity, or group making an expenditure,"[19] so they easily extended to corporations and labor unions—once they began making

---

[16]    AS 15.13.090(a), (f) (2010).

[17]    AS 15.13.090(c)-(d). The audio component may simplify the disclaimer by omitting the city and state of residence or principal place of business for the top contributors. AS 15.13.090(d).

[18]    2010 Alaska Sess. Laws ch. 36, § 4.

[19]    AS 15.13.040(d)-(e) (2009); 2 AAC 50.270(c) (2009) (providing that "a person making an independent expenditure must disclose the following on an independent expenditure report under AS 15.13.040(d) and (e): (1) the date of the expenditure; (2) the amount of the expenditure; (3) the check number, if the expenditure is paid by check; (4) the name and address of the payee; (5) a description of items or services purchased; (6) identification of the candidate or ballot proposition the expenditure was intended to influence; (7) a statement as to whether the expenditure was intended to support or oppose the candidate or ballot proposition").

expenditures—because Alaska law defined "person" to include such entities.[20] But existing law did not require a person, other than a candidate, group, or nongroup entity, to report the source of funds used to make expenditures, so corporations and labor unions were not required to report this information.[21] In the same 2010 legislation that expanded the disclaimer requirements, the legislature closed this loophole by amending AS 15.13.040(d).[22] The statute now provides that "[e]very person making an independent expenditure shall make a full report of expenditures made and *contributions received*, upon a form prescribed by the commission."[23] The report must include, among other things, the date of the contribution and the name and address of the contributor.[24] When the contributor is an individual who contributes more than $50, information about the contributor's employer is also required.[25] When the contributor is not an individual, the report must include the name and address of each officer and director of the contributor.[26] Generally, a

---

[20]    AS 15.13.400(14) (2009); AS 01.10.060; *see also* AS 15.13.084 (2009) (stating that a "person may not make an expenditure anonymously," except for certain expenditures paid for by a natural person).

[21]    *See* AS 15.13.040(a)-(b), (d)-(e), (j) (2009); AS 15.13.400(14) (2009).

[22]    2010 Alaska Sess. Laws ch. 36, § 3.

[23]    AS 15.13.040(d) (emphasis added).

[24]    AS 15.13.040(e); *see* 2010 Alaska Sess. Laws ch. 36, § 4.

[25]    AS 15.13.040(e).

[26]    *Id*.

report must be filed with APOC no later than 10 days after an independent

expenditure is made.[27] But the timeframe shortens as an election approaches—an

independent expenditure exceeding $250 and made within nine days of an election

must be reported within 24 hours.[28]

In 2020, after ten years of on-the-ground experience with these provisions,

Alaska voters enacted Ballot Measure 2 to close gaps in the statutory scheme and

to require more information about independent expenditures.[29] This ballot initiative

made three changes relevant here. First, Ballot Measure 2 added a donor disclosure

requirement for contributions to independent expenditure groups: any donor who

contributes $2,000 or more in a calendar year to an entity that made independent

expenditures in candidate elections in the current or previous election cycle or is

likely to do so in the current election cycle must report the contribution within

24 hours.[30] Second, Ballot Measure 2 updated the existing disclaimer requirements

---

[27]     AS 15.13.110(h).

[28]     *Id.*

[29]     2020 Alaska Laws Initiative Meas. 2, § 3 ("The people of Alaska have the right to know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska. This right requires the prompt, accessible, comprehensible, and public disclosure of the true and original sources of funds used to influence these elections, and is essential to the rights of free speech, assembly, and petition guaranteed by the First Amendment to the United States Constitution.").

[30]     AS 15.13.040(r).

for political ads: disclaimers now must "remain onscreen throughout the entirety of the communication,"[31] and an entity receiving most of its funding from outside Alaska must include a disclaimer about this in any communication with a print or video component.[32] Third, Ballot Measure 2 restricted the use of "dark money" for independent expenditures: disclosures now must reveal the "true source" of funds, defined as the "person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services," including an entity that got the funds through "contributions, donations, dues, or gifts" only if those were "less than $2,000 per person per year."[33] The provisions of Ballot Measure 2 went into effect in February 2021.

Ballot Measure 2 also made two major changes to Alaska's election system that are not at issue here—specifically, instituting an open, nonpartisan primary election and ranked-choice voting in the general election. In December 2020, shortly before Ballot Measure 2 went into effect, a different group of plaintiffs— the Kohlhaas plaintiffs—sued in state court challenging these provisions, but not the campaign finance provisions that Smith challenges here.[34] The Smith plaintiffs

---

[31]  AS 15.13.090(c), (g).

[32]  AS 15.13.090(g). The out-of-state funding disclaimer requirement does not apply to ads that have only an audio component like radio ads. *Id.*

[33]  *See* AS 15.13.400(19) (defining "true source").

[34]  *See* Order, *Kohlhaas v. State*, Case No. S-18210 (Alaska Jan. 19, 2022), *available at* https://appellate-

did not intervene in that case or file their own claims at that time. In January 2022, the Alaska Supreme Court affirmed the trial court's summary judgment order rejecting the Kohlhaas plaintiffs' claims and upholding the nonpartisan primary and ranked-choice voting provisions.[35] The Kohlhaas lawsuit did not touch on any of the campaign finance provisions that the Smith plaintiffs now challenge, and thus would not have invalidated them even if it had been successful.

## II.     In April 2022, Smith sued to challenge Alaska's disclosure and disclaimer requirements and moved for a preliminary injunction.

In April 2022—more than a year after Ballot Measure 2 went into effect—Smith brought this lawsuit against the State in federal district court. ER-116. The complaint included three counts, challenging new requirements added by Ballot Measure 2 as well as pre-existing requirements dating back a decade. SER-125-28. Count I challenges the donor disclosure provision requiring anyone who contributes $2,000 or more to an entity that made independent expenditures in candidate elections in the current or previous election cycle (or that is likely to do so in the current election cycle) to report the contribution within 24 hours.[36] SER-125-26. Count II challenges the disclaimer requirements for political ads as

---

records.courts.alaska.gov/CMSPublic/UserControl/OpenDocument?q=9QT9uu7Ri
q+J2bZc7oG2pg==%27 (download link, last accessed Sept. 13, 2022).

[35]     *See id*.

[36]     AS 15.13.040(r).

11

enacted in 2010 and then supplemented by Ballot Measure 2. SER-126-27. Count III—which is not at issue in this preliminary injunction appeal—challenges the requirement that disclosures include the "true source" of the money used to pay for independent expenditures. SER-127-28. Smith claims that these challenged provisions all violate the First Amendment. SER-125-28. Smith has made clear that this lawsuit is a purely facial challenge, not an as-applied challenge. [*See* SER-42 (stating that "[t]his is a facial challenge," "not an as-applied challenge")]

The sponsors of Ballot Measure 2—Alaskans for Better Elections— intervened to defend the law. ER-117-18. Smith moved for a preliminary injunction, and the State and the sponsors filed oppositions. ER-117-19. Along with opposing Smith's motion for preliminary injunction, the State and the sponsors also filed motions to dismiss the complaint for failure to state a claim. ER-119. Instead of opposing these motions, Smith filed an amended complaint. ER-120; SER-3-24. But by that point, preliminary injunction briefing was already complete, so that briefing addressed the original complaint rather than the amended version. *See* ER-119-20. The State and the sponsors later filed renewed motions to dismiss addressing the amended complaint, and the district court stayed briefing on those motions pending this preliminary injunction appeal. ER-120.

**III.  In July 2022, the district court denied Smith's motion for a preliminary injunction.**

In July 2022, the district court denied Smith's motion for a preliminary injunction, concluding that the "Plaintiffs have not demonstrated a likelihood of success on any of the three counts pleaded in their complaint." ER-41.

On Count I—donor disclosure—the court agreed with all parties that the appropriate standard of review is "exacting scrutiny," which, as recently laid out in *Americans for Prosperity v. Bonta*, requires (1) a "sufficiently important governmental interest" and (2) "that the disclosure requirement be narrowly tailored to the interest it promotes."[37] ER-11. Applying that standard, the court found that "the State has a sufficiently important governmental interest in providing voters with information related to the source of funds received by independent expenditure entities."[38] ER-13. And the court concluded that the donor disclosure law is narrowly tailored to that interest. ER-15-22.

The court reasoned that the law "is directly related to the State's important interest." ER-17. It "overlaps with, but is not completely duplicative of, the reporting requirements for independent expenditure entities," because the donor is

---

[37]  *Americans for Prosperity*, 141 S. Ct. at 2385.

[38]  The court also found that the State "has an important governmental interest in deterring the appearance of and actual corruption in elections, as well as foreign influence in elections," but rested its order on the State's informational interest rather than separately addressing the anti-corruption interest. ER-14.

in a better position to identify the true source of the contribution and "requiring prompt disclosure by both parties maximizes the likelihood of prompt and accurate reporting of the information when it is most useful to the electorate." ER-19.

The court rejected Smith's argument that the donor disclosure law is "unduly burdensome," observing that Smith produced "no evidence to suggest" that compliance is difficult for donors, and that the State produced screenshots of its online reporting form "which appears to be a straightforward document that enables a donor to promptly comply with the reporting requirement." ER-16-17.

The court also rejected Smith's argument that the disclosure law is too broad because it covers contributions to groups "likely to" make independent expenditures in addition to those that have already done so in the current election cycle. ER-20-22. The court emphasized that a facial challenge cannot be sustained based on "hypothetical" or "imaginary" cases, and that Smith did not submit any evidence of a negative impact or demonstrate that a "substantial number" of the law's applications are unconstitutional in light of its "plainly legitimate sweep." ER-21. The court concluded that the law's "temporal reach" is sufficiently tailored because it "helps ensure that voters will promptly have access to complete information" and "prevents donors from sidestepping disclosure requirements by strategically donating in the final stretch of an election cycle." ER-22. The court

therefore concluded that Smith did not establish likely success on the merits of Count I. ER-22.

On Count II—disclaimers—the court decided that the appropriate standard of review is also "exacting scrutiny," rejecting Smith's position that strict scrutiny applies. ER-23-27. The court explained that the Supreme Court applied exacting scrutiny to both disclosures and disclaimers in *Citizens United*. ER-25-26. The court then proceeded to apply that standard to Alaska's disclaimers, first recognizing the same "sufficiently important governmental interest in providing voters with information related to the funding of political advertisements by independent expenditure organizations" and then concluding that the disclaimers are sufficiently tailored to this interest. ER-27-38.

The court observed that the top-three donor disclaimer "does not require [an ad producer] to convey a message that is directly contrary to whatever political statement they seek to make," and that "[w]hile voters have access to donor information through the required disclosures to the APOC, the on-ad placement of some of that information provides a far more efficient and effective form of disclosure." ER-31. As for the out-of-state funding disclaimer, the court noted that it is not "an outright ban or cap on contributions or certain political activities" and does not "even directly burden out-of-state donors; rather, it burdens independent expenditure entities that receive over a certain percentage of their funds from out-

15

of-state donors." ER-34. The disclaimer makes "information far more accessible and presents it at a highly useful time for voters attempting to weigh competing political messages." ER-35. And "though an entity's principal place of business may be an imperfect proxy for its interest in Alaska's elections, it is likely an accurate measure in most cases." ER-35. Thus, the out-of-state disclaimer has a substantial relation to the State's interest and is narrowly tailored. ER-35.

The court also rejected Smith's position that the disclaimers consume too much ad space, observing that they "are not required by law to take up a certain percentage of ad space" and that Smith did not "offer evidence that shorter or less prominent disclaimers would serve the State's informational interest equally well." ER-35-38. Smith did not supply example ads "or otherwise provide evidentiary support for this claim sufficient to demonstrate that a 'substantial number of [the disclaimer law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" ER-37. The court therefore concluded that Smith did not establish likely success on the merits of Count II. ER-38.

On Count III—dark money—the court again applied exacting scrutiny and concluded that "Ballot Measure 2's 'true source' definition, together with its requirement that independent expenditure entities report these true sources to the State, are both substantially related and narrowly tailored to fulfill the State's informational interest in informing voters about the actual identity of those trying

16

to influence the outcome of elections." ER-40. The court reasoned that Smith's "hypothetical examples" failed to demonstrate that the law was not narrowly tailored, noting that Smith lacks standing "to maintain an action based on hypothetical scenarios by non-parties" and that courts should not speculate about imaginary cases. ER-40-41. The court therefore concluded that Smith did not establish likely success on the merits of Count III. ER-41.

With respect to each of the three counts, after assessing "likelihood of success on the merits," the court also said that applying a "more relaxed" merits analysis "would yield the same result" because Smith had not shown "serious questions" about the challenged provisions' constitutional validity. ER-22, 38, 41.

Finally, the court also noted that Smith had waited over a year to seek the "extraordinary relief" of a preliminary injunction and that altering election rules on the eve of an election is disfavored. ER-41. But having concluded that Smith did not show a likelihood of success on the merits, the court declined to consider whether Smith satisfied the remaining three *Winter* factors.[39] ER-42.

Smith has appealed the denial of a preliminary injunction on Counts I and II, but not Count III. *See* Op. Br. 4 n.1.

---

[39]    *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest").

## SUMMARY OF THE ARGUMENT

Because Smith failed to show probable success on the merits of this facial challenge, the district court correctly denied a preliminary injunction.

The district court chose the proper tier of constitutional scrutiny—that is, exacting scrutiny—for both the donor disclosure (Count I) and disclaimer (Count II) laws. The parties all agree that this is the correct standard for disclosure laws, and although Smith advocates strict scrutiny for disclaimers, *Citizens United* and subsequent decisions make clear that exacting scrutiny applies to both disclosures and disclaimers.[40] Exacting scrutiny requires (1) a "sufficiently important governmental interest" and (2) "that the disclosure requirement be narrowly tailored to the interest it promotes."[41]

The district court did not abuse its discretion when applying this legal standard to Alaska's donor disclosure law (Count I). This law is supported by the important—and well-recognized—governmental interests in an informed electorate and in preventing corruption and is narrowly tailored to those goals. It applies only to high-dollar donations intended for spending on election advocacy. And even though recipients must also disclose donations, donor disclosure is not unduly repetitive because only donors can accurately report the true source of the funds

---

[40]    *See Citizens United*, 558 U.S. at 366.

[41]    *Americans for Prosperity*, 141 S. Ct. at 2385.

they are funneling into politics. Compliance is not onerous either: the State produced evidence that it is easy, and Smith produced no evidence that donors have struggled with it, even though it has been in effect for over a year. Smith thus failed to show that a "substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[42]

Likewise, the district court did not abuse its discretion when applying exacting scrutiny to Alaska's top-donor and out-of-state disclaimers (Count II). Both disclaimers are also supported by the important governmental interest in an informed electorate and narrowly tailored to that goal. Giving voters information about funding sources helps prevent entities from "hiding behind dubious and misleading names"[43] while trying to influence voters. Doing this via on-ad disclaimers is not a matter of mere administrative convenience; the State has no other viable way to get this information to voters at the time they are confronted with an ad. Smith produced no evidence—such as sample ads—to support factual assertions that Alaska's disclaimers are especially onerous because they take up too much ad space. And the out-of-state disclaimer is not analogous to out-of-state campaign contribution limits because it does not limit out-of-state participation, it

---

[42]    *Id.* at 2387.

[43]    *McConnell*, 540 U.S. at 196-97 (quoting district court decision).

just provides voters with information that Alaskan voters—who enacted Ballot Measure 2—want to know.

This Court should affirm the district court's order because the district court did not abuse its discretion in concluding that Smith failed to make an adequate showing on the merits to justify a preliminary injunction on either count.

## STANDARDS OF REVIEW

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."[44] This Court reviews the denial of a preliminary injunction for abuse of discretion.[45] This review is "limited and deferential,"[46] and the Court "do[es] not review the underlying merits of the case."[47] This Court's task is "to determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand."[48] "[A]s long as the district court got the law right, 'it will not be reversed simply

---

[44]     *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129–130 (2d ed.1995) (emphasis added by the Supreme Court)).

[45]     *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

[46]     *Id*.

[47]     *Gregorio T. By & Through Jose T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir. 1995).

[48]     *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015).

because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.'"[49] Instead, this Court reverses only when the district court "abused its discretion by relying on an erroneous legal premise or clearly erroneous finding of fact."[50] The district court's "choice of a tier of scrutiny is a legal question" reviewed de novo.[51] But the district court's "application of that tier of scrutiny is reviewed for abuse of discretion."[52] The district court "only abuses its discretion when its application of the [correct legal] standard is illogical, implausible, or without support in inferences that may be drawn from the record."[53]

Applying these principles here, the Court should review the district court's choice of "exacting scrutiny" as the legal standard—which Smith challenges in the context of disclaimers—de novo.[54] But the district court's "application of that tier of scrutiny is reviewed for abuse of discretion,"[55] reversable only if "illogical,

---

[49] *Gregorio T.*, 59 F.3d at 1004 (quoting *Sports Form, Inc. v. United Press Int'l*, 686 F.2d 750, 752 (9th Cir.1982)).

[50] *Jones v. Bonta*, 34 F.4th 704, 713 (9th Cir. 2022).

[51] *Id*.

[52] *Id*. & at 727 ("Having determined that intermediate scrutiny applies to the [challenged law], we now review for abuse of discretion the district court's application of that test.").

[53] *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 933 (9th Cir. 2021) (quoting *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017)).

[54] *Jones*, 34 F.4th at 713.

[55] *Id*.

implausible, or without support in inferences that may be drawn from the record."[56] This is not, as Smith suggests, a case where the relevant facts are so "established" or "undisputed" that only legal issues remain. Op. Br. 10. On the contrary, Smith has produced minimal evidence and their conclusory assertions about the impacts of the laws they challenge are neither established nor undisputed.

This Court should also keep in mind that Smith brought only facial challenges, which are "disfavored" because they "often rest on speculation," risk "premature interpretation of statutes on the basis of factually barebones records," and "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."[57]

## ARGUMENT

**I.      The district court did not err in finding that Smith failed to show likely success on the merits of Count I, the challenge to donor disclosure.**

Count I challenges the disclosure requirement that applies to a donor who contributes $2,000 or more in a calendar year to an entity that made independent expenditures in candidate elections in the current or previous election cycle or is

---

[56]     *Norbert*, 10 F.4th at 933 (quoting *Doe*, 878 F.3d at 719).

[57]     *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (cleaned up).

likely to do so in the current election cycle.[58] SER-125-26. A donor covered by this disclosure requirement must report the contribution within 24 hours.[59] The district court chose the proper tier of scrutiny and did not abuse its discretion in applying it to the donor disclosure law, ultimately concluding that Smith failed to show likely success on the merits of Count I. ER-22.

### A. The donor disclosure law is subject to exacting scrutiny and furthers sufficiently important state interests.

The parties agree that the district court properly chose "exacting scrutiny" as the legal standard for the donor disclosure law. Op. Br. 11. That test requires (1) a "sufficiently important governmental interest" and (2) "that the disclosure requirement be narrowly tailored to the interest it promotes."[60] This is not as rigorous as the "least restrictive means" test of strict scrutiny—instead, it falls somewhere between strict and intermediate scrutiny.[61]

Here, as Smith acknowledges, the interest in an informed electorate is a "sufficiently important governmental interest" to satisfy the first prong of exacting

---

[58]    *See* AS 15.13.040(r).

[59]    *Id*.

[60]    *Americans for Prosperity*, 141 S. Ct. at 2385. In *Citizens United*, the Court described the standard as calling for "a 'substantial relation' between the disclosure requirement and [the government] interest." 558 U.S. at 366-67. The Supreme Court has not yet applied the newer *Americans for Prosperity* formulation to a campaign finance disclosure law, but the laws here survive under either formulation of the standard.

[61]    *Americans for Prosperity*, 141 S. Ct. at 2383.

scrutiny.[62] Op. Br. 12. As the First Circuit explained in *Gaspee Project*, the

Supreme Court recognized this interest as supporting disclosure laws in *Buckley v.*

*Valeo*, *McConnell v. FEC*, and *Citizens United*.[63] In *Buckley*, the Court reasoned

that disclosure of independent expenditures "helps voters to define more of the

candidates' constituencies."[64] In *McConnell*, the Court observed that "independent

groups were running election-related advertisements 'while hiding behind dubious

and misleading names,'" meaning disclosure would "help citizens 'make informed

choices in the political marketplace.'"[65] Then in *Citizens United*, the Court

reaffirmed this "governmental interest in providing information to the electorate"

as supporting disclosures and disclaimers for independent expenditures, noting that

"the public has an interest in knowing who is speaking about a candidate shortly

before an election."[66]

---

[62]　*See Buckley*, 424 U.S. at 14-15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential.").

[63]　13 F.4th at 87.

[64]　424 U.S. at 81.

[65]　*Citizens United*, 558 U.S. at 367 (describing and quoting *McConnell*, 540 U.S. at 196-97).

[66]　*Citizens United*, 558 U.S. at 368 & 369; *see also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected.").

This informational interest is—as this Court has noted—"vital," "important and well-recognized," and "only likely to increase" in magnitude.[67] Indeed, current political realities make this interest more compelling now than it was at the time of *Buckley*.[68] As this Court explained, "[a]ccess to reliable information becomes even more important as more speakers, more speech—and thus more spending—enter the marketplace, which is precisely what has occurred in recent years."[69] Informing the electorate "is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment," and disclosure laws "help ensure that voters have the facts they need to evaluate the various messages competing for their attention."[70] The First Circuit has similarly noted that in "an age characterized by the rapid multiplication of media outlets and the rise of internet reporting," citizens "rely ever more on a message's source as a proxy for reliability and a barometer of political spin."[71]

In addition to informing voters, disclosure laws also "deter actual corruption and avoid the appearance of corruption by exposing large contributions and

---

[67]   *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1005-08 (9th Cir. 2010).

[68]   424 U.S. at 1.

[69]   *Human Life*, 624 F.3d at 1007.

[70]   *Id*. at 1005.

[71]   *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 57 (1st Cir. 2011).

expenditures to the light of publicity."[72] Although it is true that the Supreme Court has said that anti-corruption or regulatory avoidance interests do not justify *banning* or *limiting* independent expenditures,[73] these interests can still support *disclosures* about such expenditures. The conclusion that independent expenditures do not create corruption risk rests on the premise that they are not coordinated with candidates.[74] This premise rests in turn on an assumption that the public and regulators know who is doing what when it comes to political spending. If funders remain in the shadows, the public cannot be assured that no corrupt transactions are taking place—indeed, the public cannot even be assured that the money spent to influence their votes does not originate from prohibited foreign sources.[75] Disclosure laws thus further the government's anti-corruption and enforcement

---

[72]    *Buckley*, 424 U.S. at 67 ("Congress could reasonably conclude that full disclosure during an election campaign tends 'to prevent the corrupt use of money to affect elections.'"); *see also McCutcheon*, 572 U.S. at 224 ("Today, given the Internet, disclosure offers much more robust protections against corruption.").

[73]    *See Citizens United*, 558 U.S. at 357.

[74]    *See SpeechNow.org v. Fed. Election Comm'n*, 599 F.3d 686, 693 (D.C. Cir. 2010) (explaining that "[t]he independence of independent expenditures was a central consideration in the Court's decision" in *Citizens United*).

[75]    *See* AS 15.13.068; *cf. SpeechNow.org*, 599 F.3d at 698 ("[R]equiring disclosure of such information deters and helps expose violations of other campaign finance restrictions, such as those barring contributions from foreign corporations or individuals.").

interests, even if those interests do not justify limiting independent expenditures. The first part of exacting scrutiny is thus doubly satisfied here.

### B. The donor disclosure law is narrowly tailored.

Moving on to the second part of exacting scrutiny, the donor disclosure law is narrowly tailored to further these important governmental interests. "Sunlight is said to be the best of disinfectants," and the Supreme Court has long upheld laws requiring disclosures about campaign finances, calling such laws "the least restrictive means of curbing the evils of campaign ignorance and corruption."[76]

Several features of Alaska's donor disclosure law keep it from being overbroad. For one thing, small contributions need not be disclosed—only significant ones totaling $2,000 or more.[77] This is twice as high as the threshold for the disclosures upheld in *Citizens United*[78] and by the First Circuit in *Gaspee Project*.[79] For another thing, disclosure is triggered only by a "contribution" to an

---

[76]    *Buckley*, 424 U.S. at 67-68 (quoting L. Brandeis, *Other People's Money* 62 (National Home Library Foundation ed. 1933)).

[77]    AS 15.13.040(r); *cf. Yamada v. Snipes*, 786 F.3d 1182, 1199 (9th Cir. 2015) ("Hawaii's choice of a $1,000 registration and reporting threshold is also a far cry from the zero dollar threshold invalidated in [*Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1033-34 (9th Cir. 2009)].").

[78]    *See Citizens United*, 558 U.S. at 366-67; 52 U.S.C. § 30104(f)(2) (providing that a disclosure statement identify contributors who "contributed an aggregate amount of $1,000 or more").

[79]    *See Gaspee Project*, 13 F.4th at 88. Relatedly, the First Circuit has upheld laws requiring independent expenditure entities to disclose the identity of donors who have contributed far less. *Nat'l Org. for Marriage*, 649 F.3d at 58 (concluding

entity that makes "independent expenditures" in candidate elections, so the definitions of "expenditure" and "contribution"—and the law's application to only candidate elections—further narrow the coverage.[80] An "expenditure" in candidate elections means spending money "for the purpose of . . . influencing the nomination or election of a candidate."[81] A definitional carve-out tailors this to exclude an "issues communication," which identifies a candidate but "addresses an issue of national, state, or local political importance and does not support or oppose a candidate for election to public office."[82]

The disclosure law does not contain an explicit "opt out" provision for donors who do not want their money used to make political expenditures, but the freedom to opt out is inherent in the definition of "contribution." A "contribution" as relevant here means a donation "that is made for the purpose of . . . influencing the nomination or election of a candidate."[83] If a donor gives money with no such

_____

that donor disclosure requirements were narrowly tailored in that they "require[ed] disclosure only of . . . identifying information for any contributors who have given more than $50 to the PAC to support or oppose a candidate or campaign"). Alaska law requires each person making an expenditure to disclose the name and address of each contributor. AS 15.13.040(e)(5).

[80]    AS 15.13.040(r).

[81]    AS 15.13.400(7) (defining "expenditure").

[82]    AS 15.13.400(7)(C) & (13). As an election approaches,, issue ads could become "electioneering communications," which constitute "expenditures." AS 15.13.400(6) & (7)(C).

[83]    AS 15.13.400(4)(A)(i).

purpose, that is not a "contribution" that triggers reporting. Donors and recipients can avoid the need to report donations that will not go toward independent expenditures by simply making their intentions clear to one another in their transactions: the donor can tell the recipient that her money should not be used for this purpose, and the recipient can place the money in an account that will not be used for this purpose.[84] Indeed, an entity that makes independent expenditures already must maintain a "political activities account" for those expenditures, so it can simply put the donor's funds in a different account.[85] Donors and recipients can thus avoid disclosure of donations not destined for political spending.

### 1. The donor disclosure law is not unduly repetitive.

Smith complains that the donor disclosure law is "repetitive" because recipients must also report contributions. Op. Br. 11-14. But the two halves of the law work together to provide voters complete, accurate, real-time information about the money being funneled into independent expenditures. The donor is the one who can trace the "true source" of the donor's funds, so the law reasonably

---

[84]    APOC approved two advisory opinions about how entities can segregate funds to avoid unnecessary disclosures. *See* AO 21-11-CD, *The Alaska Center*, https://aws.state.ak.us/ApocReports/Paper/Download.aspx?ID=23802 (June 20, 2022); AO 22-01-CD, *The Elias Law Group on behalf of "The Organization,"* https://aws.state.ak.us/ApocReports/Paper/Download.aspx?ID=23803 (June 20, 2022).

[85]    *See* AS 15.13.052.

obligates the donor to provide and certify the truth of this information.[86] Placing this obligation solely on the recipient would lead to incomplete or inaccurate reporting of true sources. Smith acknowledges the "state interest in knowing who funds election advocacy." Op. Br. 19-20. And Smith does not challenge the true source reporting requirement in this appeal, so the validity of the state interest in revealing true source information is not in question here. Op. Br. 5.

Smith asserts that the State could reveal the true source of funds using more narrowly tailored means than donor reporting, but despite claiming that "the less intrusive alternative is obvious," Smith does not adequately explain how it works. Op. Br. 13-14. Smith first seems to suggest that nearly all donors will themselves be the "true source" of their donations because otherwise they would be making "illegal straw donation[s]." Op. Br. 13. But a donation is only an illegal straw donation if is made at the direction of the source of the funds.[87] There is nothing illegal about receiving donated funds and re-donating them to an independent expenditure group in the absence of such direction. The State thus cannot presume that a donor is not passing on donated funds unless the donor certifies that they are

---

[86]     *See* AS 15.13.400(19) (defining "true source").

[87]     *See* 2 AAC 50.258(a) (describing the scenarios that qualify as illegally donating in the name of another).

the true source of the funds under the disclosure law. If the donor is indeed the true source of the funds, the disclosure form is even easier to complete. *See* SER-75.

Smith further asserts that many organizational donors "report publicly their donors to other public authorities," Op. Br. 13, appearing to contend that true source information could be gleaned from these other reports instead of through the donor disclosure law. But different reports differ in their timeframes, applicability, and where and how they are publicly accessible.[88] Smith's brief does not even cite the existing reporting requirements that Smith believes could adequately serve the State's interests, Op. Br. 13, nor did Smith provide the district court with any evidence about this that could support preliminary relief.

Donor disclosure is not a disfavored "prophylaxis-upon-prophylaxis" in the words of *McCutcheon*,[89] as Smith claims. Op. Br. 14-15. Disclosure is not a "prophylaxis" in the first place. A contribution limit is a "prophylaxis" because it caps all contributions to safeguard against corruption even though "few if any

---

[88]    For example, independent expenditure reports to APOC, which include information about contributions, are generally due ten days after an expenditure and do not include true source reporting. *See* AS 15.13.110(h); AS 15.13.040(e). Federal reports likewise occur on a different timeframe, do not include true sources, and are not available for Alaska voters through APOC's website. *See* 52 U.S.C. § 30104(b)(3), (a)(4).

[89]    *See McCutcheon*, 572 U.S. at 221.

contributions to candidates will involve *quid pro quo* arrangements."[90] The aggregate limit in *McCutcheon*, designed to safeguard against circumvention of such prophylactic limits, was therefore a "prophylaxis-upon-prophylaxis."[91] By contrast, a disclosure law's main purpose is not to safeguard against potential harm, but rather to inform voters, a purpose it serves in all cases. And while a truly redundant disclosure law could be called a "prophylaxis"—designed merely to safeguard against failure of an existing disclosure law it duplicates—Alaska's donor disclosure law is not redundant, as explained above.

### 2. The donor disclosure law is not temporally overbroad.

The donor disclosure law is further tailored by a temporal limitation: it applies only to contributions to an entity that made independent expenditures in the current or previous election cycle, or "that the contributor knows or has reason to know is likely to make independent expenditures" in the current cycle.[92]

Smith argues that this makes the law overbroad, because not every such group will necessarily make expenditures this cycle. Op. Br. 18-21. But covering contributions to entities *likely* to make expenditures—either because they have done so recently, or because the donor knows their plans—is reasonable tailoring.

---

[90]   *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022) (quoting *Citizens United*, 558 U.S. at 357).

[91]   *See McCutcheon*, 572 U.S. at 221.

[92]   AS 15.13.040(r).

Contrary to Smith's position, an entity amassing funds for the purpose of making independent expenditures is indeed "actively engaged" in campaign activity even if it has not yet made its planned expenditures. Op. Br. 21.

The donor disclosure law's coverage is necessary to provide voters accurate, real-time information about the true sources of funding. Smith argues that this interest is sufficiently served by requiring the recipient to report its donors *after* it begins making independent expenditures, including in the final run-up to an election. Op. Br. 21. But as explained above, recipient-side reporting is not adequate to reveal true sources because only the donor can accurately provide and certify true source information.[93] Without donor-side disclosure (including true sources) for contributions to entities *planning* to make independent expenditures, an entity could amass a secret war chest, blitz Alaskans with campaign ads before an election, and disclose only that it paid for those ads with $1 million contributions from opaque intermediaries like "Citizens for Alaska" and "Alaskans for Our Future" received well in advance, long before expenditures began. Smith calls this a "phantom fear" but does not explain how Alaskans would untangle the true source of this money until after the election, if at all. Op. Br. 21.

---

[93] *See supra* pp. 29-31.

The donor disclosure law will not, as Smith argues, unnecessarily invade the privacy of entities not engaged in politics. Op. Br. 21. Any entity that is amassing funds for non-political purposes—even if it would otherwise be covered—can avoid reporting by simply segregating funds, because donations segregated from independent expenditure activity are not reportable "contributions."[94] Segregating non-political funds is not a serious burden for an entity that has made independent expenditures in recent elections. Indeed, such an entity may already have a "political activities account" for its expenditures, making this easy.[95]

In any event, because exacting scrutiny does not require the donor disclosure law to be the "least restrictive means" to advance the State's interests,[96] simply identifying minor possible adjustments would not be sufficient to defeat the law. This is particularly true given that Smith brings only a facial challenge to the law, which requires showing that a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[97] The "plainly legitimate sweep" of the law is clear: it ensures prompt, accurate reporting of true source information that is generally not otherwise available.

---

[94]    *See supra* note 84.

[95]    *See* AS 15.13.052 (requiring some entities to maintain such accounts).

[96]    *See Americans for Prosperity*, 141 S. Ct. at 2383.

[97]    *Id.* at 2387.

Given all of its tailoring, Alaska's donor disclosure law stands in contrast to the overbroad ones the Supreme Court disapproved in *Shelton* and *Americans for Prosperity*, both of which required vastly more disclosure than was useful.[98] In *Shelton*, Arkansas required teachers to disclose every organization to which they belonged or contributed.[99] Although the Court acknowledged the importance of "the right of a State to investigate the competence and fitness of those whom it hires to teach in its schools," the statute was overbroad for this purpose because it covered "every conceivable kind of associational tie," many of which "could have no possible bearing upon the teacher's occupational competence or fitness."[100] Similarly in *Americans for Prosperity*, the Court saw a "dramatic mismatch" between the up-front, across-the-board disclosures that California required from charities and the state interest in policing charity fraud, because the disclosed information was never used to initiate investigations and only became marginally useful in a handful of cases each year after complaints were filed.[101] Unlike that law—which "cast[] a dragnet" for information that was rarely used—all or nearly

---

[98]    *Shelton v. Tucker*, 364 U.S. 479, 480 (1960); *Americans for Prosperity*, 141 S. Ct. 2373.

[99]    364 U.S. at 480.

[100]   *Id*. at 485, 488.

[101]   141 S. Ct. at 2386.

all of Alaska's required donor disclosures directly serve the interest in informing voters about the sources of election spending.[102]

### 3. The donor disclosure law is not overly burdensome.

Smith suggests that "everyday citizens" will face onerous compliance burdens under the donor disclosure law, but they failed to present evidence of this. Op. Br. 16. As the district court correctly observed, the State produced evidence that compliance is simple—a donor need only fill out a straightforward online form—and Smith produced no contrary evidence. ER-17; SER-69-79. This form is not the "sort of compliance burden[] typically reserved for sophisticated parties." Op. Br. 15. The Seventh Circuit has said that a "simple, one-page form" is a "minimally burdensome regulatory requirement . . . reasonably tailored to the public's informational interest."[103] This Court should conclude similarly.

Smith objects that "the problem" is not the complexity of the online form, "but rather the burden to know about the recipient entity's activities, know of the [disclosure] requirement, and to comply with it instantaneously." Op. Br. 18. But Smith failed to produce evidence that even a single donor has faced compliance difficulties for any of these reasons even though the law has been in place for well

---

[102]    *Id.* at 2387.

[103]    *See Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 843 & 841 (7th Cir. 2014); *see also Yamada*, 786 F.3d at 1195 (concluding that registration and reporting requirements were not unduly onerous).

over a year. The simple need to "know of the requirement" is not a "burden" because this is true of all laws. Op. Br. 17. Smith does not claim that the law is unconstitutionally vague or unclear,[104] just that it is new. But considering this a "burden" would make any change to the law difficult to justify.

As for the need to "know about the recipient entity's activities," Smith is incorrect that a donor needs "encyclopedic and prophetic knowledge" and "a campaign finance attorney" to comply. Op. Br. 18-19. The donor need only know a little bit about the recipient of $2,000 or more of their money. It is reasonable to expect that someone making such a large donation will already know whether the recipient makes independent expenditures in candidate elections, and if not, the donor can simply ask the recipient. If the donor is truly not giving money for political purposes and has no reason to know that the recipient has made or intends to make independent expenditures, the donor disclosure obligation is not triggered.

The obligation to report within 24 hours is likewise not unreasonably burdensome as Smith claims. Op. Br. 16-18. Reporting can be done online concurrently with writing a large check—Smith presented no evidence to suggest

---

[104]    *See Canyon Ferry*, 556 F.3d at 1028 (stating that a vagueness challenge alleges that the law "'fails to provide people of ordinary intelligence a reasonable opportunity to understand' whether their activities require disclosure under the statute'") (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

that donors need additional time to comply.[105] And indeed, keeping the reporting timeframe constant rather than varying it throughout the year simplifies the process for donors: they need not keep track of shifting deadlines, they need only submit an easy online form whenever they write a large political check.

Because Smith has brought a purely facial challenge, any speculation that the State's enforcement agency will apply the donor disclosure law too harshly or broadly—or that problematic cases might arise at the margins—cannot sustain Smith's burden of showing that a "substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[106] The district court did not abuse its discretion in concluding that Smith failed to demonstrate likely success in making this showing.

At bottom, Smith's objection to the donor disclosure law is not that it is redundant, nor that disclosure is difficult, but rather that political spending must be disclosed *at all*: they claim that disclosure is "in conflict with their principles" and "may lead to reprisals against them and their business interests in the current climate of cancel culture." SER-121. But as Justice Scalia once observed, "harsh criticism, short of unlawful action, is a price our people have traditionally been

---

[105]    *See Citizens United*, 558 U.S. at 370 (noting that "modern technology makes disclosures rapid and informative").

[106]    *Americans for Prosperity*, 141 S. Ct. at 2387.

willing to pay for self-governance. Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed."[107] Smith does not have a constitutional right to avoid disclosure absent very specific facts: although the Supreme Court has "left open the possibility of as-applied challenges to disclosure and disclaimer requirements if a threat of retaliation looms," this requires a "reasonable probability" of "threats, harassment, or reprisals" based on a plaintiff's specific circumstances.[108] The Supreme Court has repeatedly rejected such as-applied challenges,[109] and Smith has not even attempted bring one.

This Court should affirm the denial of a preliminary injunction on Count I.

## II. The district court did not err in finding that Smith failed to show likely success on the merits of Count II, the challenge to the disclaimers.

Count II challenges the requirement—in place since 2010—those ads include a "paid for by" disclaimer indicating the entity responsible, its city and

---

[107]   *John Doe No. 1 v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J., concurring).

[108]   *See Gaspee Project*, 13 F.4th at 92.

[109]   *McConnell*, 540 U.S. at 198 (explaining that in *Buckley*, the Court "found no evidence that any party had been exposed to economic reprisals or physical threats as a result of the compelled disclosure," in contrast with a prior case involving disclosure of NAACP membership lists in 1950s Alabama); *Citizens United*, 558 U.S. at 370 (although some amici "point[ed] to recent events in which donors to certain causes were blacklisted, threatened, or otherwise targeted for retaliation," the plaintiff "offered no evidence that its members may face similar threats or reprisals"); *John Doe No. 1*, 561 U.S. at 201-02 (acknowledging that disclosure of names on "controversial" ballot measure petitions might subject signatories to threats, but rejecting a facial challenge because "only modest burdens attend[ed] the disclosure of a typical petition").

principal place of business, and its top three contributors.[110] SER-126-27. It also challenges Ballot Measure 2's provision requiring disclaimers from entities receiving most of their funds from outside Alaska.[111] SER-126. The district court chose the proper tier of scrutiny here as well—consistent with established precedent on political disclaimers—and did not abuse its discretion in applying it, ultimately concluding that Smith failed to show likely success on the merits of Count II. ER-38.

### A. The disclaimers are also subject to exacting—not strict—scrutiny, and further a sufficiently important state interest.

First, Smith is mistaken that strict scrutiny applies to the disclaimers. Op. Br. 22-32. In *Citizens United*, the Supreme Court applied exacting scrutiny to both disclosures and disclaimers.[112] And it did so even though the plaintiff—like Smith—advocated strict scrutiny on the theory that disclaimers are "compelled speech" or "content-based restrictions on political speech."[113] The Court explained that like disclosure requirements, "[d]isclaimer . . . requirements may burden the

---

[110]    *See* AS 15.13.090(a)-(e).

[111]    *See* AS 15.13.090(g).

[112]    *See Citizens United*, 558 U.S. at 366.

[113]    *See* Br. for Appellant, *Citizens United*, 558 U.S. 310 (No. 08-205), 2009 WL 61467 at *43-44 (Jan. 8, 2009) (arguing that "oral and written disclaimers" are "content-based restrictions on political speech" and "compelled speech requirements" subject to strict scrutiny).

ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking."[114]

Smith ignores *Citizens United* and points to cases that either predate *Citizens United* or are not about political disclaimers. Op. Br. 22-32. For example, Smith relies on *ACLU of Nevada v. Heller*,[115] which applied strict scrutiny but predated *Citizens United*.[116] Op. Br. 28-29. This Court has since recognized *Citizens United* as the controlling law on political disclaimers, relying on *Citizens United* to apply exacting scrutiny in both *Yamada v. Snipes* and *Chula Vista Citizens for Jobs & Fair Competition v. Norris*.[117] Smith attempts to distinguish *Chula Vista* on its facts, but ignores *Yamada* entirely. Op. Br. 29-30. Smith also relies on *National Institute of Family & Life Advocates v. Becerra (NIFLA)*, but *NIFLA* was not about

---

[114]    *Citizens United*, 558 U.S. at 366 (cleaned up).

[115]    378 F.3d 979, 991 (9th Cir. 2004).

[116]    *See San Franciscans Supporting Prop B v. Chiu*, Case No. 22-cv-02785-CRB, 2022 WL 1786573, at *4 (N.D. Cal. June 1, 2022) (concluding that *Heller*'s analysis applying strict scrutiny to disclaimers is no longer good law after *Citizens United*), *appeal filed*, Case No. 22-15824 (9th Cir. June 6, 2022).

[117]    *See Yamada*, 786 F.3d at 1202-03 & n.14 (applying exacting scrutiny to a requirement that ads include a disclaimer about candidate approval); *Chula Vista*, 782 F.3d 520, 535–36 (9th Cir. 2015) (en banc) (applying exacting scrutiny to a requirement that an official proponent's name appear on an initiative petition circulated to voters); *see also Montanans for Cmty. Dev. v. Mangan*, 735 Fed. App'x 280, 284 (9th Cir. 2018) (unpublished) (applying exacting scrutiny to "paid-for" attribution requirement for electioneering communications).

political disclaimers.[118] Op. Br. 23-24. It did not discuss, much less overrule, the *Citizens United* holding on political disclaimers.

Smith emphasizes that First Amendment values are especially important in the political context, Op. Br. 25, but that is part of why cases that do not involve political disclaimers—like *NIFLA*—are inapplicable. In the political context, disclaimers may burden speech but they also *further* First Amendment values. As this Court has explained, "[p]roviding information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment."[119] This Court has "frequently reiterated" that in the "cacophony of political communications . . . being able to evaluate who is doing the talking is of great importance."[120]

And that is all political disclaimers do—they tell voters "who is doing the talking."[121] Such disclaimers do not force speakers to "incorporate the government's message" into their speech or "speak the government's own

---

[118]    138 S. Ct. 2361 (2018); *cf. Gaspee Project*, 13 F.4th at 95 ("The election-related context implicated here is alone sufficient to distinguish *NIFLA*.").

[119]    *Human Life*, 624 F.3d at 1005. *See also Buckley*, 424 U.S. at 82 (observing that disclosure is a "reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view").

[120]    *Human Life*, 624 F.3d at 1006 (citation omitted).

[121]    *See id*.

message," they merely require speakers to disclose their identities when speaking to voters. Op. Br. 24, 26. The speaker's identity is not a "message" and does not "change the subject" of the speaker's ads. Op. Br. 27. It conveys no ideological, political, or even substantive content—it just sheds light on the speaker. Including donor information as part of identity disclaimers just prevents entities trying to influence voters from "hiding behind dubious and misleading names" like "'Citizens for Better Medicare' (funded by the pharmaceutical industry)."[122]

This is nothing like the government message that pregnancy centers had to communicate in *NIFLA*, "inform[ing] women how they can obtain state-subsidized abortions," which was "the very practice that [they] are devoted to opposing."[123] Despite Smith's insistence, requiring election advocacy groups to list top donors is in no way "similar to forcing pro-life groups to share information about abortion access." Op. Br. 26. Nor is it like the substantive messages involved in the other compelled speech cases that Smith cites, like *Wooley v. Maynard* (requiring motorists to display the motto "Live Free or Die"),[124] *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston* (requiring parade organizers to

---

[122]  *McConnell*, 540 U.S. at 196-97 (quoting district court decision).

[123]  *Id*. at 2371.

[124]  430 U.S. 705, 713 (1977).

include marchers with gay pride messages),[125] or *Tornillo* (requiring newspapers to publish opposing viewpoints). Op. Br. 22-26. These cases are inapposite.

This Court should not ignore *Citizens United* and *Yamada*, which applied exacting scrutiny to disclaimers. Smith cannot demonstrate likely success on the merits of Count II by contravening precedent.

### B. The donor disclaimer is narrowly tailored.

Smith also failed to demonstrate likely success on the merits of Count II under the correct standard: exacting scrutiny. Courts regularly uphold political disclaimers, and although the disclaimers challenged here have been largely in place since 2010, Smith produced no ads—real or example—to show the district court that they are so especially onerous as to be facially unconstitutional.

The Supreme Court in *Citizens United* upheld disclaimers under exacting scrutiny, recognizing that they "provid[e] the electorate with information," "insure that the voters are fully informed about the person or group who is speaking," and "[a]t the very least . . . avoid confusion by making clear that the ads are not funded by a candidate or political party."[126] Smith attempts to delegitimize this interest by invoking *McIntyre v. Ohio Elections Commission*—in which the Court held that a

---

[125]    515 U.S. 557, 564 (1995).

[126]    558 U.S. at 368 (cleaned up).

lone pamphleteer had the right to remain anonymous[127]—but as the Eleventh

Circuit observed, "*Citizens United* upheld that disclaimer requirement without any

mention of *McIntyre*."[128] Op. Br. 32-33. *Citizens United* also dismissed the

concern—similar to Smith's—that disclaimer "decrease[d] both the quantity and

effectiveness of the group's speech by forcing it to devote four seconds of each

advertisement to the spoken disclaimer."[129] And the Court was unpersuaded by the

argument that the disclaimers would "distort the message" of the ads.[130]

Following this controlling Supreme Court precedent in *Yamada,* this Court

concluded that a Hawaii disclaimer "serves an important governmental interest by

informing the public about who is speaking in favor or against a candidate before

the election and imposes only a modest burden on First Amendment rights,"

explaining that the plaintiff's "arguments to the contrary are all but foreclosed by

*Citizens United*."[131] The Court recognized that the required disclaimer was "closely

---

[127]    *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).

[128]    *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1254 (11th Cir. 2013).

[129]    *Citizens United*, 558 U.S. at 368.

[130]    *See* Br. for Appellant, *Citizens United*, 558 U.S. 310 (No. 08-205), 2009 WL 61467 at *50 (Jan. 8, 2009).

[131]    786 F.3d at 1202.

related to Hawaii's important governmental interest in 'dissemination of information regarding the financing of political messages.'"[132]

The First Circuit in *Gaspee Project* likewise upheld a top-donor disclaimer like Alaska's, rejecting arguments like Smith's.[133] Smith argues that on-ad donor disclaimers are unnecessary because voters can look up donor information online. Op. Br. 33. The *Gaspee Project* plaintiffs similarly argued that an on-ad disclaimer "serves no informational interest and is essentially redundant of the disclosure requirement."[134] But the First Circuit disagreed, explaining that "on-ad donor information is a more efficient tool for a member of the public" that "provides an instantaneous heuristic by which to evaluate generic or uninformative speaker names," and that it "may be more effective in generating discourse that facilitates the ability of the public to make informed choices in the specialized electoral context."[135] Smith objects that "[n]arrow tailoring requires more than a marginal gain in convenience or efficiency," Op. Br. 33, but the State's concern is not about

---

[132]   *Id.*; *see also Miles*, 441 F.3d at 793 ("[W]e believe that there is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way.").

[133]   *Gaspee Project*, 13 F.4th at 90-92.

[134]   *Id.* at 91.

[135]   *Id.*

its own "convenience"—like in *Americans for Prosperity*[136]—but about actually having an informed electorate. The State has no way, other than disclaimers, to get voters this information at the time they are confronted with an ad; disclosures will only be seen after the fact by voters motivated to search for them. As this Court knows, "[p]eople have jobs, families, and other distractions" and "cannot be expected to explore the myriad pressures to which they are regularly subjected."[137]

Like Smith, the *Gaspee Project* plaintiffs also argued that top donor names are "potentially irrelevant information," but the First Circuit explained that "even though the degree of relevancy may vary, the identification of top donors is relevant in all cases."[138] Indeed, without donor information, entities can easily "hid[e] behind dubious and misleading names"[139] that mean nothing to anyone.[140] Smith invokes *Riley v. National Federation of the Blind* to question whether providing relevant information is a sufficiently important interest, but *Riley*—like

---

[136]  *See* 141 S. Ct. at 2387 (explaining that California had multiple alternative ways to investigate fraud and only collected donor information from charities up front for "ease of administration" and "administrative convenience").

[137]  *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1106 (9th Cir. 2003) (quoting *United States v. Harriss*, 347 U.S. 612, 625 (1954)).

[138]  13 F.4th at 91.

[139]  *McConnell*, 540 U.S. at 196-97 (quoting district court decision).

[140]  *Cf. San Franciscans Supporting Prop B v. Chiu*, No. 22-CV-02785-CRB, 2022 WL 1786573, at *5 (N.D. Cal. June 1, 2022) (donor disclaimers "assist[] voters in determining who is speaking, and if that speaker has a 'creative and misleading' name, who is most closely associated with that speaker").

*Americans for Prosperity*—was about regulating charities, not about political disclaimers.[141] Op. Br. 37. *Riley* concluded that in the charity solicitation context, the State's informational interest was "not as weighty as the State asserts,"[142] but in the political context the Supreme Court and this Court have both found the interest informing voters about who is trying to influence them to be crucially important.[143] Unlike in the charity solicitation context, "[p]roviding information to the electorate is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment."[144]

The *Gaspee Project* plaintiffs further argued that a top donor disclaimer "might mislead a viewer either as to the makeup of a speaker's contributor base or as to a donor's endorsement of the message," or "elicit threats or harassment," but the First Circuit noted that "the on-ad donor disclaimer is subject to the same off-ramps that apply to the disclosure requirement."[145] Similarly here, as explained above, donors and recipients can avoid the need to disclose donations not intended

---

[141]     *See* 487 U.S. 781, 795 (1988).

[142]     *Id*. at 798-99.

[143]     *See supra* pp. 23-25.

[144]     *Human Life*, 624 F.3d at 1005.

[145]     13 F.4th at 92.

for independent expenditures (and the corresponding need to include such donors' names in disclaimers) by segregating funds meant for other purposes.[146]

Smith argues that the State's defense of its disclaimer law "lacks any limiting principle," hypothesizing that the State might next require disclaimers including political affiliation or other demographic information about speakers. Op. Br. 34-35. But that is not the law Alaskan voters adopted, and speculation about non-existent laws does not justify a preliminary injunction against this one. These disclaimers do not include any extra information beyond what is already included in the disclosures that Smith does not challenge.

Swimming against the tide of the caselaw upholding political disclaimers, Smith claims that Alaska's disclaimers are "especially onerous" because they "will take up a significant portion of the advertisement." Op. Br. 36. Smith asserts that Alaska's disclaimers "commandeer[] even more speech than the health warning in *American Beverage Association*,"[147] which occupied 20 percent of beverage advertisements. Op. Br. 36-37. But even putting aside the fact that *American Beverage Association* was not about political disclaimers and did not establish a constitutional maximum disclaimer size, Smith produced no evidence—such as

---

[146]   *See supra* pp. 28-29.

[147]   *American Beverage Association v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019).

sample ads—to support these factual assertions. The *American Beverage Association* plaintiffs prevailed because record evidence showed that a disclaimer taking up just 10 percent of ads would have worked just as well as the 20 percent the law required.[148] Here, Smith produced no evidence about how much space Alaska's disclaimers actually occupy in any ads, much less evidence that smaller disclaimers would serve the State's informational interest just as well. Unlike in *American Beverage Association*, Alaska law does not require the disclaimers to be larger than needed: the text need not be printed any larger than necessary for voters to read it, nor read any slower than necessary for voters to hear it.[149]

As the First Circuit observed in *Gaspee Project*, an entity having trouble accommodating disclaimers "could, of course, raise any concerns particular to its circumstances by means of an as-applied challenge."[150] Likewise, Smith can challenge the law as applied to real ads, as other plaintiffs have done.[151] Anyone

---

[148]    *Id*. at 757.

[149]    *See* AS 15.13.090(c), (d), (g) (requiring written disclaimers to be "easily discernible" and spoken ones to be "read in a manner that is easily heard").

[150]    558 U.S. at 367-68.

[151]    *Cf. Yes on Prop B v. City & Cty. of San Francisco*, 440 F. Supp. 3d 1049, 1056 (N.D. Cal. 2020), *appeal dismissed as moot*, 826 F. App'x 648 (9th Cir. 2020) (considering an as-applied challenge to a disclaimer requirement, and noting that "[t]he burden imposed by a given disclaimer will vary depending on the type of disclaimer, relevant advertisement, and various other case-specific factors"); *San Franciscans Supporting Prop B v. Chiu*, No. 22-CV-02785-CRB, 2022 WL 1786573, at *2 (N.D. Cal. June 1, 2022) (considering a renewed as-applied

uncertain about whether their ads comply with the law can ask APOC for an advisory opinion[152] and—if they do not like the answer—bring an as-applied challenge in which the courts will have concrete examples to examine. But facial challenges are "disfavored"[153] and require showing that a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[154] Smith failed to produce evidence that could show that even a *single* application of Alaska's disclaimer law is overly burdensome. This complete lack of evidence cannot meet the standard for a preliminary injunction.

Because Smith has not articulated a meaningful legal distinction between Alaska's top-donor disclaimer and political disclaimers upheld by other courts, nor produced any evidence that Alaska's is especially onerous, the district court did not abuse its discretion in denying a preliminary injunction on this part of Count II.

### C.     The out-of-state disclaimer is narrowly tailored.

Nor did the district court abuse its discretion in denying a preliminary injunction on the other part of Count II, Smith's challenge to the out-of-state disclaimer. This challenge rests on the mistaken premise that this disclaimer is

---

challenge, in which the plaintiffs included "exhibits of their proposed ads with the disclaimers" with their motion for a preliminary injunction).

[152]    *See* AS 15.13.374 (providing that "[a]ny person" can request an advisory opinion).

[153]    *See Wash. State Grange*, 552 U.S. at 450.

[154]    *Americans for Prosperity*, 141 S. Ct. at 2387.

analogous to a limit on nonresident participation in Alaska elections. But it is not. And like the top-donor disclaimer, it is narrowly tailored to the important state interest in informing voters about who is attempting to influence them.

The same "exacting scrutiny" standard applies to the out-of-state disclaimer as to the top-donor disclaimer, and *Citizens United* does not, as Smith has suggested, support applying strict scrutiny. *Citizens United* applied strict scrutiny to a *ban* on speech by corporations but applied exacting scrutiny to disclosures disclaimer because they "do not prevent anyone from speaking."[155] Likewise here, strict scrutiny would apply if the State *banned* out-of-state-funded speech, but it does not apply to disclaimer laws that do not prevent anyone from speaking.

Smith observes that "[o]ut-of-state campaign contribution restrictions are routinely invalidated by courts," including this Court in *Thompson v. Hebdon*.[156] Op. Br. 39-40. But this case is not about "campaign contribution restrictions," out-of-state or otherwise. Contribution limits—unlike disclaimers—must be justified by the interest in preventing quid pro quo corruption,[157] and *Thompson* concluded that this interest did not justify imposing special aggregate limits on nonresident

---

[155]    558 U.S. at 366 (quoting *McConnell*, 540 U.S. at 201).

[156]    909 F.3d 1027, 1040-43 (9th Cir. 2018), *judgment vacated on other grounds*, 140 S. Ct. 348 (2019).

[157]    *Id*. at 1043 ("Campaign contribution limits rise or fall on whether they target quid pro quo corruption or its appearance.").

campaign contributions.[158] But that does not matter here because the State is neither limiting nonresident campaign contributions nor justifying the out-of-state disclaimer as a way to prevent quid pro quo corruption.

Instead, the interest justifying the out-of-state disclaimer is the first important state interest discussed above: having an informed electorate. Smith asserts that the disclaimer is not narrowly tailored to this interest because "one's principal place of business is a poor proxy for one's interest in Alaska's elections." Op. Br. 41. But the disclaimer is not meant to be a "proxy" for an entity's "interest in Alaska elections," but rather simply more information about the identity of the speaker. By passing Ballot Measure 2, Alaska voters decided that they want to know when an election communication is coming from an entity funded mostly from sources located outside Alaska. This information can help voters from being misled when an entity uses a name—like "Families of the Last Frontier"—that implies otherwise. *See* ER-106. Voters may have trouble understanding who an election-influencing entity with an opaque name really is, and this information will assist them. Unlike a campaign contribution limit, a disclaimer including this information does not limit the speech of entities like Families of the Last Frontier, it just tells voters more about where that speech is coming from.

---

[158]     *Id.*

The district court therefore did not abuse its discretion in denying a preliminary injunction on this part of Count II.

## CONCLUSION

For these reasons, the Court should affirm the district court's denial of a preliminary injunction.

Dated: September 16, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

*/s/ Laura Fox*
Laura Fox
Alaska Bar No. 0905015

**STATEMENT OF RELATED CASES (Circuit Rule 28-2.6)**

The State is aware of one pending case about related issues: No. 22-15824,

*San Franciscans Supporting Prop B, et al v. David Chiu, et al*.

The State is not aware of any other related cases pending before this Court.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: September 16, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

*/s/ Laura Fox*
Laura Fox
Attorney for State Appellees
Anne Helzer, et al.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  | No. 22-35612

I am the attorney or self-represented party.

**This brief contains** | 12,320 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |              |.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Laura Fox | **Date** | Sep 15, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

57

# ADDENDUM CONTENTS

**State Statutes**

AS 15.13.052.................................................................................... A-2

AS 15.13.400.................................................................................... A-3

# ADDENDUM

AS § 15.13.052

§ 15.13.052. Independent expenditures; political activities accounts

Currentness

(a) Before making an independent expenditure in support of or in opposition to a candidate or before making an independent expenditure in support of or in opposition to a ballot proposition or question, each person other than an individual, candidate, or nongroup entity with an annual operating budget of $250 or less shall establish a political activities account. The political activities account may be a separate account in the person's general treasury. The political activities account must be administered using generally accepted accounting principles. All funds used by the person to make independent expenditures must be drawn from the person's political activities account.

(b) Records necessary to substantiate that the requirements of (a) of this section have been met must be made available for inspection by the commission.

(c) Each person who has established a political activities account under this section shall preserve all records necessary to substantiate the person's compliance with the requirements of this section for each of the six preceding years.

**Credits**
Added by SLA 2010, ch. 36, § 8, eff. June 2, 2010.

AS § 15.13.052, AK ST § 15.13.052
Current with amendments received through July 9, 2022 of the 2022 Second Regular Session of the 32nd Legislature. Some sections may be more current than others.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Alaska Statutes Annotated
   Title 15. Elections (Refs & Annos)
      Chapter 13. State Election Campaigns (Refs & Annos)

AS § 15.13.400

§ 15.13.400. Definitions

Effective: February 28, 2021

Currentness

In this chapter,

(1) "candidate"

(A) means an individual who files for election to the state legislature, for governor, for lieutenant governor, for municipal office, for retention in judicial office, or for constitutional convention delegate, or who campaigns as a write-in candidate for any of these offices; and

(B) when used in a provision of this chapter that limits or prohibits the donation, solicitation, or acceptance of campaign contributions, or limits or prohibits an expenditure, includes

(i) a candidate's campaign treasurer and a deputy campaign treasurer;

(ii) a member of the candidate's immediate family;

(iii) a person acting as agent for the candidate;

(iv) the candidate's campaign committee; and

(v) a group that makes expenditures or receives contributions with the authorization or consent, express or implied, or under the control, direct or indirect, of the candidate;

(2) "commission" means the Alaska Public Offices Commission;

(3) "communication" means an announcement or advertisement disseminated through print or broadcast media, including radio, television, cable, and satellite, the Internet, or through a mass mailing, excluding those placed by

an individual or nongroup entity and costing $500 or less and those that do not directly or indirectly identify a candidate or proposition, as that term is defined in AS 15.13.065(c);

(4) "contribution"

(A) means a purchase, payment, promise or obligation to pay, loan or loan guarantee, deposit or gift of money, goods, or services for which charge is ordinarily made, and includes the payment by a person other than a candidate or political party, or compensation for the personal services of another person, that is rendered to the candidate or political party, and that is made for the purpose of

(i) influencing the nomination or election of a candidate;

(ii) influencing a ballot proposition or question; or

(iii) supporting or opposing an initiative proposal application filed with the lieutenant governor under AS 15.45.020;

(B) does not include

(i) services provided without compensation by individuals volunteering a portion or all of their time on behalf of a political party, candidate, or ballot proposition or question;

(ii) ordinary hospitality in a home;

(iii) two or fewer mass mailings before each election by each political party describing members of the party running as candidates for public office in that election, which may include photographs, biographies, and information about the candidates;

(iv) the results of a poll limited to issues and not mentioning any candidate, unless the poll was requested by or designed primarily to benefit the candidate;

(v) any communication in the form of a newsletter from a legislator to the legislator's constituents, except a communication expressly advocating the election or defeat of a candidate or a newsletter or material in a newsletter that is clearly only for the private benefit of a legislator or a legislative employee;

(vi) a fundraising list provided without compensation by one candidate or political party to a candidate or political party; or

A-4

(vii) an opportunity to participate in a candidate forum provided to a candidate without compensation to the candidate by another person and for which a candidate is not ordinarily charged;

(5) "dark money" means a contribution whose source or sources, whether from wages, investment income, inheritance, or revenue generated from selling goods or services, is not disclosed to the public; notwithstanding the foregoing, to the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source;

(6) "electioneering communication" means a communication that

(A) directly or indirectly identifies a candidate;

(B) addresses an issue of national, state, or local political importance and attributes a position on that issue to the candidate identified; and

(C) occurs within the 30 days preceding a general or municipal election;

(7) "expenditure"

(A) means a purchase or a transfer of money or anything of value, or promise or agreement to purchase or transfer money or anything of value, incurred or made for the purpose of

(i) influencing the nomination or election of a candidate or of any individual who files for nomination at a later date and becomes a candidate;

(ii) use by a political party;

(iii) the payment by a person other than a candidate or political party of compensation for the personal services of another person that are rendered to a candidate or political party;

(iv) influencing the outcome of a ballot proposition or question; or

(v) supporting or opposing an initiative proposal application filed with the lieutenant governor under AS 15.45.020;

(B) does not include a candidate's filing fee or the cost of preparing reports and statements required by this chapter;

A-5

(C) includes an express communication and an electioneering communication, but does not include an issues communication;

(8) "express communication" means a communication that, when read as a whole and with limited reference to outside events, is susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate;

(9) "group" means

(A) every state and regional executive committee of a political party;

(B) any combination of two or more individuals acting jointly who organize for the principal purpose of influencing the outcome of one or more elections and who take action the major purpose of which is to influence the outcome of an election; a group that makes expenditures or receives contributions with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate shall be considered to be controlled by that candidate; a group whose major purpose is to further the nomination, election, or candidacy of only one individual, or intends to expend more than 50 percent of its money on a single candidate, shall be considered to be controlled by that candidate and its actions done with the candidate's knowledge and consent unless, within 10 days from the date the candidate learns of the existence of the group the candidate files with the commission, on a form provided by the commission, an affidavit that the group is operating without the candidate's control; a group organized for more than one year preceding an election and endorsing candidates for more than one office or more than one political party is presumed not to be controlled by a candidate; however, a group that contributes more than 50 percent of its money to or on behalf of one candidate shall be considered to support only one candidate for purposes of AS 15.13.070, whether or not control of the group has been disclaimed by the candidate; and

(C) any combination of two or more individuals acting jointly who organize for the principal purpose of filing an initiative proposal application under AS 15.45.020 or who file an initiative proposal application under AS 15.45.020;

(10) "immediate family" means the spouse, parent, child, including a stepchild and an adopted child, and sibling of an individual;

(11) "independent expenditure" means an expenditure that is made without the direct or indirect consultation or cooperation with, or at the suggestion or the request of, or with the prior consent of, a candidate, a candidate's campaign treasurer or deputy campaign treasurer, or another person acting as a principal or agent of the candidate;

(12) "individual" means a natural person;

A-6

(13) "issues communication" means a communication that

    (A) directly or indirectly identifies a candidate; and

    (B) addresses an issue of national, state, or local political importance and does not support or oppose a candidate for election to public office;

(14) "nongroup entity" means a person, other than an individual, that takes action the major purpose of which is to influence the outcome of an election, and that

    (A) cannot participate in business activities;

    (B) does not have shareholders who have a claim on corporate earnings; and

    (C) is independent from the influence of business corporations.

(15) "outside-funded entity" means an entity that makes one or more independent expenditures in one or more candidate elections and that, during the previous 12-month period, received more than 50 percent of its aggregate contributions from true sources, or their equivalents, who, at the time of the contribution, resided or had their principal place of business outside Alaska;

(16) "person" has the meaning given in AS 01.10.060, and includes a labor union, nongroup entity, and a group;

(17) "political party" means any group that is a political party under AS 15.80.010 and any subordinate unit of that group if, consistent with the rules or bylaws of the political party, the unit conducts or supports campaign operations in a municipality, neighborhood, house district, or precinct;

(18) "publicly funded entity" means a person, other than an individual, that receives half or more of the money on which it operates during a calendar year from government, including a public corporation;

(19) "true source" means the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services; a person or legal entity who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source; notwithstanding the foregoing, to the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source.

A-7

**Credits**

SLA 1996, ch. 48, § 24; SLA 2000, ch. 21, § 39; SLA 2002, ch. 1, §§ 25, 26; SLA 2002, ch. 3, § 7; 3rd Sp. Sess. 2002, ch. 1, §§ 8, 9; SLA 2003, ch. 108, §§ 18, 19; SLA 2006, ch. 90, § 2, eff. Oct. 11, 2006. Amended by SLA 2010, ch. 73, §§ 7 to 9, eff. Sept. 9, 2010; SLA 2012, ch. 44, § 3, eff. Aug. 22, 2012; SLA 2014, ch. 9, § 4, eff. April 23, 2014; 2020 Ballot Measure No. 2, §§ 16 to 19, eff. Feb. 28, 2021.


AS § 15.13.400, AK ST § 15.13.400

Current with amendments received through July 9, 2022 of the 2022 Second Regular Session of the 32nd Legislature. Some sections may be more current than others.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.